IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION



UNITED STATES OF AMERICA

v.

JODY E. OWENS II,
CHOKWE ANTAR LUMUMBA, and
AARON B. BANKS

**The Grand Jury charges:**

CRIMINAL NO. 3:24cr103DPJ-LGF

18 U.S.C. § 371
18 U.S.C. § 666(a)(2)
18 U.S.C. § 666(a)(1)(B)
18 U.S.C. § 1952(a)(3)
18 U.S.C. §§ 1343, 1346
18 U.S.C. § 1956(a)(1)(B)(i)
18 U.S.C. § 1001
18 U.S.C. § 2

At all times relevant to this Indictment:

## INTRODUCTION

### *Overview*

1.      Beginning on or about October 16, 2023, and continuing through on or about May 23, 2024, **JODY E. OWENS II** ("**OWENS**"), the Hinds County District Attorney, conspired with **CHOKWE ANTAR LUMUMBA** ("**LUMUMBA**"), the Mayor of Jackson, Mississippi; **AARON B. BANKS** ("**BANKS**"), the President of the Jackson City Council; ANGELIQUE LEE ("LEE"), the Vice President of the Jackson City Council; SHERIK MARVE SMITH ("SMITH"), a resident of Hinds County; and others known and unknown, to carry out a bribery scheme to enrich themselves. Specifically, **OWENS**, on behalf of two individuals purporting to be real estate developers from Nashville, Tennessee ("Developer 1" and "Developer 2," collectively "the Developers"), facilitated over $80,000 in bribe payments to **BANKS**, **LUMUMBA**, and LEE in exchange for their agreement to take official action to ensure the approval of the Developers' proposed multi-million-dollar downtown Jackson development project. **OWENS** solicited and accepted at least $115,000 in cash and promises of future financial benefits from the Developers

to use his relationships with **BANKS**, **LUMUMBA**, and LEE to act as an intermediary for the over $80,000 in bribe payments. **OWENS, BANKS, LUMUMBA**, LEE, and SMITH were not aware that, in reality, the Developers were working for the Federal Bureau of Investigation ("FBI").

2.     As part of the scheme, on or about January 11, 2024, **BANKS** solicited a $50,000 bribe in exchange for his future vote(s) in favor of the Developers' proposed development project. On or about February 13, 2024, **BANKS** accepted an initial payment of $10,000 in cash from the Developers via **OWENS**, along with a promise of funding for the employment of a family member and a protective detail service.

3.     As part of the scheme, in or about February and March 2024, in exchange for LEE's future vote(s) in favor of the Developers' proposed development project, **OWENS** and the Developers offered, and LEE accepted, a $10,000 debt repayment, $3,000 in cash, and a shopping trip resulting in approximately $6,000 in luxury goods.

4.     As part of the scheme, in or about March and April of 2024, **LUMUMBA** accepted a bribe payment of $50,000 from the Developers via **OWENS** in the form of five $10,000 campaign-donation checks from various entities and individuals, including **OWENS** and SMITH. **OWENS** used the campaign-donation checks to disguise the true source of the funds, the Developers, in an attempt to avoid scrutiny from the public and law enforcement. And **LUMUMBA** accepted the checks knowing and understanding that the money was from the Developers, and that it was being offered in exchange for official action from **LUMUMBA** in favor of the Developers' proposed development project.

***Background on Relevant Individuals and Entities***

5.     In 2019, **OWENS** was elected as the District Attorney for Hinds County, Mississippi, which includes Jackson, Mississippi. **OWENS** was reelected as District Attorney in November 2023. As District Attorney, **OWENS** was responsible for, among other duties, enforcing criminal laws in Jackson.

6.     **LUMUMBA** was first elected the Mayor of the City of Jackson in 2017. As Mayor, **LUMUMBA** was an agent of the City of Jackson and had the power to put matters, including development projects, before the Jackson City Council for a vote.

7.     **BANKS** was first elected to the City Council in 2017 as Representative of Ward 6 and, until July 2024, was the President of the Jackson City Council. As a member of the City Council, **BANKS** was an agent of the City of Jackson and, among other duties, voted for or against development project proposals put before the City Council.

8.     LEE was first elected to the City Council in 2020 and, until August 2024, was the elected Representative of Ward 2. LEE also served as the Vice President of the Jackson City Council until July 2024. As a member of the City Council, LEE was an agent of the City of Jackson and, among other duties, voted for or against development project proposals put before the City Council.

9.     SMITH was a resident of Hinds County, Mississippi, and an insurance broker. He was also a relative and close associate of **OWENS**.

10.     Developer 1 was a confidential human source ("CHS") employed by the FBI. Developer 1 purported to be a real estate developer from Nashville, Tennessee, seeking to invest in and develop property in downtown Jackson, Mississippi.

11.     Developer 2 was an undercover employee and CHS employed by the FBI. Developer 2 purported to be a real estate developer from Nashville, Tennessee, seeking to invest in and develop property in downtown Jackson, Mississippi.

12.     Witness 1 was an adult resident of Hinds County, Mississippi.

13.     Company A was a limited liability company incorporated in Mississippi with its principal place of business located in downtown Jackson, Mississippi. **OWENS** was listed as the sole manager and registered agent.

14.     Company B was a professional limited liability company registered in Mississippi. **OWENS** was designated as the organizer and a member.

