

UNITED STATES DEPARTMENT OF JUSTICE


UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF MISSISSIPPI
GULFPORT DIVISION


FEDERAL GRAND JURY
DANIEL M. RUSSELL JR. UNITED STATES COURTHOUSE
2012 FIFTEENTH STREET
SUITE 403
GULFPORT, MISSISSIPPI 39501


TESTIMONY OF
LAWRENCE ANDREW CORRELL, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


WEDNESDAY, OCTOBER 23, 2024
2:30 P.M.

DOJ-0000044384

1                   **APPEARANCES**

2    **ON BEHALF OF THE DEPARTMENT OF JUSTICE:**

3    NICHOLAS CANNON, TRIAL ATTORNEY

4    **UNITED STATES ATTORNEY'S OFFICE**

5    501 EAST COURT STREET

6    JACKSON, MISSISSIPPI 39201

7    TELEPHONE: 601.874.2132

8    FACSIMILE: 601.965.4035

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                           INDEX

 2                                           Page

 3

 4  DIRECT EXAMINATION BY MR. CANNON          4

 5

 6

 7                        EXHIBITS

 8

 9  Exhibit                                   Page

10

11     1      Exhibit 1                       7

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```


County
COURT REPORTERS, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE   •   540.667.0600 LOCAL   •   540.667.6562 FAX   •   CountyCourtReporters.com

DOJ-0000044386

1        **FEDERAL GRAND JURY**

2        **WEDNESDAY, OCTOBER 23, 2024**

3                **2:30 P.M.**

4                **FOREPERSON:**  Do you solemnly swear

5    that the testimony you're about to share with

6    this grand jury will be the truth, the whole

7    truth, and nothing but the truth so help you God?

8                **WITNESS:**  I do.

9                **FOREPERSON:**  Thank you.  You may

10   be seated.

11   **FBI SPECIAL AGENT LAWRENCE ANDREW CORRELL,** having

12   been duly sworn by the FOREPERSON, was examined

13   and testified as follows:

14   **DIRECT EXAMINATION**

15   **BY MR. CANNON:**

16       Q.   **Good afternoon, sir.**

17       A.   Good afternoon.

18       Q.   **Can you please state your name and**

19   **spell it for the court reporter, please?**

20       A.   My name is Lawrence Andrew Correll.

21   Lawrence is L-A-W-R-E-N-C-E.  Andrew is A-N-D-R-

22   E-W.  And Correll is C-O-R-R-E-L-L.

23       Q.   **And who are you employed by, sir?**

24       A.   The Federal Bureau of Investigation.

25       Q.   **And what is your title with the Federal**



1  Bureau of Investigation, FBI?

2      A.    I'm a special agent.

3      Q.    And how long have you been a special

4  agent with the FBI?

5      A.    Approximately eight years.

6      Q.    And where are you currently working

7  out?  What city?

8      A.    Jackson, Mississippi.

9      Q.    And what group are you in at the FBI in

10 Jackson?

11     A.    I work, I investigate public

12 corruption.

13     Q.    All right.  And what kind of offenses

14 do you investigate as part of a public

15 corruption, as part of being in the public

16 corruption group?

17     A.    Those offenses would include bribery,

18 false statement, extortion, wire fraud, those

19 types of things.

20     Q.    All right.  And were you one of the

21 case agents involved in an investigation in the

22 city of Jackson related to the bribery of certain

23 public officials there?

24     A.    Yes.

25     Q.    And did this investigation ultimately



1  lead to the guilty plea of Councilwoman Angelique

2  Lee?

3       A.   Yes.

4       Q.   And also led to the guilty plea of a

5  co-conspirator, Marve Smith; is that right?

6       A.   Yes.

7       Q.   And this is the same investigation that

8  is the subject of why you're here today, which is

9  in regards to Mr. Aaron Banks, Mr. Jody Owens,

10 and Mr. Chokwe Lumumba?

11      A.   Yes.

12      Q.   All right.  And have you read through

13 the proposed indictment that is being presented

14 to the grand jury today?

15      A.   Yes.

16      Q.   And is everything as far as you know

17 today accurate in that proposed indictment?

18      A.   It is.

19      Q.   All right.  In addition to reading

20 through that proposed indictment, did you also

21 prepare with the assistance of the attorneys,

22 myself included, in this case a grand jury

23 presentation that kind of walks through the

24 course of this investigation?

25      A.   I did.  Yes.



1      Q.    And it should be up on the screen.    I

2  think you can see it.

3      A.    I can.

4      Q.    Is this your grand jury presentation?

5  (WHEREUPON, no audible response.)

6              MR. CANNON:    We will mark this as

7  an exhibit, ladies and gentlemen, so that'll be

8  part of the record.    It'll be Grand Jury Exhibit-

9  1 for Special Agent Correll.

10  (WHEREUPON, the WITNESS examined Grand Jury

11  Exhibit-1 for identification.)

12  CONTINUATION OF DIRECT EXAMINATION

13  BY MR. CANNON:

14      Q.    All right.    If we can just start, we'll

15  start with slide number 2.    If you can just read

16  kind of how this investigation got started.

17      A.    In late 2022, early 2023, the FBI

18  initiated an undercover operation using

19  confidential human sources and undercover

20  employees to pose as out-of-town real estate

21  developers interested in redevelopment of the

22  property owned by the city of Jackson.