### Federal Funding and the Downtown Development Project

15.     In each of the calendar years of 2023 and 2024, the City of Jackson, Mississippi, received over $10,000 in benefits from the United States government under federal programs involving grants, subsidies, loans, guarantees, insurance, and other forms of assistance. Specifically, the City of Jackson received more than $10,000 from the U.S. Department of Housing and Urban Development ("HUD").

16.     Since approximately 2008, the City of Jackson has sought to develop a 7.75-acre plot of land in downtown Jackson in the vicinity of the Convention Center Complex. The development of this land was key to the revitalization of Jackson's downtown area and would cost potential developers and the city millions of dollars to develop. To facilitate the project, the City of Jackson took out a multi-million-dollar loan from HUD in 2008 via the Section 108 Loan Guarantee Program. As a condition of the loan, the City would then relend the money to potential developers for the purchase and development of the land. Pursuant to the terms of the loan, the City of Jackson has until June 30, 2025, to complete its downtown development project.

17.     In order to complete the downtown development project, the City of Jackson's Department of Planning and Development ("DPD") sought the assistance and partnership of a so-called "Master Developer." Specifically, over the years, the DPD issued multiple Requests for Proposals ("RFP")—solicitations from qualified contractors seeking to serve as a Master Developer—for the downtown development project.

18.     The DPD last issued an RFP for the downtown development project in July 2023. That RFP sought a Master Developer that would transform a parking lot across from the Convention Center into a mixed-use development that included a hotel, parking garage, and community green space. The July 2023 RFP received no responses from qualified developers.

19.     On February 5, 2024, the DPD again sought to recruit developers, but instead of issuing an RFP, the DPD issued a Request for Statement of Qualifications ("RFQ") with a deadline of March 12, 2024. While an RFP requires developers to submit detailed project proposals and bids, an RFQ seeks only developers' credentials and portfolios. Then, after a selection process, the chosen developer submits a proposal in partnership with the DPD. The proposal is ultimately approved or denied by the Jackson City Council.

### OWENS Develops a Scheme to Bribe Jackson Public Officials

20.     In July 2023, Developer 1 visited Company A's place of business in downtown Jackson, which had been recommended to him because of his genuine interest in the products sold at Company A. While at Company A, Developer 1 met Witness 1. After hearing of Developer 1's interest in pursuing real estate development in Jackson, Witness 1 agreed to introduce Developer 1 to individuals he believed could assist Developer 1 with his goals.

21.     On or about August 14, 2023, Witness 1 introduced Developer 1 to **OWENS**, SMITH, and others at Company A. Developer 1 told **OWENS** and the others that he and Developer

2 were interested in potential real estate opportunities in Jackson, Mississippi.

22. On October 9, 2023, through October 11, 2023, **OWENS**, SMITH, and others went on a trip to Nashville via a private jet paid for by the FBI on behalf of the Developers. The purpose of the trip was, in part, to discuss business opportunities in Jackson.

23. **OWENS** was ready, willing, and predisposed to engage in bribery at least as early as October 16, 2023. On that date, **OWENS** told the Developers about his influence in the City of Jackson and the ability to purchase the support of public officials in the City of Jackson. Specifically, **OWENS** told the Developers that he could "give" the Developers the Jackson Redevelopment Authority ("JRA"), a seven-person commission established by the Jackson City Council with authority over certain real property in the City of Jackson. **OWENS** also told the Developers that he and SMITH "own enough of the city" and that he had "a bag of fucking information on all the city councilmen" that allowed him to "get votes approved."

24. During **OWENS's** re-election victory party on November 7, 2023, upon being congratulated by the Developers, **OWENS** responded unprompted that his position as District Attorney was "the part-time job. The full-time job is developing . . . This is the part time job, to get leverage for the full-time job. This is the part time job to get the conversations and the access. Access equals the other shit we're trying to do."

25. The following day, on November 8, 2023, the Developers met with **OWENS**, SMITH, and Witness 1 in the back room of Company A. During that meeting, **OWENS** and SMITH negotiated an upfront payment of $250,000 to be paid to **OWENS**, SMITH, and Witness 1 for their roles in assisting the Developers. **OWENS** and SMITH were to be paid $100,000 each, while Witness 1 was to be paid $50,000.

### *OWENS Accepts $125,000 in Florida to Facilitate the Scheme*

26.     On or about December 13, 2023, **OWENS**, SMITH, and Witness 1 traveled via a private jet paid for by the FBI on behalf of the Developers, to Ft. Lauderdale, Florida, for a meeting with the Developers. That evening, **OWENS** met with the Developers in a private room on a yacht. During the meeting, the Developers asked **OWENS** how he wanted to receive his payment. **OWENS** responded that cash was "easier" and that he had brought a bag on the trip specifically for that purpose. Developer 2 then gave **OWENS** $125,000 in cash to be split by **OWENS** between himself, SMITH, and Witness 1.

27.     After receiving the $125,000, **OWENS** explained his value to the Developers: "I'm not trying to overemphasize this, you guys, but my ability to prosecute people . . . there's only one me. So right now, every police agency comes to us. Everybody needs something. Every file comes to us. Everybody needs something fixed."

### *OWENS Informs the Developers of the Downtown Development RFQ*

28.     On or about January 10, 2024, the Developers met with **OWENS** and SMITH at **OWENS's** private office in Jackson, Mississippi. **OWENS** referred to that office as his "War Room." There, **OWENS** informed the Developers that the City of Jackson would soon issue an RFQ for the downtown development project. The Developers expressed interest in obtaining the downtown development project for themselves and noted their desire to secure the long-term support of the City Council. In response, **OWENS** stated that they would need to avoid paying the City Council members too much money up front. Specifically, **OWENS** stated: "I don't know if you have been around addicts before, right? You can give them a little blow, a little blunt, a little drink. But if you give them a case of whiskey, and you give them a kilo of coke, and you give them a motherfucking pound of weed. They will die."