23              Beginning on August 14th, 2023, two FBI

24  CHSs, hereinafter CHS1 and CHS2, identified in

25  the proposed indictment as Developer 1 and

County
COURT REPORTERS, Inc.
Videography  Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044390

1  Developer 2, began covertly recording in-person

2  meetings and phone conversations with Jody Owens,

3  the elected district attorney of Hinds County,

4  Mississippi and others.

5       **Q.   All right.  And the deployment of these**

6  **two individuals to the city of Jackson, was that**

7  **based on information that the FBI had received**

8  **that indicated there may be bribery going on**

9  **related to government contracts in Jackson?**

10      A.   Yes.

11      **Q.   And specifically, bribery of public**

12  **official, high-level public officials?**

13      A.   Correct.

14      **Q.   All right.  And we're going to move to**

15  **slide 3.**

16      A.   CHS1 and CHS2 proposed to Owens that

17  they wanted to build a hotel on property owned by

18  the city of Jackson, which was adjacent to the

19  Jackson Convention Center.  Over the course of

20  numerous meetings and phone calls, Owens and

21  Smith solicited $250,000 in exchange for Owens

22  using his influence as district attorney, as well

23  as damaging or embarrassing information about

24  members of the Jackson City Council gathered in

25  his capacity as district attorney to pressure



1  members of the city council to vote in favor of

2  the hotel development proposed by CHS1 and CHS2.

3         In addition, Owens agreed to facilitate

4  bribes to at least two members of the Jackson

5  City Council and the mayor of Jackson to secure

6  their votes in favor of closing out a road in

7  downtown Jackson and to take other official acts

8  to facilitate the approval of their convention

9  center hotel project, referred to as the proposed

10 development project in the indictment.

11     Q.   All right.  And just to be clear, when

12 this investigation got started, was Mr. Owens a

13 target of the FBI that had been previously

14 mentioned as somebody who was taking bribes?

15     A.   He was not.

16     Q.   All right.  And CHS1 specifically just

17 happened to kind of run into Owens at a business

18 that Owens owned; is that right?

19     A.   Yes.  That's correct.

20     Q.   And is it accurate to say that Owens

21 kind of then inserted himself into this bribery

22 scheme?

23     A.   That's correct.

24     Q.   All right.  We're going to move to

25 slide 4.



1          A.     Between January 2024 and May of 2024,

2     Owens agreed to facilitate the following bribes

3     to public officials.  $50,000 to Aaron Banks, the

4     president of the Jackson City Council in exchange

5     for his vote in his capacity as a member of the

6     council and as chair of the finance committee to

7     vote in support of awarding the contract to CHS1

8     and CHS2, referred to as the developers in the

9     indictment.  Approximately $19,500 to Angelique

10    Lee, $10,000 to pay the campaign debt, $3,000

11    cash, and over $6,000 in shopping for luxury

12    goods in exchange for her vote in her capacity as

13    a member of the council to close a road and vote

14    in support of awarding a contract to CHS1 and

15    CHS2 for the fictitious hotel development.  And

16    $50,000 to Chokwe Antar Lumumba, the mayor of

17    Jackson, in the form of checks written to his

18    political campaign in exchange for Lumumba's

19    agreement to shorten the deadline for submission

20    of request for proposal.

21         **Q.    All right.  And that's the last of the**

22    **summary slides.  Let's move to slide 5, which**

23    **describes a little bit more detail how the**

24    **investigation began.**

25         A.     In December of 2022, at the direction


County
COURT REPORTERS, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

```
 1  of the FBI, CHS1, posing as an out-of-town
 2  businessman, began meeting with Lobbyist 1.  The
 3  FBI in a covert capacity subsequently hired
 4  Lobbyist 1 and began using CHS1 and CHS2 to
 5  conduct in-person meetings with public officials
 6  in Jackson.
 7          In these meetings, CHS1 and 2 expressed
 8  interest in redeveloping property in downtown
 9  Jackson that was owned by the Jackson
10  Redevelopment Authority.  It's a quasi-
11  governmental agent affiliated with the city of
12  Jackson.  The members of the JRA board are
13  appointed by the Jackson mayor and confirmed by
14  the city council.
15      Q.  All right.  And next slide?
16      A.  On July 26th, 2023, Lobbyist 1 directed
17  CHS1 to a cigar bar in downtown Jackson that was
18  identified as the Downtown Cigar Company, Company
19  A in the indictment, located at 159 East Pearl
20  Street, Jackson, Mississippi.
21          On the same day the CHS visited the
22  cigar bar and briefly met and spoke with Jody
23  Owens, the elected district attorney of Hinds
24  County.
25      Q.  And just to be clear, Mr. Owens
```



 1  **actually, at least in part, owns the Downtown**

 2  **Cigar Bar?**

 3      A.   He does.  Correct.

 4      **Q.   All right.**

 5      A.   On October 16th, 2023, CHS1 met with

 6  Owens and subject Marve Smith, and associate of

 7  Owens in Jackson, Mississippi.  During the

 8  meeting, Owens and CHS1 specifically discussed

 9  real estate development and the JRA, the Jackson

10  Redevelopment Authority.  During the discussions,

11  CHS1 expressed concerned that the JRA might be an

12  impediment to their real estate development plans

13  during the meeting, which was recorded.  CHS1,

14  Owens told CHS1, "I can give you JRA."

15              **MR. CANNON:**  And I'm going to try

16  to play this, ladies and gentlemen.  Hopefully

17  you can hear it.

18  **(WHEREUPON, an audio recording was played for the**

19  **grand jury.)**

20  **CONTINUATION OF DIRECT EXAMINATION**

21  **BY MR. CANNON:**

22      **Q.   And just to be clear, at the end of**

23  **that, do you hear Mr. Owens state that, quote, "I**

24  **can give you the JRA"?**

25      A.   Yes.



1         Q.   All right.  All right.  Slide 7.

2         A.   Also on October 16th, 2023, Owens,

3    Smith, and CHS1 went on a walk in downtown

4    Jackson to look at various properties that would

5    be suitable for investment.  During this

6    conversation, CHS1 told Owens that it would be

7    necessary to be sure that the members of the city

8    council would support the real estate project.