### OWENS and BANKS Conspire to Solicit a $50,000 Bribe

29.     The next night, on January 11, 2024, the Developers met with **OWENS**, SMITH, and **BANKS** in the back room of Company A. There, **OWENS** had a sidebar conversation with **BANKS** in which **OWENS** told **BANKS** that he would tell the Developers to pay **BANKS** "25 now and 25 later." **OWENS** then dismissed **BANKS** from the table and privately informed the Developers of **BANKS's** demand. While **BANKS** was absent, **OWENS** also stated:

> We never give them the asking price. I buy pussy, I buy cars, I buy cows, I buy drugs, whatever. My point is, like [**BANKS**] need 50, you get 30. He gets installments. That's my game. Some people will overpay and say I'm the guy who needs more and some people will choose who to pay. He wants 50? We'll give him 15 this year and 15 next year.

30.     When **BANKS** rejoined the meeting, Developer 2 asked him what he would need to support the Developers moving forward. **BANKS** responded that "fifty grand as soon as possible would help."

### OWENS Introduces LUMUMBA to the Developers and Refines the Scheme

31.     On February 12, 2024, **OWENS** arranged a dinner for himself, **LUMUMBA**, Smith, and the Developers. During **OWENS's** introduction of the Developers to **LUMUMBA**, **OWENS** stated: "I've done background checks. They're not FBI by the way." **OWENS** also explained to **LUMUMBA** that the Developers "had shifted [their] focus to the RFP/RFQ related to the convention area hotels."

32.     Following dinner, **OWENS**, SMITH, and the Developers went to the back room of Company A's place of business. There, they discussed how they would continue to secure the support of the City Council. Developer 2 expressed concern that they still did not have enough votes secured. In response, **OWENS** stated that the following day, he would get the Developers

three more votes. **OWENS** explained that the Developers already had "the leadership" through **LUMUMBA** and **BANKS**, and that he would next get the Developers "the pawns."

33.     **OWENS** also explained that, because public officials finance their personal lives through their campaign accounts, campaign contributions were the most effective way to influence them, so long as the money came from within the state of Mississippi. To that end, **OWENS** said that to "clean" the money, he planned to deposit all cash provided to him by the Developers into a bank account owned by a Mississippi company. **OWENS** then stated:

> I don't give a shit where the money comes from. It can come from blood diamonds in Africa, I don't give a fucking shit. I'm a whole DA. Fuck that shit. My job, as I understand it, with a little paperwork, is to get this deal done, and get it done most effectively . . . We can take dope boy money, I don't give a shit. But I need to clean it and spread it. I can do it in here. That's why we have businesses. To clean the money. Right? I don't give a shit. You give us cash, we deposit it and give it back that way. That's easy.

### *OWENS Facilitates Bribes to BANKS and LEE*

34.     On February 13, 2024, **OWENS** and the Developers met in the back room of Company A. As previously planned, the Developers gave **OWENS** additional funds, in the amount of $60,000, including $25,000 for **OWENS**, $25,000 for **BANKS**, and $10,000 for LEE. **OWENS** pocketed his share and said that he would store the cash designated for **BANKS** and LEE in a safe at the Hinds County District Attorney's Office.

35.     When **BANKS** arrived in the back room, **OWENS** gave **BANKS** an envelope with $10,000 cash inside and told **BANKS** that the money was from the Developers. **BANKS** and **OWENS** understood that the money was being paid in exchange for **BANKS's** future vote(s) to approve the Developers' proposed development project. **OWENS** then inquired as to whether **BANKS** was "comfortable" walking around with the cash because it was "not a check like we

normally do." **OWENS** told **BANKS** to "do what you need to do, if you need to document some of this, then document it." **BANKS** said that he was going to "break it up."

36.     On the same evening, **BANKS** also accepted employment for a family member and a protective detail service from the Developers. Both were paid for by the Developers through **OWENS** via a Mississippi bank account. Between March and May 2024, the Developers spent approximately $1,500 on **BANKS's** protective detail and $4,800 **BANKS's** family member's employment.

37.     Two days later, on or about February 15, 2024, **OWENS**, using the money from the Developers, paid off $10,000 of LEE's campaign debt via wire transfer from his campaign account. **OWENS** later sent the Developers proof of the payment via text message. **OWENS** and LEE understood that the debt payment was in exchange for LEE's future vote(s) to approve the Developers' proposed development project.

### *OWENS's Plans for Future Bribes*

38.     On or about February 28, 2024, **OWENS**, SMITH, and the Developers met again at the War Room. During the meeting, **OWENS** explained that to ensure LEE's votes at the various stages of the development project, they could pay LEE $5,000 every month from **OWENS's** campaign account.

39.     At another point in the meeting, Developer 2 asked **OWENS** and SMITH "why do we need [**LUMUMBA**]?" SMITH responded that **LUMUMBA** "could make things a lot harder." Later on in the conversation, **OWENS** informed the Developers that **LUMUMBA** had agreed to take a trip to Florida with the Developers. He further stated that it was important for the Developers to get **LUMUMBA** on their side because **LUMUMBA** could "do damage" to the Developers' proposed development project throughout the RFQ and permitting processes by "mak[ing] it

difficult."