9    Owens stated that, stated, "But we own enough of

10   the city.  Like, I mean, I got enough.  I

11   literally got a bag of fucking information on all

12   the city councilmen.  I can get votes approved."

13        Q.   And just to be clear for the grand

14   jurors' edification, these recordings right here

15   in this period of time in October that we're

16   hearing, it's because CHS1 is actually wearing a

17   recording device or holding some type of

18   recording device?

19        A.   That's correct.

20        Q.   Okay.  And was it the practice to have

21   them record essentially any time they

22   communicated with anybody related to this case,

23   essentially?

24        A.   Yes.

25        Q.   All right.



1  **(WHEREUPON, an audio recording was played for the**
2  **grand jury.)**
3      **Q.    Slide 8.**
4      A.    On November 7th, 2023, CHS1 and CHS2
5  attended a post-election party for Owens in
6  Jackson.  CHS1 congratulated Owens on his
7  reelection, and Owens responded, "This, this is
8  the parttime job.  The fulltime job is
9  developing.  This is the parttime job to get
10 leverage for the fulltime job.  This is the
11 parttime job to get the conversations and the
12 access.  Access equals the other shit we're
13 trying to do.  I was trying to do it without you
14 guys, but I need you guys to do it.  If in four
15 years I can't deliver, whatever you want to do,"
16 and then he trailed off.
17     **Q.    All right.  I'm going to try to play**
18 **that part.**
19 **(WHEREUPON, an audio recording was played for the**
20 **grand jury.)**
21     **Q.    And just to be clear, when he says this**
22 **is the parttime job, what is he referring to,**
23 **based on kind of your impression of the whole**
24 **entire recording?**
25     A.    His job as district attorney.



1      Q.   If you can continue reading slide 8,
2  the second bullet.
3      A.   Sure.  On November 8th, 2023, CHS1 and
4  CHS2 met with Owens and Smith.  During the
5  meeting, Owens negotiated a $250,000 payment for
6  Owens, Smith, and Subject 1 for their roles in
7  the real estate development project.
8  **(WHEREUPON, an audio recording was played for the**
9  **grand jury.)**
10     Q.   All right.  Slide 9?
11     A.   On December 13th, 2023, Owens, Smith,
12 and Witness 1 all traveled to Fort Lauderdale,
13 Florida for a meeting with CHS1 and CHS2.  During
14 the meeting in Fort Lauderdale on the same date,
15 Owens accepted $125,000 in cash.  After receiving
16 the cash, Owens emphasized that he intended to
17 use his access to embarrassing or incriminating
18 information on members of the city council to
19 gain votes in favor of the real estate
20 development.
21         Owens stated that, "I'm not trying to
22 overemphasize this, you guys, but my ability to
23 prosecute people in Hinds County, there's only
24 one of me.  So right now, every police agency
25 comes to us.  Everybody needs something.  Every



1  file comes to us.  Everybody needs something

2  fixed.  We've been keeping this book for a while.

3  Kind of old school, this stuff.  Keep our

4  favorites.  They know that."

5  **(WHEREUPON, an audio recording was played for the**

6  **grand jury.)**

7       Q.   All right.  Slide 10?

8       A.   On or about January 10th, 2024, CHS1

9  and CHS2 met with Owens and Smith at a private

10 office in Jackson, Mississippi that Owens

11 referred to as his war room.  During this

12 meeting, CHS1 and CHS2 expressed their desire to

13 own the city council for the next eight to ten

14 years, thereby solidifying their ability to

15 engage in a long-term, unimpeded series of real

16 estate development projects in Jackson.

17            Owens and Smith cautioned CHS1 and CHS2

18 not to pay too much money upfront as it would be

19 counterproductive to their plans.  Owens stated,

20 quote, "I don't know if you," sorry, "I don't

21 know if you have been around addicts before,

22 right?  You can give them a little blow, a little

23 blunt, a little drink.  But if you give them a

24 case of whiskey and you give them a kilo of coke

25 and you give them a motherfucking pound of weed,



```
 1  they will die."

 2      Q.   And is it fair to say that's referring

 3  to kind of giving them smaller amounts of money

 4  kind of periodically to keep them in favor of

 5  this development project, the public officials?

 6      A.   Yes.

 7      Q.   All right.  Slide 11?

 8      A.   On January 11th, 2024, a meeting

 9  occurred in Jackson, Mississippi between Owens,

10  Smith, CHS1, CHS2, and Jackson City Council

11  president Aaron Banks.  During the meeting, a

12  conversation between Banks and Owens can be

13  overheard where Banks and Owens discuss how much

14  money Banks would request from CHS1 and CHS2.

15  Banks and Owens decided on $50,000.  Owens could

16  be heard saying, "25 now and 25 later."

17      Q.   And prior to this meeting, prior to

18  several meetings with the CHSs and Owens, would

19  there be dinners or drinks, some kind of other

20  events that would occur prior to the negotiations

21  that we're looking at?

22      A.   Yes.  Owens then dismissed Banks from

23  the room and informed CHS1 and CHS2 that Banks

24  was going to request $50,000 to vote in favor to

25  approve the group's real estate development plan.
```



```
 1           Owens cautioned CHS1 and CHS2 against
 2  paying Banks the entire $50,000.  Owens stated,
 3  quote, "We never give them the asking price.  I
 4  buy pussy.  I buy cars.  I buy cows.  I buy
 5  drugs.  Whatever.  My point is, like, Banks need
 6  50; you get 30.  He gets installments.  That's my
 7  game.  Some people overpay and say I'm the guy
 8  who needs more, and some people will choose to
 9  who to pay.  He wants 50.  We'll give him 15
10  this year and 15 next year."
11  (WHEREUPON, an audio recording was played for the
12  grand jury.)
13       Q.   All right.  Slide 12.
14       A.   Banks then rejoined the conversation,
15  and the following exchange occurred.
16       Q.   We play this whole thing, and then we
17  can ...
18  (WHEREUPON, an audio recording was played for the
19  grand jury.)
20       Q.   And just to be clear, who is Owens
21  talking to here?
22       A.   He's talking to Councilman Aaron Banks.
23  (WHEREUPON, an audio recording was played for the
24  grand jury.)
25       Q.   Who is that that says, "50 grand as
```