40.  **OWENS** then warned the Developers that they needed to be wary of attracting the attention of law enforcement and appearing like they were bribing public officials:

> **OWENS**: Here's the thing, there is a very thin line from the appearances of you guys being federal agents. Right? There is a guy named Louis Armstrong. Louis Armstrong, right when [telecommunications company] first came to the City Council, they first came into Mississippi, you remember this?[1]
>
> **SMITH**: Mm-hmm. I do.
>
> **OWENS**: They came in and were everybody's friends. They got a huge contract. And, somehow, they were able to show that Louis got something, right? So, we got to stay away from the "b-word." Fund is not the "b-word." The "b-word" is a bad word. We don't even say it. Right? You know what the "b-word" is, right?

41.  **OWENS** then explained that while he still had $15,000 set aside for **BANKS**, he and the Developers should either keep the money for the time being or use it to pay LEE, who they would be meeting that night. **OWENS** said that if they paid LEE, they would need to "clean it out like we always do, we'll put it in a campaign account, or directly wire it, you can wire it to the bank too, or I can handle that in increments like we've been doing it." **OWENS** further stated that he had wired LEE's prior debt payment directly to the owner of her debt "because that's the only way I want the paper trail to look. Because, here's the thing, at the end of the fucking day, my most important job is to keep everybody out of jail or prison, because I'm not fucking going."

42.  **OWENS** then took an additional $10,000 in cash from the Developers and put that money into a bag he had brought with him for that purpose. **OWENS** explained that the money would fund the Mississippi business account that he was creating for the Developers to conceal future payments to officials.

---

[1] A Jackson City Council member Louis E. Armstrong was convicted in the United States District Court for the Southern District of Mississippi in 1999 for extortion and bribery.

43.     That evening, **OWENS** and the Developers met in the back room of Company A's place of business. They discussed the future trip to Florida with **LUMUMBA**, and **OWENS** laid out the plan to buy **LUMUMBA's** support. Specifically, **OWENS** explained that because **LUMUMBA** would not take cash directly from the Developers, the Developers would need to give **OWENS** between $50,000 and $100,000 so that **OWENS** could deposit the cash and get "campaign contribution" checks with those funds from third parties in Mississippi. **OWENS** emphasized that if the Developers gave **LUMUMBA** $100,000 in cash, "then everybody goes to jail because we gave over five thousand cash." **OWENS** went on to say that he kept the money given to him by the Developers in a safe at the District Attorney's Office mixed in with "dope money and drug money and more than a million dollars." **OWENS** made clear that he did not keep large amounts of cash at home because that money could be directly linked to him, while money kept mixed in with other funds in the District Attorney's Office safe could not be:

> Because if someone comes in my motherfucking safe it's a million dollars in cash, it's a million dollars. You know what, if they come to my house, it reads like this "DA Owens had twenty grand in cash." The regular people who vote for me, who give me $10 or a $100 they can't count that much money. But guess what, in my safe at my DA office I got a million dollars in cash, guess what, your fucking ten grand don't matter, your fifteen grand it don't matter, I got a million dollars there. But guess what, at my house it matters.

### The RFQ Deadline and Planning for the Trip with LUMUMBA

44.     On or about March 5, 2024, **OWENS** and Developer 1 met in **OWENS's** office at the Hinds County District Attorney's Office. During that meeting, they discussed the fact that the submission deadline for the downtown development project RFQ was extended from March 12, 2024, to April 30, 2024, to allow for additional submissions. **OWENS** also had multiple calls with a city employee, which he put on speaker phone for Developer 1 to hear. In those calls, he expressed his dissatisfaction with the extended deadline and his concern that others aside from the

Developers would bid for downtown development project.

45. During the same meeting, **OWENS** and Developer 1 discussed the impending trip to Florida with **LUMUMBA**. **OWENS** said that he would discuss with **LUMUMBA** the way in which **LUMUMBA** would "feel most comfortable" with receiving money from the Developers.

46. After the meeting, **OWENS** texted **LUMUMBA** the following:

Two things to chat about: when you have a moment. They came into town to submit their proposal but learned the deadline had been adjusted another 45 days presumably because no one else had applied.

Need to understand how to donate to your reelection campaign in a size able way that is most appropriate. Don't know if you have a PAC or when you are planning to or if we can through [sic] you a private fundraiser.

47. Later that day, **OWENS** and Developer 1 met again. **OWENS** informed Developer 1 that he had texted with **LUMUMBA**, that **LUMUMBA** was interested in taking the trip to Florida, and that **LUMUMBA** was aware of the Developers' desire to move the RFQ submission deadline up. **OWENS** said that they would hold a "fundraiser" in Florida, and that they could either have "ten guys with ten checks" for **LUMUMBA** or **OWENS** could give **LUMUMBA** ten checks in one envelope. **OWENS** went on to tell Developer 1, "what we used to do, if people wanted to stay under the radar, you just give a bunch of different checks from a bunch of different companies."

48. Between on or about March 7, 2024, and March 9, 2024, **OWENS** and **LUMUMBA** spoke on the phone and exchanged texts regarding dates for the Florida trip. On the evening of March 9, 2024, **OWENS** texted **LUMUMBA**, stating that he was "outside."