County
COURT REPORTERS, Inc.
Videography  Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044401

1    soon as possible would help"?

2        A.    That was Councilman Aaron Banks.

3    (WHEREUPON, an audio recording was played for the

4    grand jury.)

5        Q.    And there's a quote in there, "I just

6    don't trust wire taps anymore."  Who said that?

7        A.    That was Jody Owens.

8    (WHEREUPON, an audio recording was played for the

9    grand jury.)

10       Q.    All right.  And who is that speaking

11   right there that said, "We had a good

12   conversation today"?

13       A.    That was Councilman Aaron Banks.

14       Q.    And when he refers to the president and

15   the vice president, who's he referring to?

16       A.    He was the president of the Jackson

17   City Council, and Angelique Lee was the vice

18   president of the Jackson City Council.

19       Q.    And had Angelique Lee been at the

20   dinner prior to this meeting with Banks that same

21   night?

22       A.    Yes.

23   (WHEREUPON, an audio recording was played for the

24   grand jury.)

25       Q.    And just to be clear, somebody is in

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044402

1   there saying they just protect interests.  Do you

2   recognize that, who that voice is?

3       A.   That was Marve Smith.

4       Q.   And Mr. Smith kind of was trying to cut

5   off the CHS when he was being specific about what

6   the payment to Banks was for; is that right?

7       A.   Yes.

8       Q.   Is that fair to say?

9            MR. CANNON:  All right.  I think

10  the next slide, slide 13 is just the transcript

11  of what you guys just heard.  Do you want us to

12  read it or were you able to catch that?

13           GRAND JUROR:  We're good.

14           MR. CANNON:  We're going to keep

15  moving on.

16  CONTINUATION OF DIRECT EXAMINATION

17  BY MR. CANNON:

18      Q.   Slide 14.  Same thing.  It's just a

19  further transcript of that recording from that

20  same night.  So we'll go to slide 15.

21      A.   On the night of February 13th, 2024,

22  Owens, CHS1, and CHS2 met in Jackson,

23  Mississippi.  CHS2 gave Owens $60,000 in cash.

24  CHS2 explained to Owens that 25,000 was a payment

25  to Owens, $25,000 was for Banks, and $10,000 was

County
COURT REPORTERS, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044403

```
 1  for Lee.  Owens, CHS1, and CHS2 agreed that they
 2  would pay Banks $10,000 that night, and Owens
 3  would hold $15,000 to be paid to Banks at a later
 4  date.  Owens stated that he would store the cash
 5  in a safe that he had at the Hinds County
 6  District Attorney's Office.  Owens also explained
 7  that he had a conversation with Lee, and that she
 8  knew the $10,000 was coming from CHS1 and CHS2.
 9      Q.   All right.  We're going to go to the
10  next slide.  I'm going to play this.  This is
11  actual a video that we have on slide 16.  The
12  transcript's a little bit difficult to read.  But
13  we can read it after we watch the video.
14  (WHEREUPON, a video recording was played for the
15  grand jury.)
16      Q.   There's a comment there where one of
17  the CHSs says they're worried about Banks.
18      A.   Mm-hmm (indicating affirmatively).
19      Q.   What was that in reference to if you
20  recall?
21      A.   The, a few weeks prior to this meeting,
22  Councilman Banks received a DUI, driving under
23  the influence.
24      Q.   And just to be clear, that video that
25  we just saw, the video and audio, where was that
```



1  meeting?  Where'd that take place?

2      A.   That meeting occurred at the Downtown

3  Cigar Company in Jackson, Mississippi.

4  (WHEREUPON, a video recording was played for the

5  grand jury.)

6      Q.   That's a little bit difficult to kind

7  of see what's going on in that video.  What

8  happened there?  What transaction occurred in

9  that interaction we just saw between Mr. Owens

10  and Mr. Banks?

11      A.   During that recording and that

12  transaction, Jody Owens handed Councilman Banks

13  $10,000 in cash.

14      Q.   And we're going to move onto slide 17.

15  If you can read just kind of what happened ...

16      A.   Sure.

17      Q.   ... later in that conversation.

18      A.   Later in the same conversation on

19  February 13th, 2024, CHS2 had the following

20  exchange with Banks discussing a potential

21  competitor to the CHSs' hotel project.  CHS2

22  stated, "I was telling Jody.  He said, you know,

23  there is another deal out there.  There is a

24  hotel deal.  It's got plans.  I've already seen

25  it."  CHS1 stated, "It looks like a guitar.  Have



```
 1  you ever heard of that?"  CHS2 stated, "Is that
 2  true?  I'd be shocked."  Banks, "So that is
 3  something that I will have to deal with.  So I
 4  will handle that."  CHS2 stated, "You will?
 5  Thank you."
 6       Q.   All right.  And slide 18?
 7       A.   On February 29th, 2024, CHS1 and CHS2
 8  met at Jackson and discussed incorporating a
 9  version of the CHSs' business in Mississippi and
10  opening a business bank account to fund the bribe
11  payments to various public officials.
12  Specifically, through banks, employment for
13  Banks' family member and a driver service for
14  Banks.
15       Q.   And that driver service, was that
16  something that Mr. Owens came up with along with
17  the CHSs in terms of a benefit to Banks that they
18  were going to provide?
19       A.   It was.  Yes.
20       Q.   And also stemming from the concern
21  regarding his previous DUI that he got in
22  January?
23       A.   Yes.
24       Q.   And continue on March 5th.
25       A.   On March 5th, 2024, Owens sent an email
```