49. On March 10, 2024, **OWENS** called Developer 1 to inform him that he had met with **LUMUMBA** the previous evening at **LUMUMBA's** house, that everyone was "on one accord," and that they would give **LUMUMBA** $50,000 at a "fundraiser" in Florida. To avoid

scrutiny, **OWENS** said that the plan was to split up the $50,000 he received from the Developers into checks of $5,000 or $10,000. **OWENS** also said that he had assured **LUMUMBA** that the $50,000 was just the beginning, and that **LUMUMBA's** "final number" was $100,000. **OWENS** and **LUMUMBA** understood that the Developers were paying **LUMUMBA** in exchange for **LUMUMBA** taking official action to assist the Developers' in obtaining approval of their proposed development project.

50.     On or about March 19, 2024, **OWENS** opened a Mississippi bank account in the name of the Developers' company for, at least in part, the purpose of funneling and concealing future bribe payments to public officials.

51.     On or about March 22, 2024, **OWENS** and **LUMUMBA** exchanged texts to set up a meeting. Prior to the meeting, Developer 1 and **OWENS** spoke on the phone. During the call, **OWENS** stated that he and **LUMUMBA** had discussed the plan to split up the money into checks the night prior, and that he and **LUMUMBA** were set to meet that afternoon to discuss specifics. **LUMUMBA** and **OWENS** exchanged text messages following that call, including one from **LUMUMBA** to **OWENS** stating, "on the way."

*OWENS Orchestrates Additional Bribes for LEE*

52.     On or about March 27, 2024, **OWENS** planned a dinner meeting for himself, LEE, the Developers, and others. **OWENS** organized the seating so that LEE was seated next to Developer 1. As previously planned by **OWENS** and the Developers, following dinner, LEE accepted a bag containing $3,000 in cash from Developer 2, along with an offer to go shopping with Developer 2's credit card. LEE accepted those benefits in exchange for her future vote(s) to support the Developers' proposed development project. The following day, LEE spent more than $6,000 on luxury goods using Developer 2's credit card.

### *BANKS Confirms Allegiance to the Developers*

53.     On March 28, 2024, **BANKS**, **OWENS**, SMITH, and the Developers met in the back room of Company A. During this meeting, the group discussed the RFQ submission deadline. **BANKS** stated that he was working to move the submission deadline back up and that, given his position, he could threaten to hold up the salary raises of city employees in order to achieve the Developers' ends. **BANKS** also assured the Developers that he would "make sure" they got the votes of certain council members.

### *OWENS Orchestrates LUMUMBA's Bribe Payment*

54.     On or about March 27 and 28, 2024, after the Developers delivered $50,000 in cash to **OWENS** at the Hinds Country District Attorney's Office, **OWENS** converted that money into five $10,000 "campaign contribution" checks from SMITH, **OWENS**, Company B, and two other associates of **OWENS**. **OWENS** reimbursed SMITH and the two associates in full.

55.     On April 2, 2024, **OWENS**, **LUMUMBA**, SMITH, and the Developers traveled to Ft. Lauderdale, Florida via a private jet paid for by the FBI on behalf of the Developers. That same day, **OWENS** and **LUMUMBA** met with the Developers in a private room on a yacht. That meeting was audio and video recorded. The following exchange was captured:

**OWENS:** We want to be very mindful of out-of-state money.

**LUMUMBA**: Yeah.

**OWENS**: So what this team did was give us the money, being me, and we just filtered it through several accounts in a way we comfortable doing.

**LUMUMBA**: Yeah.

**OWENS**: So we did five $10,000 checks to make it very simple, and then when we get past the process, to our second phase, maybe in Jackson, maybe somewhere else . . . we'll do something similar.

**LUMUMBA**: Yeah.

**OWENS**: -- to make sure there's no worries about you financially in this thing cause you're as big part of this thing as anybody.

56.    Developer 1 then asked **LUMUMBA** to have the RFQ submission deadline moved up from April 30, 2024, to April 10 or 15, 2024. **LUMUMBA** then placed a telephone call to a city employee in which he directed the city employee to move the RFQ submission deadline to April 15, 2024:



57.    Later in the discussion, Developer 2 handed five $10,000 checks to **LUMUMBA** in an envelope. **OWENS** then stated: "These checks are Mississippi checks but they're from this group." **LUMUMBA** stated: "Okay."



58.     **OWENS** and **LUMUMBA** understood that the money from the Developers was in exchange for **LUMUMBA** directing his subordinate to move the RFQ submission deadline up. **OWENS** and **LUMUMBA** also understood that the change in the RFQ deadline was worth more than $5,000 given the resulting likelihood of elimination of competition for the Developers' desired development project and given the Developers' agreement to pay **LUMUMBA** $50,000 to move up the deadline and to pay him an additional $50,000 in the future.

59.     Developer 2 then directly asked **LUMUMBA** whether the RFQ submission deadline would in fact be moved up. **LUMUMBA** then checked his text messages and informed the Developers that the city employee he had called had confirmed that the RFQ submission deadline would be moved.

60.     Later that same day, **OWENS** had a separate discussion with the Developers and accepted an additional $50,000 in cash contained in a bag from Developer 2 for his services. **OWENS** removed the cash from the bag and put it in his pockets:



61.     During the evening of April 2, 2024, as planned by **OWENS** and as agreed by **LUMUMBA** in advance of the trip to Florida, **OWENS**, **LUMUMBA**, the Developers, and others went to a local club. Before heading to the club, **OWENS** directed the Developers to make cash available for **LUMUMBA's** use at the club. Pursuant to **OWENS's** instruction, Developer 2 made $5,000 cash available for **LUMUMBA** and others' use at the club. While at the club, **LUMUMBA** also directed Developer 2 to pay cash to employees of the club for **LUMUMBA's** benefit.