 1 | to CHS1 stating, "FYI, I've attached a signed
 2 | agreements for the executive protection team and
 3 | Banks' family member," with the name redacted.
 4 | Attached to the email were two contracts signed
 5 | by Owens.  The purpose of these contracts were to
 6 | provide a driver service for Banks paid for by
 7 | CHS1 and CHS2 and to hire a family member for
 8 | Banks at the Hinds County DA's Office paid for by
 9 | CHS1 and CHS2.
10 |     Q.   Slide 19.
11 |     A.   On March 28th, 2024, a meeting occurred
12 | with Owens, Banks, Smith, CHS1, and CHS2.  During
13 | the meeting, the group discussed the fact that
14 | Owens hired Banks' family member for a position
15 | at the district attorney's office using money
16 | from CHS2 and the need to keep that information
17 | secret from other members of the city council.
18 | The group also discussed the RFQ submission
19 | deadline, which had been extended.
20 |     Q.   We'll play this, and then you can ...
21 |     A.   Okay.
22 |     Q.   We can read the transcript if
23 | necessary.
24 | (WHEREUPON, an audio recording was played for the
25 | grand jury.)



1        Q.    And just to be clear, that's Mr. Banks

2   and Mr. Smith and the CHS, the CHSs are present

3   for this conversation?

4        A.    Yes.

5   (WHEREUPON, an audio recording was played for the

6   grand jury.)

7               MR. CANNON:    Slide 20 is just a

8   transcript of the audio we already heard.  Ladies

9   and gentlemen, are you okay just moving through

10  the transcript that we've already heard?

11  (WHEREUPON, the grand jury indicates

12  affirmatively.)

13  CONTINUATION OF DIRECT EXAMINATION

14  BY MR. CANNON:

15       Q.    And we're going to move now to slide

16  21.  If you just read that.

17       A.    Sure.  The March 28th, 2024, meeting

18  continued, and the following exchange was heard.

19  Owens stated, "Hey, look.  The most important

20  thing for us is the RFQ being shortened."  Banks

21  stated, "Understand this."  Marve Smith, "Me and

22  him had a conversation about that."  Owens, "We

23  heard you."  Banks, "As the president, as the

24  person who is going to be chairing the finance

25  committee for the next year, the council controls

County
COURT REPORTERS, Inc.
Videography     Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044408

```
 1  the purse strings."  CHS2, "Everywhere?"  Banks,
 2  "Everywhere."
 3       Q.   All right.  And continuing on page 22.
 4       A.   CHS2, "Everywhere?"  Banks, "Right now,
 5  right now the mayor got a proposal on the table
 6  for the finance department to get 525,000 in
 7  raises.  That shit is held up, and I can hold it.
 8  It's in my committee that I chair.  I can hold it
 9  as long as I want to."
10       Q.   And it's fair to say Banks is just
11  threatening to kind of utilize his power on the
12  city council to assist the developers with
13  getting the RFQ?
14       A.   Yes.
15       Q.   To the extent that he can.  All right.
16  Moving onto slide 23.
17       A.   On February 15th, 2024, Owens initiated
18  a wire transfer in the amount of $10,000 with a
19  notation, "Paying off campaign debt of Angelique
20  Lee."  On February 18th, 2024, Owens, using his
21  cell phone, sent CHS1 a picture of the wire
22  transfer receipt and a video from Lee thanking
23  CHS1 and CHS2 for their support.
24       Q.   And that wire transfer was sent
25  directly to the debtor that Ms. Lee owed money
```



DOJ-0000044409

```
 1  to; is that right?

 2       A.   Correct.

 3       Q.   And slide 24, is that just a copy of

 4  the Bank Plus wire that Jody sent, Owens sent to

 5  the developers regarding the payment to Lee?

 6       A.   Yes.

 7       Q.   All right.  And there's a picture of

 8  Lee.  Is that part of the video that she made,

 9  thanking the developers for the $10,000 repayment

10  of debt?

11       A.   Yes.

12       Q.   And that was done through Jody Owens?

13       A.   Yes.

14  (WHEREUPON, a video recording was played for the

15  grand jury.)

16       Q.   And          and         , those are the

17  names of the CHSs; is that correct?

18       A.   Correct.

19       Q.   All right.  Slide 25.

20       A.   A recording of Lee's conversation with

21  CHS2 after dinner in the parking lot captured the

22  following exchange.

23       Q.   And this is later in March of 2024,

24  correct?

25       A.   Correct.
```

```
 1   (WHEREUPON, an audio recording was played for the

 2   grand jury.)

 3       Q.    And just to be clear, we're listening

 4   to a recording.  What is the CHS giving to Ms.

 5   Banks here?

 6       A.    To Councilwoman Lee.

 7       Q.    Ms. Lee.  Lee.  Sorry.

 8       A.    To Councilwoman Lee, he's giving $3,000

 9   in cash.

10   (WHEREUPON, an audio recording was played for the

11   grand jury.)

12       Q.    All right.  And the next day, read from

13   slide 25.  What did Ms. Lee do?

14       A.    The next day on March 28th, 2024, Lee

15   spent more than $6,000 shopping at a luxury

16   retail store in Jackson.  All of her purchases

17   were made using CHS2's credit card.

18       Q.    And this $10,000 repayment of debt,

19   this $3,000 cash, and the luxury retail spending

20   spree were all in exchange for Ms. Lee's vote on

21   the CHSs' proposed development project; is that

22   right?

23       A.    Yes.

24       Q.    All right.  Slide 26.

25       A.    On February 12th, 2024, CHS1 and CHS2
```