62.     Following **LUMUMBA's** return to Jackson, Mississippi, on or about April 4, 2024, the five $10,000 checks **LUMUMBA** received on April 2, 2024, from Developer 2 were deposited into **LUMUMBA's** campaign bank account. Prior to that deposit, the account's balance was approximately $465.30.

63.     On or about April 5, 2024, a check in the amount of $9,500 was made payable to **LUMUMBA** from his campaign account. On or about April 8, 2024, a check in the amount of $5,000 was made payable to **LUMUMBA** from his campaign account. Both checks were ultimately cashed.

***Partial Recovery of Funds Paid to OWENS***

64.     Between February and April 2024, **OWENS** made numerous cash deposits at banks around Hinds County, Mississippi. Approximately $18,000 of those deposits consisted of money paid to **OWENS** by the Developers. The FBI identified the money via serial numbers.

65.     On May 22, 2024, pursuant to a judicially authorized search warrant, the FBI conducted a search of **OWENS's** office at the Hinds County District Attorney's Office. The search revealed a small lockbox made to appear like a book bearing the title "The Constitution of the United States of America." The FBI discovered approximately $20,000 in cash within the container, approximately $9,900 of which was confirmed via serial numbers to be the cash paid to **OWENS** by the Developers on December 13, 2023.[2]



---

[2] The FBI recovered no other safes or lockboxes from OWENS's office at the Hinds County District Attorney's Office.



**Count One**
**Conspiracy**
**(18 U.S.C. § 371)**

66.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

67.     Beginning no later than October 2023, and continuing until at least May 23, 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendants, **JODY E. OWENS II**, **AARON B. BANKS**, and **CHOKWE ANTAR LUMUMBA**, together with ANGELIQUE LEE, SHERIK MARVE SMITH, and others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other, to commit the following offenses against the United States:

        a.      For the Developers, through **OWENS** and SMITH, to corruptly give, offer, and agree to give things of value, that is $10,000 in cash and other benefits to **BANKS**; approximately $19,000 in cash and other benefits to LEE; and $50,000 in campaign contributions to **LUMUMBA**, with the intent to influence **BANKS**, **LUMUMBA**, and LEE in connection with

any business, transaction, and series of transactions of the City of Jackson, Mississippi, valued at $5,000 or more, to wit: **BANKS's** and LEE's votes to approve and support the Developers' proposed development project, and **LUMUMBA's** direction of a City of Jackson employee to shorten the RFQ submission deadline to benefit the Developers, in violation of Title 18, United States Code, Section 666(a)(2).

      b.    For **BANKS**, **LUMUMBA**, and LEE, agents of the City of Jackson, Mississippi, to corruptly solicit, demand, accept, and agree to receive and accept anything of value—that is cash, campaign contributions, and other benefits—from the Developers via **OWENS**, in exchange for being influenced in connection with any business, transaction, and series of transactions of the City of Jackson, Mississippi, valued at $5,000 or more, to wit: LEE's and **BANKS's** votes to approve the Developers' proposed development project and **LUMUMBA's** direction of a City of Jackson employee to shorten the RFQ submission deadline to benefit the Developers, in violation of Title 18, United States Code, Section 666(a)(1)(B).

      c.    For **OWENS** and **LUMUMBA** to devise and intend to devise a scheme and artifice to defraud and deprive, by means of material false and fraudulent pretenses, representations, and promises, the citizens of Jackson, Mississippi, of their right to the honest services of **LUMUMBA**, the Mayor of the City of Jackson, through bribery to influence **LUMUMBA's** official acts and to induce him to do acts in violation of his official duty, and to knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

d.  For **OWENS** and **LUMUMBA**, knowing the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to knowingly conduct and attempt to conduct a financial transaction which in fact involved the proceeds of a specific unlawful activity, that is federal program bribery, in violation of Title 18, United States Code, Sections 666(a)(2) and 666(a)(1)(B), and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, knowing the transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Object of the Conspiracy

68.  It was the object of the conspiracy for **OWENS** and SMITH to enrich themselves by facilitating and executing a bribery scheme on behalf of the Developers.

69.  It was a further object of the conspiracy for **BANKS**, **LUMUMBA**, and LEE to use their official positions in the government of the City of Jackson to benefit and enrich themselves through bribery.

70.  It was a further object of the conspiracy for **OWENS** and **LUMUMBA** to defraud and deprive, by means of material and false pretenses, representations, and promises, the citizens of Jackson, Mississippi, of their right to the honest services of **LUMUMBA**, the Mayor of the City of Jackson, through bribery.

71.  It was a further object of the conspiracy to conceal **OWENS**, **BANKS**, **LUMUMBA**, SMITH, and LEE's unlawful activities from the public and law enforcement.