1  had dinner with mayor Chokwe Antar Lumumba,

2  Owens, Smith, and a member of Lumumba's staff.

3  Owens introduced CHS1 and CHS2 to Lumumba.  And

4  Owens can be heard telling Lumumba that Owens did

5  a background check on CHS1 and CHS2 and that they

6  were not FBI agents.

7           On February 28th, 2024, during a

8  meeting in Jackson, Mississippi, Owens, Smith,

9  CHS1, and CHS2 discuss whether they needed

10  Lumumba's approval for their project.  Smith

11  stated he can make things a lot harder.  Owens

12  explained that Lumumba could block projects that

13  he does not like and hold things up.  The group

14  discussed taking Lumumba to Miami to meet with

15  CHS1 and CHS2 and that Lumumba had agreed to go.

16     **Q.   All right.  I think we have audio we're**

17  **going to play.  I believe it's from February**

18  **12th.  So the audio that we're going to play is**

19  **from February 12th where they are dinner, which**

20  **is the first bullet point on slide 26.**

21  **(WHEREUPON, an audio recording was played for the**

22  **grand jury.)**

23     **Q.   All right.  Slide 27.**

24     A.   Sometime between February 29th, 2024,

25  and March 5th, 2024, the submission deadline for



1  request for qualifications published by the City

2  of Jackson was extended till the end of April of

3  2024.  CHS1 and CHS2 represented to Owens that

4  they were upset with this extension because they

5  didn't want any competitors to their project.

6       **Q.   And this is the same extension that we**

7  **had previously discussed with the Banks' slides**

8  **as well, too?**

9       A.   Yes.

10      **Q.   Councilman Banks was responding to?**

11      A.   Yes.  On March 5th, 2024, CHS1 met with

12  Owens to discuss the deadline extension and plans

13  for financing and hosting a trip for Lumumba in

14  Florida.  CHS1 asked Owens how they should move

15  money to Lumumba.  Owens responded that he would

16  have a conversation with Lumumba and find out the

17  way Lumumba would feel most comfortable and the

18  way he feels escapes the most, enough scrutiny

19  about people who are doing business with the City

20  of Jackson.  Owens stated ...

21      **Q.   We're going to play this.**

22      A.   Okay.

23  **(WHEREUPON, an audio recording was played for the**

24  **grand jury.)**

25      **Q.   All right.  Slide 29.**



 1        A.    Later on March 5th, 2024, Owens stated

 2   that he had a text message conversation with

 3   Lumumba and that Lumumba was open to taking a

 4   trip to Florida and having a conversation about

 5   moving the RFQ deadline.  Owens stated that he

 6   told Lumumba that they would throw Lumumba a

 7   fundraiser.  Owens told CHS1 that they could have

 8   ten guys with ten checks and that Owens could

 9   give Lumumba ten checks, or that Owens could give

10   Lumumba ten checks in one envelope.  Owens went

11   on to tell CHS1, "What we used to do, what we

12   used to do if people wanted to stay under the

13   radar, you just give a bunch of a different

14   checks from a bunch of different companies."

15   **(WHEREUPON, an audio recording was played for the**

16   **grand jury.)**

17        Q.    All right.  Now slide 30.

18        A.    On March 9th, 2024, during a phone

19   conversation between CHS1 and Owens, Owens said

20   that he was talking to Lumumba and that he was

21   going to meet to discuss the RFQ submission

22   deadline change with Lumumba that night.  Owens

23   said that he discussed with Lumumba that CHS1 and

24   CHS2 wanted to submit their response to the RFQ

25   in accordance with the original deadline.  Owens



```
 1  said that Lumumba understood that CHS1 and CHS2
 2  were throwing him a fundraiser in Miami.
 3  (WHEREUPON, an audio recording was played for the
 4  grand jury.)
 5      Q.  And just to be clear, CHS1 is talking
 6  about the proposal that they were going to submit
 7  in response to the RFQ; is that right?
 8      A.  Yes.
 9  (WHEREUPON, an audio recording was played for the
10  grand jury.)
11      Q.  All right.  Slide 31.
12      A.  On March 10th, 2024, during a phone
13  conversation between CHS1 and Owens, Owens said
14  that he had gone by Lumumba's house and had a
15  good conversation and that we are on one accord.
16  And that we are going to raise him $50,000 at the
17  fundraiser and that he wants everything
18  documented and above board.  The 50,000 will be,
19  would be in checks of 5,000 or 10,000.  Owens
20  said that he had told Lumumba that 50,000 was the
21  first to start, and Lumumba's bottom number was
22  100,000.  CHS1 asked Owens if he thinks Lumumba
23  can move the RFQ submission deadline.  Owens said
24  that he told Lumumba what they were asking him to
25  do in relation to the RFQ deadline.
```



1          Owens and CHS1 discussed the logistics

2   of creating the checks to be provided to Lumumba,

3   and Owens stated that he could create the checks

4   using businesses and individuals that he

5   controlled if CHS1 and CHS2 got him the cash.