## Manner and Means of the Conspiracy

72.    The manner and means by which the defendants carried out the conspiracy included, but were not limited to, the following:

a.    In exchange for his own financial gain, **OWENS**, with assistance from SMITH, used his connections as an official of Hinds County to connect the Developers with public officials whom **OWENS** believed would be ready, willing, open, and predisposed to an opportunity to receive bribes, namely **BANKS**, **LUMUMBA**, and LEE.

b.    **OWENS**, on behalf of the Developers, negotiated, offered, and organized bribe payments of: (1) $10,000 in cash, a protective detail service, and a family member's employment for **BANKS**; (2) $50,000 in campaign contributions for **LUMUMBA**; and (3) approximately $19,000 in debt payment, cash, and shopping for luxury goods for LEE.

c.    **BANKS** and LEE solicited and accepted the aforementioned bribes in exchange for their votes in support of the Developers' proposed development project.

d.    **LUMUMBA** solicited and accepted the aforementioned bribes in exchange for shortening the RFQ deadline to ensure that the Developers' proposed development project would be selected.

e.    **OWENS** and **LUMUMBA** concealed the $50,000 bribe payment to **LUMUMBA** from the public, the United States, and law-enforcement authorities by, among other things, funneling the bribe payment through third-party individuals and entities. **LUMUMBA** further concealed the bribe payment by depositing the $50,000 into his campaign account.

<u>Overt Acts in Furtherance of the Conspiracy</u>

73.    In furtherance of the conspiracy, and to effect its illegal objects, the following overt acts, among others, were committed and caused to be committed in the Southern District of Mississippi and elsewhere:

a.    On December 13, 2023, **OWENS** accepted approximately $125,000 in cash from the Developers to facilitate the bribery scheme.

b.    On January 11, 2024, **OWENS** and **BANKS** determined that the price for **BANKS's** support of and vote(s) for the Developers' proposed development project would be $50,000 and communicated that price to the Developers.

c.    On February 13, 2024, **OWENS** offered, and **BANKS** accepted, $10,000 from the Developers in exchange for **BANKS's** future vote(s) in support of the Developers' proposed development project.

f.    On February 15, 2024, **OWENS** paid off $10,000 of LEE's campaign debt with funds from the Developers in exchange for LEE's future vote(s) in support of the Developers' proposed development project.

g.    Between March 24, 2024, and April 1, 2024, **OWENS** converted $50,000 in cash he received from the Developers for **LUMUMBA's** bribe payment into five $10,000 campaign-contribution checks from third parties, including SMITH.

h.    On April 2, 2024, at a sham campaign fundraiser for **LUMUMBA**, **OWENS** delivered the five $10,000 checks to **LUMUMBA** in exchange for **LUMUMBA's** official acts in favor of the Developers, including shortening the RFQ submission deadline.

i.    On April 2, 2024, during a meeting between **OWENS**, **LUMUMBA**, and the Developers on a yacht in Florida, and contemporaneous to **LUMUMBA** receiving the five

$10,000 checks, **LUMUMBA** called a City of Jackson employee, who was in Jackson, Mississippi, and instructed that employee to move the RFQ submission deadline from April 30, 2024, to April 15, 2024, to benefit the Developers, causing wire transmissions in interstate commerce.

j.      On April 4, 2024, **LUMUMBA** caused five $10,000 checks to be deposited into **LUMUMBA's** campaign account.

k.      On April 5, 2024, a check in the amount of $9,500 was made payable to **LUMUMBA** from his campaign account.

l.      On April 8, 2024, a check in the amount of $5,000 was made payable to **LUMUMBA** from his campaign account.

All in violation Title 18, United States Code, Section 371.

**Count Two**
**Federal Program Bribery**
**(18 U.S.C. § 666(a)(2))**

74.      The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

75.      In or about January 2024 through March 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **JODY E. OWENS II**, did corruptly give, offer, and agree to give things of value, that is $10,000 in cash and other things of value to **AARON B. BANKS**, the President of the Jackson City Council, with the intent of influencing and rewarding **BANKS** in connection with any business, transaction, and series of transactions of the City of Jackson, Mississippi, valued at $5,000 or more, to wit: **BANKS's** vote(s) in support of the Developers' proposed development project.

All in violation of Title 18, United States Code, Section 666(a)(2).

## Count Three
## Federal Program Bribery
## (18 U.S.C. § 666(a)(1)(B))

76.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

77.     In or about January 2024 through February 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **AARON B. BANKS**, the President of the Jackson City Council, corruptly solicited and demanded for his own benefit and accepted and agreed to accept things of value from **JODY E. OWENS II** and the Developers, that is $10,000 in cash and other things of value, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of the City of Jackson, Mississippi, valued at $5,000 or more, to wit: **BANKS's** vote(s) in support of the Developers' proposed development project.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## Count Four
## Federal Program Bribery
## (18 U.S.C. § 666(a)(2))

78.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

79.     In or about February 2024 through April 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **JODY E. OWENS II**, did corruptly give, offer, and agree to give things of value, that is $50,000 in campaign contributions, to **CHOKWE ANTAR LUMUMBA** with the intent of influencing and rewarding **LUMUMBA** in connection with any business, transaction, and series of transactions in Jackson, Mississippi,

valued at $5,000 or more, to wit: **LUMUMBA's** direction to a City of Jackson employee to shorten the RFQ submission deadline for the downtown development project to benefit the Developers.

All in violation of Title 18, United States Code, Section 666(a)(2).