6   **(WHEREUPON, an audio recording was played for the**

7   **grand jury.)**

8        **Q.   And just to be clear, they're talking**

9   **about Ms. Lee; is that right?**

10       A.   That's correct.  Yes.

11       **Q.   And potentially flying her to**

12   **Nashville?**

13       A.   Yes.

14   **(WHEREUPON, an audio recording was played for the**

15   **grand jury.)**

16       **Q.   Now is it fair to say part of this kind**

17   **of scheme with the checks was to make it appear**

18   **that the donations, the campaign contributions**

19   **were coming from individuals or companies within**

20   **the state of Mississippi and not the CHSs, who**

21   **were essentially out-of-town developers; is that**

22   **right?**

23       A.   Yes.

24       **Q.   All right.  Slide 32.**

25       A.   On March 20th, 2024, Owens met with

```
 1  CHS1 and CHS2 in Nashville, Tennessee.  During
 2  the meeting, Owens, CHS1, and CHS2 planned for
 3  moving money to Lumumba during the upcoming
 4  Florida trip.  Owens laid out that CHS1 and CHS2
 5  needed to give Owens $50,000 cash in advance of
 6  the trip and that Owens would convert the 50,000
 7  cash into five $10,000 checks to give to Lumumba.
 8  (WHEREUPON, an audio recording was played for the
 9  grand jury.)
10       Q.   Slide 33.
11       A.   Owens then laid out his concerns about
12  obscuring the source of the money to Lumumba to
13  avoid being prosecuted.
14  (WHEREUPON, an audio recording was played for the
15  grand jury.)
16       Q.   All right.  Slide 34.  Could you
17  describe what we're looking at here?
18       A.   On March 27th, 2024, CHS1 delivered
19  $50,000 cash to Owens at the Hinds County
20  District Attorney's Office.  On March 28th, 2024,
21  Owens delivered five $10,000 checks to CHS1 so
22  that CHS1 and CHS2 could give the checks to
23  Lumumba during the upcoming Florida trip.
24       Q.   All right.  And I know it's hard to see
25  these five checks.  Do you know who they were
```



County
COURT REPORTERS, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044417

```
 1   from essentially?

 2        A.   Yes.

 3        Q.   All right.  Go ahead and list them.

 4        A.   Sure.  Sherik M. Smith; Kevin J. May or

 5   Ursela Debbie May; Perinatal Services PLLC; The

 6   Downtown Cigar Company LLC; and one is an

 7   official check with the remitter as Carrie L.

 8   Young.

 9        Q.   All right.  And Sherik Marve Smith,

10   that's the Mr. Smith who pled guilty to

11   conspiracy?

12        A.   Yes.

13        Q.   And Kevin May is an associate of Mr.

14   Owens?

15        A.   Correct.

16        Q.   And Perinatal Services, that's the same

17   medical supply company that Mr. Owens was talking

18   about in that last recording you just listened

19   to?

20        A.   Correct.

21        Q.   And then the Downtown Cigar Company is

22   obviously Mr. Owens's cigar bar?

23        A.   Yes.

24        Q.   And then Carrie Young.  What's Carrie

25   Young's relationship to Mr. Owens, if you recall?
```



DOJ-0000044418

1          A.    Carrie Young is a relative of Mr.

2    Owens.

3          Q.    **We'll go to slide 35.**

4          A.    On April 2nd, 2024, Owens, Lumumba,

5    CHS1, and CHS2 met in Fort Lauderdale, Florida.

6    Lumumba was provided an envelope with the

7    previously described checks by CHS1.  The meeting

8    was audio and video recorded.

9                After the meeting between Owens,

10   Lumumba, CHS1, and CHS2, Owens, CHS1, and CHS2

11   met separately, and Owens received an additional

12   $50,000 cash payment.  That meeting was also

13   audio and video recorded.

14   **(WHEREUPON, an audio recording was played for the**

15   **grand jury.)**

16         Q.    **Just to be clear, who is Mayor Lumumba**

17   **speaking to about shortening the deadline for the**

18   **RFQ?**

19         A.    He was speaking with Jhai Keaton, the

20   interim director of planning and development for

21   the City of Jackson.

22   **(WHEREUPON, an audio recording was played for the**

23   **grand jury.)**

24         Q.    **All right.  Slide 37.  We had a**

25   **duplicate slide.  We're not going to watch the**

County
COUNTY COURT REPORTERS, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044419

1  **entire video again.  Promise.  Go ahead, Agent.**

2      A.    So following the, following the, us

3  giving the checks to, following us giving the

4  checks to Mayor Lumumba from the video, the

5  checks were subsequently deposited to a campaign

6  account at Bank Plus.  On April 5th, 2024, a

7  check in the amount of $9,500 was written from

8  the same account to Chokwe A. Lumumba.  The memo

9  line stated, "Canvasing, signs, campaign car."

10 It's our understanding that that check was

11 cashed.  On April 8th, 2024, a check in the

12 amount of $5,000 was written from the same

13 account that he deposited the checks into.  The

14 memo line stated, "Atlanta Film Crew," or,

15 "Atlanta Film Crew Travel."  It's our

16 understanding that that check was also cashed.

17     **Q.    And so the $50,000 were put into the**

18 **campaign account, and then just a few days later,**

19 **the campaign wrote personal checks to Mr.**

20 **Lumumba?**

21     A.    Correct.

22     **Q.    All right.  And it's our understanding**

23 **at this point that those are cashed, but we**

24 **haven't figured out exactly where that money**

25 **ultimately ended up?**



 1      A.    Correct.

 2      Q.    **We have two more slides, ladies and**

 3  **gentlemen.  And then we're done.  All right.**

 4  **Slide 38.**

 5      A.    On May 22nd, 2024, multiple search

 6  warrants were executed by the FBI.  During the

 7  course of these search warrants, Mr. Owens was

 8  interviewed by the FBI.  During the interview,

 9  Owens was advised that the FBI had a search

10  warrant for his office at the Hinds County

11  District Attorney's Office and was asked by an

12  FBI agent if there are any safes or lockboxes in

13  your office.  Owens responded that none exist.