### Count 5
### Federal Program Bribery
### (18 U.S.C. § 666(a)(1)(B))

80.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

81.     In or about February 2024 through April 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **CHOKWE ANTAR LUMUMBA**, corruptly solicited and demanded for his own benefit and accepted and agreed to accept things of value from **JODY E. OWENS II** and the Developers, that is $50,000 in campaign contributions, intending to be influenced and rewarded in connection with a business, transaction, and series of transactions of Jackson, Mississippi, valued at $5,000 or more, to wit: **LUMUMBA's** direction to a City of Jackson employee to shorten the RFQ submission deadline to benefit the Developers.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

### Count 6
### Federal Program Bribery
### (18 U.S.C. § 666(a)(2))

82.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

83.     In or about February 2024 through March 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **JODY E. OWENS II**, did corruptly give, offer, and agree to give things of value, that is, cash and other things of value, to ANGELIQUE LEE, with the intent of influencing and rewarding LEE in connection with any

27

business, transaction, and series of transactions in Jackson, Mississippi, valued at $5,000 or more, to wit: LEE's vote(s) in support of the Developers' proposed development project.

All in violation of Title 18, United States Code, Section 666(a)(2).

### Count 7
### Use of an Interstate Facility in Aid of Racketeering – Travel Act
### (18 U.S.C. § 1952(a)(3))

84.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

85.     On or about April 2, 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **CHOKWE ANTAR LUMUMBA**, knowingly and intentionally used and caused to be used a facility in interstate commerce, namely a telephone, a wire, and electronic communication, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is bribery, in violation of Miss. Code Ann. § 97-11-13, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of the above unlawful activity.

All in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

### Count 8
### Use of an Interstate Facility in Aid of Racketeering – Travel Act
### (18 U.S.C. § 1952(a)(3))

86.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

87.     In or about March 2024 through April 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **JODY E. OWENS II**, knowingly and intentionally used and caused to be used a facility in interstate and foreign commerce, namely

a telephone, a wire, and electronic communication, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, that is bribery, in violation of Miss. Code Ann. § 97-11-11, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on, and to facilitate the promotion, management, establishment, and carrying on of the above unlawful activity.

All in violation of Title 18, United States Code, Sections 1952(a)(3) and 2.

### Count 9
### Honest Services Wire Fraud
### (18 U.S.C. §§ 1343, 1346, and 2)

88.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

89.     Beginning no later than March 2024 and continuing until at least April 2024, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendants, **CHOKWE ANTAR LUMUMBA** and **JODY E. OWENS II**, aiding and abetting each other, devised and intended to devise a scheme and artifice to defraud and deprive, by means of material and false pretenses, representations, and promises, the citizens of Jackson, Mississippi, of their right to the honest services of **LUMUMBA**, the Mayor of the City of Jackson, through bribery.

90.     During an April 2, 2024, meeting between **OWENS**, **LUMUMBA**, and the Developers on a yacht in Florida, and contemporaneous to **LUMUMBA** receiving five $10,000 checks from third parties, **LUMUMBA**, for the purpose of executing the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communications in and affecting interstate commerce writings, signs, signals, pictures, and sounds, to wit: **LUMUMBA** called a City of Jackson employee who was in Jackson, Mississippi, and instructed that employee to shorten the RFQ submission deadline to benefit the Developers.

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## Count 10
## Money Laundering
## (18 U.S.C. § 1956(a)(1)(B)(i))

91.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

92.     On or about April 2, 2024 through April 9, 2024, in the Northern Division of the Southern District of Mississippi, and elsewhere, the defendants, **JODY E. OWENS II** and **CHOKWE ANTAR LUMUMBA**, aiding and abetting each other, did knowingly conduct and attempt to conduct a financial transaction, to wit: the deposit of $50,000 in campaign contributions, knowing that the $50,000 represented the proceeds of some form of unlawful activity, which in fact involved the proceeds of a specified unlawful activity, that is, federal program bribery, in violation of Title 18, United States Code, Sections 666(a)(2) and 666(a)(1)(B), and honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346, with the transaction affecting interstate commerce, and knowing that the transaction was designed in whole and in part to conceal and disguise the source of the proceeds of said specified unlawful activity, and knowing the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## Count 11
## False Statements
## (18 U.S.C. § 1001)

93.     The allegations contained in paragraphs 1 through 65 of this Indictment are realleged and incorporated in this Count as if fully set forth herein.

94.    On or about May 22, 2024, in Hinds County, in the Northern Division of the Southern District of Mississippi and elsewhere, the defendant, **JODY E. OWENS II**, willfully and knowingly made and caused to be made a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of a department or agency of the United States, namely the Federal Bureau of Investigation, when, in an interview with the Federal Bureau of Investigation in Jackson, Mississippi, he was asked whether there were any safes or lockboxes in his office at the Hinds County District Attorney's Office and falsely responded that "none exist," even though **OWENS** knew that he had a lockbox or safe in his office at the Hinds County District Attorney's Office.

All in violation of Title 18, United States Code, Section 1001(a)(2).

[LEFT INTENTIONALLY BLANK]

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

As a result of committing the offenses as alleged in this Indictment, the defendant shall forfeit to the United States all property involved in or traceable to property involved in the offenses, including but not limited to all proceeds obtained directly or indirectly from the offenses, and all property used to facilitate the offenses. Further, if any property described above, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property, which cannot be divided without difficulty, then it is the intent of the United States to seek a judgment of forfeiture of any other property of the defendant, up to the value of the property described in this notice or any bill of particulars supporting it.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title 28, United States Code, Section 2461.

TODD W. GEE
United States Attorney

COREY R. AMUNDSON
Chief, Public Integrity Section
U.S. Department of Justice

A TRUE BILL:
S/SIGNATURE REDACTED
Foreperson of the Grand Jury

This Indictment was returned in open court by the foreperson or deputy foreperson of the Grand Jury on this the 23rd day of October 2024.

UNITED STATES MAGISTRATE JUDGE

32