14          During the search of Owens' office, a

15  locked box/safe disguised as a book entitled The

16  Constitution of the United States was discovered.

17  Contained within the locked box/safe was $9,900

18  in U.S. currency with the serial numbers matching

19  those paid to Owens by the FBI during the course

20  of this investigation.

21      Q.    **And just to be clear, I'll play the**

22  **audio, and then we'll ...**

23      A.    Okay.

24  **(WHEREUPON, an audio recording was played for the**

25  **grand jury.)**



1       Q.   All right.  And slide 39, the final

2   slide.  Can you just describe what is contained

3   in that slide?

4       A.   These are the photos taken by the FBI

5   during the search of Mr. Owens' office at the

6   Hinds County District Attorney's Office, and this

7   is the safe or lockbox shaped like a book

8   entitled The Constitution of the United States of

9   America.

10      Q.   All right.  And was it actually a book,

11  or was it ...

12      A.   It was not a book.

13      Q.   Okay.  And of that money that was found

14  in it, how much of it was FBI funds?

15      A.   $9,900.

16      Q.   All right.  Now is it fair to say you

17  haven't told us everything that you know about

18  this long investigation here before the grand

19  jury; is that correct?

20      A.   Yes.

21      Q.   And you've just simply answered

22  questions that I've asked of you and gone through

23  this PowerPoint you prepared for presentation to

24  the grand jury; is that correct?

25      A.   Yes.

County
COURT REPORTERS, Inc.
Videography    Litigation Technology™
800.262.8777 TOLL-FREE  •  540.667.0600 LOCAL  •  540.667.6562 FAX  •  CountyCourtReporters.com

DOJ-0000044422

```
 1                  MR. CANNON:  All right.  We're
 2   going to ask you to step outside.
 3   (WHEREUPON, the WITNESS was excused at 3:58 p.m.
 4   and recalled at 3:58 p.m.)
 5   CONTINUATION OF DIRECT EXAMINATION
 6   BY MR. CANNON:
 7        Q.    Special Agent Correll is back in the
 8   room.  You're still under oath, sir.  I just had
 9   one follow-up question from one of my colleagues.
10   The $9,900 that was recovered from the
11   Constitution, the fake hollowed out Constitution,
12   was there also additional funds that were
13   recovered by the FBI, FBI funds from Mr. Owens?
14        A.    Yes.
15        Q.    From something related to Mr. Owens, I
16   guess?
17        A.    From, you're talking about the safe or
18   just ...
19        Q.    No.  Elsewhere.
20        A.    Yes.
21        Q.    Okay.  And just describe that, please.
22        A.    So over the course of the
23   investigation, money that we paid to Mr. Owens,
24   the FBI recorded the serial numbers for those
25   bills.  So we have a record of all the money we
```

 1  paid to him.  And on several occasions, we were

 2  able to recover cash that Mr. Owens had deposited

 3  into ATMs at Bank Plus.

 4       Q.   All right.  And were you able to match

 5  the serial numbers with what you had provided

 6  him?  Is that how you identified it as FBI funds?

 7       A.   Yes.

 8       Q.   All right.  Now we didn't go over kind

 9  of every single quotation that's included in the

10  indictment during this PowerPoint presentation,

11  but have you read the specific quotes that are

12  contained in the indictment?

13       A.   I have.

14       Q.   And to the best of your knowledge,

15  those are accurate quotes from the recordings?

16       A.   Yes.

17                 MR. CANNON:   All right.  Thank

18  you, sir.  Nothing further.

19  (WHEREUPON, the TESTIMONY OF FBI SPECIAL AGENT

20  LAWRENCE ANDREW CORRELL concluded at 4:00 p.m.)

21

22

23

24

25



```
 1                           CAPTION

 2

 3   The foregoing matter was taken on the date, and at

 4   the time and place set out on the title page hereof.

 5

 6   It was requested that the matter be taken by the

 7   reporter and that the same be reduced to typewritten

 8   form.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        CERTIFICATE OF REPORTER AND SECURE ENCRYPTED
 2         SIGNATURE AND DELIVERY OF CERTIFIED TRANSCRIPT
 3        I, YVONNE LYNNETTE KIMMEL, Notary Public, do
 4   hereby certify that the forgoing matter was reported
 5   by stenographic and/or mechanical means, that same
 6   was reduced to written form, that the transcript
 7   prepared by me or under my direction, is a true and
 8   accurate record of same to the best of my knowledge
 9   and ability; that there is no relation nor employment
10   by any attorney or counsel employed by the parties
11   hereto, nor financial or otherwise interest in the
12   action filed or its outcome.
13        This transcript and certificate have been
14   digitally signed and securely delivered through our
15   encryption server.
16        IN WITNESS HEREOF, I have here unto set my hand
17    this 4TH day of NOVEMBER, 2024.
18
19
20
21
22   /s/ YVONNE LYNNETTE KIMMEL
23   COURT REPORTER / NOTARY
24   NOTARY REGISTRATION NUMBER:  841777
25   MY COMMISSION EXPIRES:  AUGUST 22, 2025
```



County
COURT REPORTERS, Inc.
Videography   Litigation Technology™
800.262.8777 TOLL-FREE   •   540.667.0600 LOCAL   •   540.667.6562 FAX   •   CountyCourtReporters.com

DOJ-0000044426