**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                    **Case No.  3:24-CR-103-DPJ-LGI**

**JODY E. OWENS II,**
**CHOKWE ANTAR LUMUMBA, and**
**AARON B. BANKS**

**MEMORANDUM IN SUPPORT OF JODY E. OWENS II'S**
**MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT**
**AND ENTRAPMENT AS A MATTER OF LAW**

**I.       OUTRAGEOUS GOVERNMENT CONDUCT**

The United States Supreme Court first recognized "outrageous government conduct" as a defense in *United States v. Russell*.[1] The defense applies when the conduct of law enforcement violates "fundamental fairness [in a way that is] shocking to the universal sense of justice."[2] In such a case, "due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction…."[3]

The outrageous government conduct defense evolved out of entrapment and is rooted in the notion that government power to investigate its citizens is not unlimited.[4] When "overzealous law enforcement" exceeds those limits, the government's conduct cannot form the basis of prosecution.[5] "The function of law enforcement is the prevention of crime and the apprehension of criminals."[6] "Manifestly, that function does not include the manufacturing of crime."[7] "A

---

[1] *United States v. Russell*, 411 U.S. 423, 431-32 (1973) (citing *Rochin v. California*, 342 U.S. 165 (1952)).
[2] *Id.* at 432 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)).
[3] *Id.* at 431-32 (citing *Rochin v. California*, 342 U.S. 165 (1952)).
[4] *Id.* at 427-30; *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986) ("[T]he due process clause forbids the government to act improperly even against culpable persons.").
[5] *United States v. Graves*, 556 F.2d 1319, 1322 (5th Cir. 1977) (quoting *United States v. Quinn*, 543 F.2d 640, 647-48 (8th Cir. 1976)).
[6] *Russell*, 411 U.S. at 434 (quoting *Sherman v. United States*, 356 U.S. 369, 372 (1958)).
[7] *Id.* (quoting *Sherman*, 356 U.S. at 372).

different question is presented when the criminal design originates with the officials of the Government…."[8] "When entrapment is at issue, the focal point of the inquiry is on the predisposition of the defendant."[9] For outrageous government conduct, as the name implies, the focus, at least initially, is on "the conduct of law enforcement agents."[10]

The Fifth Circuit recognizes outrageous government conduct as a defense.[11] While reserved for the "rarest" and most "egregious" government conduct,[12] the defense, once raised, presents "solely a question of law for the court."[13]

To determine outrageousness, the court examines the government's conduct within the "totality of the circumstances with no single factor controlling."[14] The initial focus, however, is on who conceived the crime;[15] who "initiate[d] contact;"[16] and whether the defendant immediately availed himself of the criminal opportunity.[17] The Fifth Circuit's treatment of outrageous government conduct is founded largely upon the Third Circuit's decision in *Twigg*.[18]

### *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978)

In *Twigg*, a government informant, Kubica, contacted Neville and proposed setting up a laboratory to manufacture "speed," the street name for amphetamines.[19] "Neville expressed an

---

[8] *Id.* (quoting *Sherman*, 356 U.S. at 372).

[9] *United States v. Tobias*, 662 F.2d 381, 384 (5th Cir. 1981) (quoting *United States v. Webster*, 649 F.2d 346, 348 (5th Cir. 1981)).

[10] *Graves*, 556 F.2d at 1322, 1325 ("[A]part from any question of predisposition of a defendant to commit the offense in question…." (quoting *Quinn*, 543 F.2d at 648). *See also* U.S. Dep't of Just., U.S. Att'ys' Manual, CRM § 648 (The outrageous government conduct defense "presupposes predisposition but seeks dismissal of the indictment on the ground that the conduct of law enforcement agents was 'so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction.'").

[11] *Graves*, 556 F.2d at 1322-23. *See also United States v. Nicoll*, 664 F.2d 1308 (5th Cir. 1982); *United States v. Garrett*, 716 F.2d 257 (5th Cir. 1983); *United States v. Yater*, 756 F.2d 1058 (5th Cir. 1985).

[12] *United States v. Carr*, 83 F.4th 267, 275 (5th Cir. 2023) (quoting *United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009)); *United States v. Garrett*, 716 F.2d 257, 275 (5th Cir. 1983).

[13] *Graves*, 556 F.2d at 1322 (quoting *Quinn*, 543 F.2d at 648).

[14] *Tobias*, 662 F.2d at 387.

[15] *United States v. Rey*, 706 F.2d 145, 147 (5th Cir. 1983).

[16] *Tobias*, 662 F.2d at 387.

[17] *United States v. Gray*, 626 F.2d 494, 498 (5th Cir. 1980).

[18] *Gray*, 626 F.2d at 499; *Tobias*, 662 F.2d at 386; *Garrett*, 716 F.2d at 275, 275 n.9.

[19] *United States v. Twigg*, 588 F.2d 373, 378 (3d Cir. 1978).

interest and a discussion of the proposed operation ensued."[20] Over several months, Kubica and Neville made plans to set up the lab.[21] Neville agreed to raise capital and arrange distribution of the drugs, while Kubica agreed to provide "the necessary equipment, raw materials, and a production site."[22] The DEA provided Kubica with chemicals, some glassware, and a farmhouse to use as a lab.[23] When time came to set up the lab, Neville brought Twigg to assist.[24] "Twigg often ran errands for groceries or coffee," while "Neville spent much of his time away from the farmhouse [lab]."[25]

On appeal, the entrapment defense was not available to either defendant. Neville was predisposed.[26] When propositioned, "Neville expressed an interest and a discussion of the proposed operation ensued."[27] "No reluctance was expressed and no inducements were needed."[28] As for Twigg, Neville brought him into the conspiracy, not a government agent.[29]

The Third Circuit examined the government's conduct within the totality of the circumstances.[30] In doing so, the court focused on who "conceived" the crime, who "initiated contact," and who instigated the criminal activity.[31] Finding the DEA both conceived the crime and initiated contact through its informant, Kubica, the court distinguished *Russell*.[32]

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.* at 375-76.
[24] *Id.* at 376.
[25] *Id.*
[26] *Id.*
[27] *Id.* at 375.
[28] *Id.* at 376.
[29] *Id.*
[30] *Id.* at 377 (quoting *United States v. Russell*, 411 U.S. 423, 436 (1973)).
[31] *Id.* at 378-82. Under the facts in *Twigg*, instigation of the crime, i.e., acts in furtherance, were more relevant than immediate availment.
[32] *Id.* at 377.

Unlike *Neville* and *Twigg*, Russell "was an active participant in an illegal drug manufacturing enterprise which began *before* the government agent appeared on the scene…."[33] The court distinguished *Hampton* on similar grounds. "[W]e are not only concerned with the supply by government agents of necessary ingredients for manufacture, but we also have before us a crime … conceived and contrived by government agents."[34]

Like *Twigg*, the Fifth Circuit follows a similar analysis beginning with who initiated the crime, who initiated contact, and whether the defendant leaped at the opportunity when presented.

### *United States v. Gray*, 626 F.2d 494 (5th Cir. 1980)

In *Gray*, DEA informants Conn and Haas met the defendant, Gray, at an airplane auction.[35] "Haas raised the subject of smuggling to Gray, thereby initiating the drug scheme."[36] "Laden with 12,000 pounds of marijuana, the defendants [including Gray] flew into Stennis Field in Mississippi early on the morning of July 24, 1978."[37] "They loaded the marijuana onto waiting trucks and drove to somewhere near Mobile, Alabama, where the trucks were searched and they were arrested."[38]

On appeal, the court considered the government's conduct within the totality of the circumstances.[39] Specifically, the court noted that while a DEA informant initially suggested "smuggling" to Gray, defendants including Gray immediately jumped on board.[40] Without

---

[33] *Id.* (quoting *Russell*, 411 U.S. at 436 (emphasis added) (defendant was suspected of operating, and was operating, a drug lab prior to government contact)). The court distinguished *United States v. Leja* and *United States v. Smith* on similar grounds. In *Leja*, "[m]ost significant" was "the criminal plan originated with the defendant" who "formulated the plan and approached the [government] informer." *Id.* (citing *United States v. Leja*, 563 F.2d 244 (6th Cir. 1977)). In *Smith*, the "defendant concocted the scheme and began implementing it before [government contact]." *Id.* (citing *United States v. Smith*, 538 F.2d 1359 (9th Cir. 1976)).

[34] *Id.* at 378 (citing *Hampton v. United States*, 425 U.S. 484, 488 (1976)).

[35] *United States v. Gray*, 626 F.2d 494, 498 (5th Cir. 1980).

[36] *Id.*

[37] *Id.* at 497.

[38] *Id.*

[39] *Id.* at 498-99.

[40] *Id.* at 498.

reluctance, defendants provided "the airplane," the "money," a source for marijuana "in Columbia," and transportation for the marijuana once the plane landed.[41]

Weighing the government's initial suggestion of a crime against the defendants' prompt and enthusiastic participation, the court determined that the government's conduct was not outrageous.[42] In other words, the government "merely eased the way for the conspirators."[43]

### *United States v. Nicoll*, 664 F.2d 1308 (5th Cir. 1982)

The DEA in Atlanta got a tip concerning Henry, a drug dealer.[44] A DEA agent met Henry and arranged a drug deal.[45] Henry instructed the agent to contact Nicoll to arrange delivery of ten kilograms of cocaine.[46] Nicoll said he was expecting the agent's call and a lengthy discussion ensued concerning the cocaine transaction.[47] However, Nicoll requested a sample before he would finalize the deal, which the DEA could not provide.[48] There were several more calls and a meeting, but eventually Nicoll backed out.[49] Shortly thereafter, Nicoll was indicted on drug conspiracy charges.[50]

On appeal, the Fifth Circuit examined the government's conduct using the same pattern as *Twigg* and *Gray*.[51] First, the court examined the government's conduct, then compared it to Nicoll's with an emphasis on inception.[52] The court found that while the DEA initiated contact with Nicoll by calling, "Nicoll acknowledged that [his co-conspirator] had contacted him to tell him to expect

---

[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *United States v. Nicoll*, 664 F.2d 1308, 1310 (5th Cir. 1982).
[45] *Id,*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] *Id.* at 1310-11.
[50] *Id.* at 1311.
[51] *Id.* at 1314-15.
[52] *Id.*

[the agent's] call" and "launched into a lengthy discussion on the details of the cocaine transaction."[53] In other words, Nicoll exhibited no reluctance.

Weighing the government's conduct (the DEA initiated contact) against Nicoll's conduct (Nicoll immediately availed himself of the opportunity to sell cocaine), and comparing these facts to *Twigg*, the court held that the "conduct of the DEA in this case does not fall within that category" of cases "in which the government's conduct is so egregious as to violate due process."[54]

### *United States v. Tobias*, 662 F.2d 381 (5th Cir. 1981)

Tobias needed money and decided to manufacture cocaine.[55] In furtherance of his plan, Tobias acquired a copy of High Times magazine, found an advertisement from a company offering the necessary chemicals and equipment, contacted the company, and ordered the supplies he needed.[56] Unbeknownst to Tobias, the company was a DEA front.[57]

After placing his order, Tobias contacted the "company" four times to inquire about delivery of his supplies.[58] On the fifth call, Tobias asked to cancel his order.[59] Not because he had a change of heart, but because he felt he lacked the skill to manufacture cocaine.[60] The DEA agent who fielded Tobias's call suggested that he manufacture PCP instead, which the agent said was easier to make.[61] Tobias liked the idea and changed his order.[62] Once Tobias received his supplies,

---

[53] *Id.* at 1310.
[54] *Id.* at 1315.
[55] *Tobias*, 662 F.2d at 383.
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.* at 384

he or his wife contacted the "company" 13 times with questions concerning the PCP manufacturing process.[63] Eventually, Tobias managed to produce some PCP and was arrested shortly thereafter.[64]

On appeal, Tobias argued that the government's excessive involvement in the scheme was outrageous.[65] Examining the government's conduct within the totality of the circumstances, the court found that while the DEA placed the advertisement in High Times magazine, the DEA "did not initiate contact with Tobias."[66] Tobias initiated not only first contact but all subsequent contact.[67]

Even so, the court expressed concern over the extent of the government's involvement.[68] The "crucial factor in this total fact picture is the step-by-step advice given by the DEA agents" to "Tobias or his wife on more than thirteen occasions."[69] Focusing on inception, the court ultimately found the government's "step-by-step advice" on how to manufacture PCP did not violate due process because "Tobias or his wife contacted the DEA," not *vice versa*.[70] "This would be a more difficult case if the DEA had pursued Tobias by repeated phone calls and encouragement."[71] However, according to the Fifth Circuit, *Tobias* sets "the outer limits to which the government may go in the quest to ferret out and prosecute crimes in this circuit."[72]

---

[63] *Id.* at 384, 387.
[64] *Id.* at 384.
[65] *Id.*
[66] *Id.* at 387.
[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*

***United States v. Rey***, 706 F.2d 145 (5th Cir. 1983)[73]

Defendant Rey was an attorney convicted of conspiracy to possess heroin with intent to distribute.[74] Rey initiated the conspiracy by asking a former client and government informant whether he "could get ahold of any drugs for him," later specifying heroin.[75] Following this conversation, the informant reported Rey to the DEA and began to call him numerous times.[76] Rey met with the informant and agreed to another meeting.[77] At this point, Rey appeared "lukewarm" to the conspiracy.[78] In the next meeting, Rey asked about the drugs.[79] After expressing the need for expert advice regarding price and quality, Rey arranged for further negotiations between the informant and a trusted employee of Rey's with more knowledge of drugs.[80] Sometime later, Rey "entertained" the thought of turning the informant over to the authorities.[81] However, "[i]n due course, a drug transaction occurred."[82]

On appeal, the Fifth Circuit focused on both the government and Rey's initial conduct at inception of the conspiracy.[83] First, the Court noted that the government pursued Rey only after learning that Rey was seeking to buy drugs.[84] Second, the Court found that even though Rey "appeared to blow hot and cold," it was Rey, not the informant, who broached "the matter at the outset."[85] As a result, the Fifth Circuit "perceive[d] no outrage" from the government's conduct.[86]

---

[73] *Rey* was overruled on other grounds in *United States v. Henry*, 749 F.2d 203, 206, 206 n.2 (5th Cir. 1984), *overruled by*, *Mathews v. United States*, 485 U.S. 58 (1988).

[74] *Rey*, 706 F.2d at 146.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.* at 146-47.

[80] *Id.* at 147.

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* (citing *Rochin v. California*, 342 U.S. 165 (1952)).

***United States v. Garrett*, 716 F.2d 257 (5th Cir. 1983)**

Defendants Garrett and Moore were convicted of bribing a Houston, Texas, city councilmember, Westmoreland, to award defendants an insurance contract with the City insuring its 25,000 employees. The contract paid a $12 million commission.[87]

Relying on its holdings in *Tobias* and *Nicoll*, as well as the Sixth Circuit opinion in *United States v. Leja*,[88] the Fifth Circuit examined the government's conduct within the totality of the circumstances with a particular focus on *who* conceived the crime, *who* initiated contact, and *who* instigated the criminality.[89]

The government originated the scheme, but both Moore and Garrett promptly availed themselves of the opportunity.[90] When approached by the government, Moore immediately touted his "union connections in many states and indicated that insurance coverage for Texas school and hospital districts may be available."[91] Shortly thereafter, "Moore accepted $2000."[92] As for Garrett,

---

[87] *United States v. Garrett*, 716 F.2d 257, 260-63 (5th Cir. 1983).

[88] *Id.* at 275, 275 n.9. In *Leja*, the defendant Leja wanted to manufacture PCP. 563 F.2d 244, 245 (6th Cir. 1977). He contacted an acquaintance, Sawicki, and proposed setting up a lab together. *Id.* Sawicki was a DEA informant. *Id.* Leja was to provide the technical expertise, Sawicki would obtain the chemicals (from the DEA), and Cody, a third accomplice, agreed to supply the glassware and the money. *Id.* A DEA lab analyst, Janovsky, joined the operation ostensibly to prevent a lab explosion. *Id.* However, Janovsky "gave some technical instructions concerning the manufacturing process of [PCP] when defendant Leja encountered difficulties." *Id.*

    On appeal, defendants contend that the government's involvement in the operation was "so excessive as to violate due process." *Id.* At the outset, the court stated, "[w]e cannot affirmatively approve of the government's activity in this case." *Id.* at 246. "Indeed, we share the view of Judge Friendly … that 'there is certainly a limit in allowing governmental involvement in crime.'" *Id.* (quoting *United States v. Archer*, 486 F.2d 670, 676 (2d Cir. 1973)). Nevertheless, the court, considering the totality of the circumstances, declined "to prohibit on constitutional grounds the prosecution of the defendants on these facts, where they were clearly predisposed to commit the acts." *Id.* at 247. The "facts" evidencing Leja's predisposition that precluded relief on constitutional grounds are that Leja both conceived the crime and made contact with the government's informant. *Id.* at 245.

[89] Recall in *Tobias*, the court found that Tobias conceived a plan to manufacture cocaine, contacted the government's agent, and pursued the criminal scheme by purchasing the necessary equipment and supplies was a "predisposed, active participant" in the criminality prior to the government's involvement. *Tobias*, 662 F.2d at 383-84, 387. In *Nicoll*, the government made initial contact with the defendant after he was recommended by a co-conspirator, but the court found him to be a "predisposed, active participant" because he immediately and without hesitation acknowledged that he was expecting the agent's call and "launched into a lengthy discussion on the details of the cocaine transaction." *Nicoll*, 664 F.2d at 1310. *See also Garrett*, 716 F.2d at 261-62, 275.

[90] *Garrett*, 716 F.2d. at 260-62.

[91] *Id.* at 261.

[92] *Id.*

he "originated the idea"[93] to call Houston city councilman Westmoreland and called him on the spot to discuss getting the insurance contract.[94] Weighing the government's role in originating the scheme against the defendants' near instantaneous willingness to engage in criminality, the court held, "we cannot find that the government's conduct [in conceiving the scheme] was so egregious and outrageous" to warrant reversal.[95]

### *United States v. Yater*, 756 F.2d 1058 (5th Cir. 1985)

Yater was a poker player of some repute, apparently.[96] In 1983, he traveled from Atlanta, Georgia, to Jackson, Mississippi, to play in a "highstakes poker game."[97] In Jackson, Yater met three men who, unbeknownst to Yater, were DEA informants.[98] The informants were looking at a major drug dealer, Snoddy, who had staked Yater in the poker game.[99] The informants stayed in touch with Yater hoping to meet Snoddy.[100] Eventually, the informants lured Yater to Jackson for another poker game. While Yater was with the informants, the subject of cocaine arose.[101] After some discussion, "Yater agreed to sell [the informants] the drug."[102] A few weeks later, Yater delivered over 400 grams of cocaine to a DEA agent in Hammond, Louisiana, where he was arrested.[103]

On appeal, the Fifth Circuit first examined the government's conduct and found it "not as extreme as in *Tobias*."[104] Then, considering the totality of the circumstances, the court examined

---

[93] *Id.* at 274.
[94] *Id.* at 261.
[95] *Id.* at 275.
[96] *United States v. Yater*, 756 F.2d 1058, 1060 (5th Cir. 1985).
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.* at 1061.
[102] *Id.*
[103] *Id.*
[104] *Id.* at 1066.

Yater's conduct. Yater had a preexisting relationship with "Snoddy, a major drug operator."[105] Yater supplied "processed cocaine through his own contacts[,] without assistance from the government," meaning that Yater had a preexisting source for large amounts of cocaine.[106] Moreover, Yater promptly availed himself of the opportunity to engage in cocaine trafficking.[107] Yater admitted that "the confidential informants told him that he could make between $30,000 and $50,000 per month by trafficking in cocaine."[108] "After discussing the matter, Yater agreed to sell them the drug."[109]

Weighing the government's conduct (originating the cocaine deal) against Yater's conduct (a close relationship with a major drug dealer, an existing source for a large amount of processed powder cocaine, and immediately agreeing to do a drug deal), the court rejected "Yater's outrageous conduct argument."[110]

### *United States v. Rodriguez*, 603 Fed. Appx. 306 (5th Cir. 2015)

Upon learning that a group of five individuals was seeking to rob a narcotics stash house, the FBI set up a reverse-sting operation where Agent Zayas would pose as a "disgruntled narcotics courier looking for a group to rob a drug stash house."[111] The operation began when an informant introduced Zayas to three of the five defendants.[112] Zayas presented a fictional cover story, including the number of individuals at the stash house, the timing of the pickup, and the quantity and location of the drugs.[113] After telling his story, Zayas stated that he was nervous.[114] In response, Defendant Titi told him "Don't be…. This is going to turn out well."[115] Titi further commented

---

[105] *Id.* at 1060, 1066.
[106] *Id.* at 1066.
[107] *Id.* at 1061, 1066.
[108] *Id.* at 1061.
[109] *Id.*
[110] *Id.* at 1066.
[111] *United States v. Rodriguez*, 603 Fed. Appx. 306, 308 (5th Cir. 2015).
[112] *Id.*
[113] *Id.*
[114] *Id.* at 308-09.
[115] *Id.*

that Zayas need not worry and that the group would "go in there with everything."[116] Later in the meeting, the group formulated a plan for the robbery, while Zayas listened.[117]

Throughout the sting operation, Zayas participated in numerous meetings with various members of the group.[118] Eventually, all five defendants were arrested moments before the planned robbery was to commence.[119]

On appeal, the Fifth Circuit rejected the outrageous government conduct defense presented by two of the five defendants.[120] In finding that the defendants were "willing and active participants," the Court focused on the defendants' initial response to the cover story: "They initiated a large number of the phone calls and meetings with agent Zayas; they planned the robbery and touted their experience and readiness; they brought firearms and police clothing to the pre-robbery meetings and planning sessions; they did not express reluctance to proceed."[121] While noting that government can violate due process when it "instigate[s] the criminal activity," the Court found that Zayas' cover story by itself did not instigate the criminal activity.[122] Rather, the defendants instigated the crime by immediately beginning to plan the robbery without reluctance or hesitation.[123]

As the foregoing Fifth Circuit cases demonstrate, the totality of the circumstances inquiry focuses first on the government's conduct and then the conduct of the defendant when first government contact occurred. *See, e.g.*, *United States v. Duvall*, 846 F.2d 966. 969 (5th Cir. 1988) (where bribery conspiracy was already ongoing before FBI involvement); *United States v. Kang*,

---

[116] *Id.* at 309.
[117] *Id.*
[118] *Id.* at 309-10.
[119] *Id.* at 310.
[120] *Id.* at 313.
[121] *Id.*
[122] *Id.* (alteration in original).
[123] *Id.*

934 F.2d 621, 623 (5th Cir. 1991) (where defendant initiated the idea to bribe IRS agent); *United States v. Evans*, 941 F.2d 267, 270 (5th Cir. 1991) (where defendant entered a chemical supply store operated by the DEA, claimed to be a drug distributor, and discussed the manufacture of methamphetamine); *United States v. Gutierrez*, 343 F.3d 415, 417-18 (5th Cir. 2003) (where defendant immediately agreed to escort shipment of cocaine); *United States v. Barraza-Mena*, 647 F. App'x 319, 321 (5th Cir. 2016) (where defendant knew from the outset that she was helping launder "drug money").

**What Is or Is Not Outrageous**

Courts generally permit the government to use "undercover agents or informants" and a reasonable degree of "deception"[124] to "infiltrate an ongoing criminal enterprise, or to induce a defendant to repeat, continue, or even expand criminal activity."[125] However, courts have found government conduct outrageous when: (1) the government sought to "induce[] a defendant to become involved *for the first time* in certain criminal activity, as opposed to [the government] merely interposing itself in an ongoing criminal enterprise;"[126] (2) the government sought to "engineer and direct a criminal enterprise from start to finish;"[127] (3) the government used "excessive physical or mental coercion" to convince a defendant to engage in criminal conduct;[128] (4) the government "essentially manufactured the crime" "merely for the sake of pressing criminal

---

[124] U.S. Dep't of Just., U.S. Att'ys' Manual, CRM § 648.

[125] *Id.* (quoting *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994)).

[126] *United States v. Mosley*, 965 F.2d 906, 909, 911 (10th Cir. 1992) (emphasis added) (first citing *United States v. Twigg*, 588 F.2d 373, 381 (3d Cir. 1978); then citing *United States v. Gardner*, 658 F. Supp. 1573, 1576 (W.D. Pa. 1987); then citing *United States v. Batres-Santolino*, 521 F. Supp. 744, 752 (N.D. Cal. 1981); then citing *Greene v. United States*, 454 F.2d 783, 787 (9th Cir. 1971); and then citing *United States v. Silva*, 180 F. Supp. 557, 559-60 (S.D.N.Y. 1959)).

[127] *United States v. Black*, 733 F.3d 294, 310 (9th Cir. 2013) (quoting *United States v. Emmert*, 829 F.2d 805, 812 (9th Cir. 1987). *See also Twigg*, 588 F.2d at 381.

[128] *Black*, 733 F.3d at 302 (quoting *Untied States v. McClelland*, 72 F.3d 717, 721 (9th Cir. 1995)). *See also United States v. Batres-Santolino*, 521 F. Supp. 744, 748-50, 752 (N.D. Cal. 1981; *United States v. Gardner*, 658 F. Supp. at 1576-77 (W.D. Pa. 1987).

charges" against the defendant;[129] (5) the government persisted in inducing defendant after he demonstrated reluctance to engage in criminal behavior;[130] (6) the government consciously engaged in misconduct;[131] or (7) the government engaged in repeated misconduct.[132]

In its zeal to "get something" on Owens, the government did not limit itself to one or two outrageous acts but brought <u>all seven</u> of the foregoing examples to bear against Owens.

### 1.    Inducing Owens into *first time* bribery.

As described in the Motion, the FBI targeted Owens, a sitting district attorney with no criminal record.[133] Owens has never been charged with bribing a public official, nor was Owens suspected of bribing public officials. In fact, the government expressly denies that Owens was being investigated, yet the FBI targeted Owens with a scheme to bribe Jackson public officials.[134] The government expressly sought to "get something" on Owens by inducing him to "first time" bribery.[135]

### 2.    The FBI's scheme to bribe Jackson public officials.

Long before the government first contacted Owens, the FBI planned to "access" the "private room" at Owens's "Cigar Shop in the back" for the purpose of "being a party to conversations" that Owens had with "officials" including the "Mayor," "Banks," and "Angelique Lee" to "get something" on Owens "in his official capacity."[136] Indeed, the government alleges

---

[129] *Black*, 733 F.3d at 310 (quoting *United States v. Emmert*, 829 F.2d 805, 812-13 (9th Cir. 1987)); *See also United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *United States v. Batres-Santolino*, 521 F. Supp. 744 (N.D. Cal. 1981); *United States v. Gardner*, 658 F. Supp. 1573 (W.D. Pa. 1987); *United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984).

[130] *Batres*, 521 F. Supp. at 749-50; *Gardner*, 658 F. Supp. at 1575-77; *Lard*, 734 F.2d at 1296-97.

[131] *U.S. v. Marshank*, 777 F. Supp. 1507, 1523–24 (N.D. Cal. 1991); *Gardner*, 658 F. Supp. at 1576.

[132] *United States v. Quintanilla-Chavez*, No. SA-25-CR-388-XR, 2025 WL 2982191, at *19–20 (W.D. Tex. Oct. 20, 2025).

[133] Doc No. 75, Motion to Dismiss Indictment, at 11-18, 29-30.

[134] *Id.* at 27-29.

[135] Doc. No. 75-3, Mayfield Interview, at 9-12, 14, 28, 89, 101, 107, 113, 116, 145, 158, 196.

[136] *Id.* at 12, 14, 28, 30, 34, 57, 63, 101, 113, 166.

Owens "became predisposed" to commit bribery by October 16, 2023, which was three months after first government contact.[137] The scheme to bribe Jackson public officials indisputably belonged to the government.

### 3.    Isolation and alcohol to mentally coerce Owens.

The government used extreme mental coercion on Owens over a period of months by isolating Owens for hours and sometimes days and by using alcohol to break down his resistance, overcome his reluctance to participate in the alleged scheme, and elicit allegedly incriminating statements.[138]

### 4.    Manufacturing a scheme to "get something" on Owens.[139]

The FBI manufactured the alleged bribery scheme for the purpose of charging Owens. The FBI's expressly stated goal was to "get something" on Owens.[140] In furtherance of its goal, the FBI attempted to coerce Mayfield into incriminating Owens. When this failed, the FBI targeted Owens with an "reverse sting" that was tailor made for Owens.[141] The FBI's agents posed as real estate developers because the FBI knew that Owens had been a real estate developer. The FBI's scheme centered around a City hotel project that the FBI knew was to be located directly adjacent to Owens's existing downtown businesses. The FBI agents claimed to have a vision to rejuvenate Jackson because they knew Owens and other black leaders believed strongly in revitalizing Jackson.

---

[137] Doc. No. 3, Indictment, at 5-6; Doc. No. 75, Motion to Dismiss Indictment, at 24-25.
[138] Doc. No. 75, Motion to Dismiss Indictment, at 44-59.
[139] Doc. No. 75-3, Mayfield Interview, at 101.
[140] *Id.*
[141] Doc. No. 75, Motion to Dismiss Indictment, at 27-28.

### 5.    Persistent inducement despite Owens's rejection and reluctance.

The FBI persisted in inducing Owens for months after he rejected the FBI's criminal overtures and exhibited reluctance.[142] Rather than moving on, the FBI actually increased its inducements by flying Owens to Nashville on a private jet where the FBI isolated Owens for days to ensure heavy alcohol consumption and to induce Owens further including by promising more private jet trips to places like Miami and Dallas. Touting their lifestyle as an inducement, one of the FBI agents told Owens, "we work hard, but we play harder. So you tell me where you want to go."[143] Essentially presenting Owens a blank check, the FBI agent said, "You let me know. I'll do anything."[144]

### 6/7.    Government misconduct

The Government elicited false testimony from the FBI concerning its investigation of Owens. Relying on this false testimony, the Government made multiple misrepresentations in the indictment. The Government's misrepresentations were intended to conceal the Mayfield Interview and undermine Owens's defenses.[145]

The Fifth Circuit deals harshly when the Government presents false testimony at trial or before the grand jury.[146] "[W]here the Government presents false testimony to the grand jury, the indictment may be dismissed … if the testimony is knowingly sponsored by the Government and material to the decision to indict."[147] "A statement is material if it is capable of influencing the

---

[142] *Id.* at 36-58.

[143] Doc. No. 75-44, FBI UC Recording, dated Oct. 9, 2023, at 02:45:00–02:45:07.

[144] *Id.* at 02:46:01–02:46:04.

[145] Doc. No. 75, Motion to Dismiss Indictment, at 28-32; Doc No. 75-17, Correll GJ Testimony, at 9.

[146] *United States v. Forte*, No. 01-21216, 2003 U.S. App. LEXIS 28046, at *15 (5th Cir. Mar. 24, 2003) (citing *Miller v. Pate*, 386 U.S. 1 (1967)). "[A] court, on occasion, must use its supervisory power to safeguard the integrity of the grand jury process." *Sinha v. United States*, No. 1:14cr9-HSO-JCG-1, 2020 U.S. Dist. LEXIS 57090, at *40 (S.D. Miss. Apr. 1, 2020) (citing *United States v. Strouse*, 286 F.3d 767, 771 (5th Cir. 2002)).

[147] *Forte*, 2003 U.S. App. LEXIS 28046, at *16 (citing *Strouse*, 286 F.3d at 773-74).

factfinder with regard to the issue before it."[148] The "false statements need not be material to any particular issue, but may be material to collateral matters that might influence the court or the jury in the decision of the question before the tribunal."[149]

The Government's investigation and prosecution of Owens has been outrageous. Owens is entitled to dismissal of the indictment based on the Government's outrageous conduct.

## II.    ENTRAPMENT AS A MATTER OF LAW

### A.    Entrapment

Entrapment occurs when the government induces a defendant to commit a crime that he was not predisposed to commit *prior* to the government's intervention.[150] "The critical determination in an entrapment defense is whether criminal intent *originated* with the defendant *or* with government agents."[151] "In their zeal to enforce the law … Government agents may not *originate* a criminal design, *implant* in an innocent person's mind the disposition to commit a criminal act, and then *induce* commission of the crime so that the Government may prosecute."[152] Entrapment as a matter of law is an appropriate finding when the evidence is such that a reasonable jury could not find beyond a reasonable doubt that: (1) the government lacked inducement; and (2) the defendant was predisposed.[153]

---

[148] *Id.* (citing *Strouse*, 286 F.3d at 771).

[149] *United States v. Strouse*, 286 F.3d 767, 771 (5th Cir. 2002) (emphasis added) (quoting *United States v. Williams*, 993 F.2d 451, 455 (5th Cir. 1993), *abrogated on other grounds by Texas v. Cobb*, 532 U.S. 162 (2001)).

[150] *Jacobson v. United States*, 503 U.S. 540, 548-49 (1992).

[151] *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir. 2009) (emphasis added) (quoting *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997)).

[152] *Jacobson,* 503 U.S. at 548 (emphasis added) (citing *Sorrells v. United States*, 287 U.S. 435, 442 (1932)).

[153] *United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001) (citing *United States v. Thompson*, 130 F.3d 676, 689 (5th Cir. 1997)); *United States v. Arditti*, 955 F.2d 331, 342 (5th Cir. 1992).

## B.    Government Inducement

Government inducement is "the creative activity of law enforcement officials in spurring an individual to crime."[154] The inducement must be more than "simply providing an opportunity or facilities to commit the offense,"[155] but it need not be substantial.[156] Inducement has been found when the government engaged in: "actions designed specifically to take advantage of the defendant's weaknesses,"[157] "persuasion or mild coercion [of the defendant],"[158] "pleas [to a defendant] based on need, sympathy, or friendship,"[159] or "persist[ing] in encouraging criminality after a defendant rejects overtures."[160]

## C.    Predisposition

To determine predisposition, the focus is "on the defendant's circumstances *before* and *at the time* the government *first* approached him with a proposal to commit the crime."[161] "[T]he question is whether the defendant intended, was predisposed, or was willing to commit the offense *before first being approached* by government agents."[162] Importantly, "predisposition must be *independent* of government action."[163] In other words, the government cannot "rely on [a defendant's] conduct that was induced by government agents…."[164]

---

[154] *Theagene*, 565 F.3d at 922 (quoting *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003)).

[155] *Id.* (quoting *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997)).

[156] *See United States v. Lard*, 734 F.2d 1290, 1292, 1294-95 (8th Cir. 1984); *United States v. Martinez*, 122 F.3d 1161, 1164-65 (9th Cir. 1997).

[157] *Theagene*, 565 F.3d at 922 (quoting *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003)).

[158] *Id.* (quoting *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985)).

[159] *Id.* (quoting *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985)).

[160] *Id.* (first citing *Jacobson*, 503 U.S. at 546-47, 549 n.2; and then citing *Bradfield*, 113 F.3d at 518, 523-24). "Reluctance can prompt further efforts at government persuasion that can rise to the level of inducement, supporting the entrapment defense." *United States v. Anderson*, 55 F.4th 545, 553 (7th Cir. 2022).

[161] *United States v. Anderson*, 55 F.4th 545, 552 (7th Cir. 2022) (third emphasis added) (quoting *United States v. Mayfield*, 771 F.3d, 417, 442 (7th Cir. 2014)).

[162] *Theagene*, 565 F.3d at 919 (emphasis in original) (quoting *Bradfield*, 113 F.3d at 522). *See also Jacobson*, 503 U.S. at 548-49.

[163] *United States v. Byrd*, 31 F.3d 1329, 1336 (5th Cir. 1994) (emphasis in original).

[164] *United States v. Baez*, 761 Fed. Appx. 23, 26 (2d Cir. 2019). *See also United States v. Hollingsworth*, 27 F.3d 1196, 1201 (7th Cir. 1994) ("[A] criminal predisposition induced by government action cannot be used to defeat an entrapment defense." (citing *Jacobson*, 503 U.S. at 549-50, 549 n.2)); *United States v. Mayfield*, 771 F.3d 417, 437 (7th Cir. 2014) ("That the defendant eventually agreed to commit the crime in response to the

Lack of predisposition is evidenced by reluctance,[165] *i.e.*, "whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducements."[166] Courts have found "reluctance" to be the "most important factor in determining the lack of predisposition as a matter of law…."[167] Reluctance can be shown through "attempts to return [a] discussion to lawful conduct."[168] "The specific reason a defendant was reluctant to commit the offense does not matter."[169] Rather, a court may find entrapment as a matter of law – that inducement was present and predisposition was absent – when "the government made overture after overture after overture before the defendant agreed to commit the crime."[170]

### D.    Caselaw

***Sherman v. United States*, 356 U.S. 369 (1958)**

In *Sherman v. United States*, the Supreme Court first recognized entrapment as a matter of law.[171]

---

government's efforts does not necessarily prove predisposition, for if the inducement was significant enough to cause even a nonpredisposed person to commit the crime, no inference can be drawn about predisposition from the success of the government's efforts."); *United States v. Acosta*, 67 F.3d 334, 339 (1st Cir. 1995) ("[P]redisposition does not count if it is itself the product of improper government conduct."); *United States v. Brooks*, 215 F.3d 842, 846 (8th Cir. 2000) ("Both sales to which the government directs us occurred after [informant's] initial inducement…. Thus, [defendant's] actions *after* his first sale to [agent] are irrelevant to the issue of his predisposition as it existed *before* this initial sale." (emphasis in original)).

[165] *Theagene*, 565 F.3d at 920 ("A lack of predisposition can appear from, for example, lack of prior interest or experience related to the crime, significant hesitation or unwillingness, or attempts to return discussion to lawful conduct.").

[166] *United States v. McLernon*, 746 F.2d 1098, 1113 (6th Cir. 1984) (quoting *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983)). However, the absence of reluctance does not preclude a finding of entrapment as a matter of law. *Jacobson*, 503 U.S. at 546-47 (finding entrapment as a matter of law where defendant promptly accepted first criminal offer after government's inducement campaign).

[167] *McLernon*, 746 F.2d at 1113 (quoting *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983)). *See also Theagene*, 565 F.3d at 920; *Lard*, 734 F.2d at 1294 ("Various courts making the predisposition determination have similarly noted the important distinction between a defendant who eagerly commits a crime upon mere government suggestion, and one who reluctantly does so after further solicitation.").

[168] *Theagene*, 565 F.3d at 920.

[169] *Anderson*, 55 F.4th at 549.

[170] *Id.* at 557. *See also Baez*, 761 Fed. Appx. at 26 ("The key question with regard to 'prompt availment' is not the precise amount of time that passes between the government contact and the criminal conduct, but rather the degree to which the defendant exhibits a ready willingness to engage in the criminal conduct with as little delay as possible, indicating that the conduct was an independent choice and not the product of persuasion or badgering by the government agent.").

[171] 356 U.S. 369 (1958).

Sherman met Kalchinian while both were in treatment for drug addiction.[172] Unbeknownst to Sherman, Kalchinian was a government informant.[173] Kalchinian asked Sherman for narcotics.[174] At first, Sherman avoided the issue.[175] However, Kalchinian persisted.[176] Moreover, Kalchinian implied that he was suffering without the narcotics.[177] Sherman acquiesced and was arrested.[178] The jury rejected Sherman's entrapment defense at trial and the Second Circuit affirmed.[179]

The Supreme Court reversed finding Sherman was entrapped as a matter of law.[180] Kalchinian's repeated requests and use of sympathy were sufficient to establish government inducement.[181] Sherman's reluctance to agree to Kalchinian's requests established lack of predisposition.[182]

Owens easily satisfies the *Sherman* standard for entrapment as a matter of law. First Government contact with Owens occurred on July 26, 2023. From this point forward, Owens exhibited reluctance despite months of relentless Government inducement.[183] Moreover, the Government has no evidence of predisposition. On August 14, 2023, Owens expressly rejected the Government's criminal overtures and "attempt[ed] to return [the] discussion to lawful conduct."[184] For months after first contact, Owens exhibited reluctance.[185] Indeed, Government "overture after

---

[172] *Id.* at 371.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] *Id.* at 371-72.
[180] *Id.* at 372-73.
[181] *Id.*
[182] *Id.* at 373-76.
[183] Doc. No. 75, Motion to Dismiss Indictment, at 32-60.
[184] *Id.* at 35-38; *United States v. Theagene*, 565 F.3d 911, 920 (5th Cir. 2009).
[185] Doc. No. 75, Motion to Dismiss Indictment, at 32-60.

overture after overture" as occurred on August 14 establishes Government inducement *and* lack of predisposition based on reluctance, and, thus, entrapment as a matter of law.[186]

### *Jacobson v. United States*, 503 U.S. 540 (1992)

In *Jacobson v. United States*, the Supreme Court held that Jacobson was entrapped as a matter of law.[187]

Jacobson ordered two magazines from an adult bookstore which contained nude photographs of young boys which, at the time, were not prohibited.[188] Subsequently, federal law changed.[189] Thereafter, the government obtained Jacobson's name and address from the adult bookstore's mailing list.[190] Using three fictitious organizations and a fabricated pen pal, the government sent Jacobson letters and surveys to probe his willingness to violate the law.[191] The fictitious organizations purported to advocate for sexual freedom without restrictions.[192] During this period, there was no evidence that Jacobson possessed child pornography.[193] Finally, Jacobson succumbed to the government's letters and surveys and ordered prohibited materials.[194] Jacobson was convicted and the Eighth Circuit affirmed.[195] The Supreme Court reversed the conviction.[196]

The Supreme Court found the government's letters and surveys "excited" Jacobson's interest in "sexually explicit materials banned by law." Once the government offered Jacobson

---

[186] *Anderson*, 55 F.4th at 557. *See also Baez*, 761 Fed. Appx. at 26 ("The key question with regard to 'prompt availment' is not the precise amount of time that passes between the government contact and the criminal conduct, but rather the degree to which the defendant exhibits a ready willingness to engage in the criminal conduct with as little delay as possible, indicating that the conduct was an independent choice and not the product of persuasion or badgering by the government agent.").
[187] 503 U.S. 540 (1992).
[188] *Id.* at 542-43.
[189] *Id.* at 543.
[190] *Id.*
[191] *Id.* at 543-46.
[192] *Id.* at 543-45.
[193] *Id.* at 546.
[194] *Id.* at 546-47.
[195] *Id.* at 547.
[196] *Id.* at 547-48.

pornography, he promptly accepted. However, the Court found the government used rhetoric criticizing "censorship and the infringement of individual rights" to place "substantial pressure" on Jacobson and induce him into ordering the prohibited materials.[197] The Court held that Jacobson's "ready response" to the government's solicitation was "the product of the attention that the Government had directed at [him]" for two years prior to the solicitation.[198] The Court also rejected the government's argument that Jacobson was predisposed. The Court found no evidence that Jacobson was willing to receive illicit materials through the mail before the government offered them to Jacobson.[199]

Based on *Jacobson*, Owens indisputably was entrapped as a matter of law. Indeed, the intensity of the FBI's inducements directed at Owens far surpass what the Supreme Court found unreasonable in *Jacobson*. Jacobson simply received mailers, while the FBI bombarded Owens for months with face-to-face contact, communications, private jets, massive amounts of alcohol, fancy dinners, raucous parties, and promises of future private jet travel and parties on private yachts and in exclusive clubs in Miami and Dallas.

**The Fifth Circuit Test for Predisposition**

***United States v. Reyes*, 239 F.3d 722 (5th Cir. 2001)**

In *Reyes*, the Fifth Circuit identified several factors courts should consider when determining whether a defendant is predisposed.[200] First, the defendant's reluctance or the lack thereof to commit the offense.[201] A "defendant's ready and willing participation in government-solicited criminal activity, standing alone, is sufficient to prove predisposition."[202] However,

---

[197] *Id.* at 552.
[198] *Id.* at 550.
[199] *Id.* at 551-53.
[200] *United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001).
[201] *Id.*
[202] *Id.* (citing *United States v. Wise*, 221 F.3d 140, 154 (5th Cir. 2000)).

reluctance proves the defendant lacks predisposition.[203] "Whether the defendant demonstrated a reluctance to commit the offense that was overcome by government persuasion … *is the most important factor in evaluating a defendant's disposition.*"[204] Second, the defendant's desire for profit.[205] Third, whether the defendant demonstrated knowledge, experience, or expertise concerning the offense.[206] Fourth, the criminal history or character of the defendant.[207] Fifth, who initiated the criminal activity.[208] Sixth, the nature of the government's inducement.[209]

### *United States v. Martinez*, 122 F.3d 1161 (9th Cir. 1997)

In *United States v. Martinez*, the Ninth Circuit applied factors similar to the Fifth Circuit in *Reyes* in affirming a district court dismissal based on entrapment as a matter of law.[210]

Martinez was approached by a government informant, Plancarte, who claimed he "bought and sold drugs on a large scale."[211] Plancarte repeatedly tried to involve Martinez in a drug deal.[212] However, "Martinez did not agree to any actual transaction until more than *two months* after first being approached by Plancarte."[213] After *two months*, Martinez acquiesced.[214] Martinez acquired methamphetamine and sold it to Plancarte four times.[215] Martinez was convicted but he was subsequently acquitted after the district court found entrapment as a matter of law.[216]

---

[203] *Id.*
[204] *Id.* (emphasis added) (quoting *United States v. Higham*, 98 F.3d 285, 290-91 (7th Cir. 1996) (emphasis added)).
[205] *Id.*
[206] *Id.*
[207] *Id.*
[208] *Id.*
[209] *Id.*
[210] 122 F.3d 1161, 1163 (9th Cir. 1997); *Reyes*, 239 F.3d at 739.
[211] *Id.* at 1162.
[212] *Id.* at 1162, 1164.
[213] *Id.* at 1164 (emphasis added).
[214] *Id.*
[215] *Id.* at 1162-63 (emphasis added).
[216] *Id.* at 1162.

The Ninth Circuit relied on factors evidencing predisposition or a lack thereof that are similar to the Fifth Circuit's *Reyes* factors (though arranged differently).[217]

First, the character and reputation of the defendant favors Martinez because the government conceded this point.[218] The court noted in its opinion that Martinez had no criminal record.[219]

Second, whether the government made the initial suggestion of criminal activity also favors Martinez.[220] The government concedes that its informant approached Martinez and suggested a drug transaction.[221]

Third, whether the defendant engaged in the activity for profit favors the government, as the evidence showed that Martinez would have profited and needed the money.[222]

Fourth, whether the defendant showed any reluctance.[223] The court called this the "most important factor" and found it favored Martinez, as well.[224] The court found the two month delay between the informant's suggestion of a drug deal and Martinez agreeing to participate compelling.[225] Moreover, the court relied on undisputed testimony that the informant persisted in his efforts to persuade Martinez to participate.[226]

Fifth, the nature of the government's inducement favors Martinez as well.[227] The uncontradicted testimony showed that the informant "spent two months wooing Martinez," "cajoled, scolded, and pressured Martinez," "attempted to sway Martinez with promises of wealth

---

[217] *Id.* at 1163-65. The Ninth Circuit's list of five factors do not include the following Fifth Circuit factor: (3) demonstrated knowledge, experience, or expertise concerning the offense. *Id.* at 1163. However, the court in *Martinez* separately considered arguments falling outside of their five factors, including Martinez's alleged knowledge and experience in drug transactions. *Id.* at 1165.

[218] *Id.* at 1163.

[219] *Id.*

[220] *Id.* at 1163-64.

[221] *Id.*

[222] *Id.*

[223] *Id.*

[224] *Id.* at 1164.

[225] *Id.*

[226] *Id.*

[227] *Id.*

and friendship."[228] The court concluded "that four of the five predisposition factors weigh in favor of Martinez, including the most important of them."[229]

The court held that a reasonable jury could not find predisposition beyond a reasonable doubt and affirmed the district court acquittal based on entrapment as a matter of law.[230] The foregoing factors overwhelmingly favor Owens.

**Reluctance**

(1)    Three months after first learning about the alleged scheme, the government alleges Owens was "ready, willing, and predisposed" to participate.[231] During these three months, the government admittedly induced Owens. The government admits its inducements culminated in the FBI taking Owens and his friends on a luxury vacation to Nashville on a private jet to party for several days.[232] The fact that it took the FBI nearly three months before it could claim Owens was "ready" to participate, and that the FBI felt a private jet trip to Nashville for Owens and his friends was necessary to close the deal is more than sufficient to show reluctance.

**Desire for Profit**

(2)    Owens did not demand compensation.[233] The government offered[234] and "predisposition must be *independent* of government action."[235] The government cannot "rely on conduct that was induced by government agents to prove that [the] defendant was predisposed to commit the charged crime."[236] Owens gave a significant portion of his compensation to others in

---

[228] *Id.*

[229] *Id.* at 1165.

[230] *Id.*

[231] Doc. No. 3, Indictment at ¶ 23.

[232] *Id.* at ¶ 22.

[233] Doc. No. 75-29, FBI UC Recording, dated Aug. 14, 2023, at 04:20-04:25 (FBI UC Agent: "Whatever team we put together, everybody makes money.").

[234] *Id.*

[235] *United States v. Byrd*, 31 F.3d 1329, 1336 (5th Cir. 1994) (emphasis in original).

[236] *United States v. Baez*, 761 Fed. Appx. 23, 26 (2d Cir. 2019). *See also Hollingsworth*, 27 F.3d at 1201 ("[A] criminal predisposition induced by government action cannot be used to defeat an entrapment defense." (citing

the Group who the government was not interested in ensnaring. In fact, the FBI agents (who wanted to charge Owens based on a larger dollar figure) chided Owens for not keeping more for himself.

### Demonstrated Knowledge, Experience, or Expertise

(3)    The government claims Owens was not suspected of bribery, nor was he being investigated when the FBI undercover agent infiltrated the Cigar Shop on July 26, 2023.[237] The government does not allege, nor does it have evidence of, demonstrated knowledge, experience, or expertise in bribing public officials to get City of Jackson contracts.

### Criminal History

(4)    Owens indisputably has no criminal record.

### Initial Suggestion of Criminality

(5)    The government indisputably contacted Owens and made the initial criminal overture followed by dozens of repeated criminal overtures.[238]

### Nature of the Inducement

(6)    None of the cases cited in this brief, where the Supreme Court and circuit courts found entrapment as a matter of law, compare to the nature of the inducement the FBI brought to bear against Owens in its expressly stated effort to "get something" on him. As the Seventh Circuit explained, "the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question."[239]

---

*Jacobson*, 503 U.S. at 549-50, 549 n.2)); *United States v. Mayfield*, 771 F.3d 417, 437 (7th Cir. 2014) ("That the defendant eventually agreed to commit the crime in response to the government's efforts does not necessarily prove predisposition, for if the inducement was significant enough to cause even a nonpredisposed person to commit the crime, no inference can be drawn about predisposition from the success of the government's efforts.").

[237] Doc. No. 75, Motion to Dismiss Indictment, at 28; Ex. 17, Correll GJ Testimony, at 9.

[238] Doc. No. 75, Motion to Dismiss Indictment, at 32-38.

[239] *United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994).

***United States v. Lard*, 734 F.2d 1290 (8th Cir. 1984)**

In *United States v. Lard*, the Eighth Circuit reversed convictions for creating, possessing, and selling a pipe bomb based on entrapment as a matter of law.[240]

An ATF undercover agent asked to buy a sawed off shotgun from Lard, but Lard declined.[241] The agent then asked about other guns Lard may be willing to sell, but Lard had none.[242] Lard offered the agent a small (legal) detonator, but the agent declined.[243] Lard then offered to tape shotgun shells to the detonator to increase its effect.[244] Again, the agent declined.[245] Trying again, the ATF agent "implored Lard that he really needed a pipe bomb to accomplish his purpose."[246] At some point, the agent smoked marijuana with Lard "to gain [his] confidence and lure him" into making the pipe bomb.[247] Finally, Lard agreed to make a pipe bomb.[248]

The Eighth Circuit found entrapment as a matter of law.[249] The court found Lard's lack of criminal history and initial reluctance to commit the crime were enough to find entrapment as a matter of law.[250] The court acknowledged that Lard expressed less reluctance than the defendant in *Sherman*, but explained the difference was one of "degree, not kind."[251] The court found Lard's lack of predisposition to be "comparable in strength" to Sherman based on Lard's complete lack of a criminal record related to dealing in unregistered firearms. Conversely, Sherman had an

---

[240] 734 F.2d 1290 (8th Cir. 1984).
[241] *Id.* at 1292.
[242] *Id.*
[243] *Id.* at 1292, 1294.
[244] *Id.* at 1292.
[245] *Id.*
[246] *Id.*
[247] *Id.* at 1292, 1297.
[248] *Id.* at 1292.
[249] *Id.* at 1294.
[250] *Id.* at 1294-95.
[251] *Id.* at 1295.

extensive history in drug trafficking.[252] The court found the government "ensnared Lard by implanting in him a law-breaking disposition that was not theretofore present.[253]

The court also found that the government's "overinvolvement in conceiving and contriving the crimes here approached being 'so outrageous that due process principles should bar the government'" from obtaining a conviction.[254] Specifically, the court found the ATF agent did not pursue "discovery or suppression of ongoing illicit dealings" but rather "was aimed at creating new crimes for the sake of bringing criminal charges against Lard, who, before being induced was lawfully and peacefully minding his own affairs."[255] The court also found the agent's criminal activity (smoking marijuana) indicative of their "overzealous efforts" to "gain Lard's confidence and lure him into" criminal activity.[256]

### *United States v. Brooks*, 215 F.3d 842 (8th Cir. 2000)

In *Brooks*, the Eighth Circuit found a defendant (with far less reluctance than Owens) was entrapped as a matter of law.[257] Brooks regularly purchased heroin from a government informant, Walker.[258] Shortly after a heroin sale, Walker asked Brooks to return some of the heroin so Walker could give it to another customer who was suffering from withdrawal.[259] In truth, Walker wanted Brooks to sell the heroin to a government agent.[260] Walker contacted Brooks multiple times over the following twenty-four hours.[261] Brooks refused until Walker, using Brooks's addiction against him, threatened to cut him off and not sell him any more heroin.[262]

---

[252] *Id.*
[253] *Id.* at 1296.
[254] *Id.* at 1296-97 (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).
[255] *Id.* at 1297.
[256] *Id.*
[257] 215 F.3d 842 (8th Cir. 2000).
[258] *Id.* at 844.
[259] *Id.*
[260] *Id.*
[261] *Id.*
[262] *Id.* at 844-45.

The Eighth Circuit found Brooks was entrapped as a matter of law. Even though Brooks had a criminal history related to the distribution of drugs, the court found that the government's strategic use of Brooks's addiction was sufficient on balance to overcome his criminal conduct.[263]

Owens easily satisfies the standard established in *Brooks* for lack of predisposition. Brooks's reluctance lasted a few hours. Owens, however, endured a wave of increasingly lavish inducements that lasted for months.[264]

### *United States v. Barta*, 776 F.3d 931 (7th Cir. 2015)

In *Barta*, the Seventh Circuit held that the government induced Barta.[265] With Owens, the government used the *Barta* script but to the extreme.

An FBI undercover agent, Castro, told Medrano that a fictitious Los Angeles County ("LA County") official would award Medrano a contract to supply bandages to the LA County hospital system in exchange for a bribe.[266] Medrano did the deal and approached agent Castro about doing another.[267] For this second deal, Medrano recruited Buenrostro and later Barta.[268]

Barta owned Sav-Rx, a company that dispensed medications for the Cook County hospital system in Chicago, Illinois.[269] Medrano and Buenrostro told the government that "Barta would be willing to provide a proposal [to LA County] and payment."[270]

On March 21, Barta met Castro and explained, "I'm not trying to sell you anything."[271] Barta said he was attending the meeting because "Gus [Buenrostro] asked me to come and tell you

---

[263] *Id.* at 846.
[264] Doc. No. 75, Motion to Dismiss Indictment, at 38-60.
[265] 776 F.3d 931 (7th Cir. 2015).
[266] *Id.* at 933.
[267] *Id.*
[268] *Id.* at 933-34.
[269] *Id.* at 934.
[270] *Id.*
[271] *Id.*

what we [Sav-Rx] do."[272] Agent Castro described the payment he was seeking as a "finder's fee," "good faith money," and a "commission."[273] Barta replied that he "understood what Castro was saying" and closed the meeting with, "I hope we can do some business."[274]

Castro and Barta had no communication for several weeks.[275] On May 9, Castro, Medrano, Buenrostro, and Barta met.[276] Castro told the group that the LA County official would "ensure approval of the contract by tailoring the request for proposal from the county to favor Sav-Rx."[277] Barta expressed concern that Sav-Rx could not solve the issues that LA County faced.[278] Barta did state, however, that if LA County had an issue that Sav-Rex could solve, "I'm in 100%."[279]

Recognizing Barta's hesitation, the FBI fabricated new "issues" at LA County for Sav-Rx to solve.[280] The FBI also sweetened the deal to induce Barta further.[281] Agent Castro told Barta by email that the original projection of 1 million prescriptions per year under the contract was now 2 million in the first year and 3 million prescriptions per year thereafter.[282] Castro emailed Barta but Barta did not respond.[283] However, Castro and Buenrostro communicated over fifty times with "several of them urging Buenrostro to elicit a response from Barta."[284]

On June 12, Castro issued an ultimatum.[285] "If I don't hear anything from [Barta] by the end of the day, I will assume he is no longer interested and my guy [at LA County] will move

---

[272] *Id.*
[273] *Id.*
[274] *Id.*
[275] *Id.*
[276] *Id.*
[277] *Id.* at 934-35.
[278] *Id.* at 935.
[279] *Id.*
[280] *Id.*
[281] *Id.*
[282] *Id.*
[283] *Id.* at 935-36.
[284] *Id.* at 936.
[285] *Id.*

on."[286] Castro and Buenrostro agreed to meet but "the next day, Buenrostro told [Castro] that Barta was not going to be there."[287] Ultimately, Castro and Buenrostro traveled to Nebraska where Barta lived to meet with Barta.[288] Barta made clear why he agreed to meet.[289] "I'd like to see Gus [Buenrostro] do something. You know Gus, Gus has always been a day late and a dollar short his whole damn life."[290] As the meeting ended, Barta wrote Castro "a Sav-Rx check for $6,500 to be used to pay the fictional county official."[291] Six days later, Barta was arrested.[292]

On appeal, the Seventh Circuit reversed Barta's conviction finding he was entrapped as a matter of law.[293] In reaching its decision, the court found multiple government inducements:

> (1) The FBI frequently emailed and called Barta, with no response from Barta. These were "repeated attempts at persuasion." (2) The FBI invented false deadlines for Barta to commit to the deal and invented false problems for the Los Angeles County hospital system. These were "fraudulent representations." (3) The FBI significantly sweetened what would have already been an attractive deal to Barta and his co-defendants. Here we have "promises of reward beyond that inherent in the customary execution of the crime." (4) And the FBI pressed Barta—both directly and through Buenrostro—to make a deal that it had reason to believe Barta would be making mainly to benefit his less fortunate friend, Buenrostro. Here we have "pleas based on need, sympathy, or friendship."[294]

Like *Barta*, the FBI targeted Owens with "repeated attempts at persuasion" to overcome his reluctance. Unlike *Barta*, the FBI unleashed an avalanche of communications and face-to-face contact on Owens to overcome his rejection of the FBI's criminal overtures and reluctance. *Infra*.

Like *Barta*, the FBI made "fraudulent representations" to create a false need to bribe Jackson public officials. The FBI agents told Owens of past experiences where payments to officials were required to complete projects to benefit inner-city communities like Jackson. Unlike

---

[286] *Id.*
[287] *Id.*
[288] *Id.*
[289] *Id.*
[290] *Id.*
[291] *Id.*
[292] *Id.*
[293] *Id.* at 937-39.
[294] *Id.* at 937.

*Barta*, Owens rejected the FBI's insistence that bribery be a part of the project, whereas Barta said he was "in 100%" so long as LA County has a problem that Sav-Rx could solve.[295]

Like *Barta*, Owens did not communicate with the FBI for weeks after meeting on August 14. To overcome Owens's rejection and reluctance, the FBI (as it did with Buenrostro) peppered Owens's friend, Roberts, with texts and calls "urging [Roberts] to elicit a response from [Owens]."[296] Unlike *Barta*, Owens exhibited demonstrable reluctance for months while Barta said he was "in 100%" as long as LA County had an issue Sav-Rx could solve.

Like *Barta*, the FBI sweetened the deal to overcome Owens's reluctance. The FBI made inducements and "promises of reward beyond that inherent in the customary execution of the crime."[297] Unlike *Barta*, the inducements to Owens did not merely go "beyond" the typical rewards, but transcended them by light years.

Like *Barta*, the FBI targeted Owens with "pleas based on need, sympathy, or friendship." As described above, the FBI cultivated a fraudulent "friendship" with Owens derived from dozens of hours drinking, eating, traveling, and partying together. Unlike *Barta*, where FBI agent Castro spoke with Barta four times, the FBI invested countless hours with Owens drinking, dining, traveling, and partying.

The FBI's inducement of Barta pales in comparison to what it brought against Owens. Standing alone, the inducements to Owens prove, not only government inducement, but also lack of predisposition, as Government "overture, after overture, after overture" proves both.[298]

---

[295] *Id.* at 935.
[296] *Id.* at 936.
[297] *Id.* at 937.
[298] *United States v. Anderson*, 55 F.4th 545, 557 (7th Cir. 2022).

The Government alleges Owens "became" predisposed three months after the Government's first contact with Owens.[299] However, the Supreme Court is clear on this issue. Predisposition is determined at the time of the Government's first contact with the defendant, not three months down the road.[300] The Government first contacted Owens on July 26, 2023.[301] There is no allegation that Owens was predisposed to bribe public officials before the FBI showed up. Only after a three months of outrageous inducements does the Government allege that Owens "became" predisposed.

## III.    "SPEAKING INDICTMENTS"

"The purpose of an indictment is to apprise a defendant of the charge against him in order to permit preparation of a defense, to protect against double jeopardy, and to inform the court of the essential facts constituting the offense charged."[302] This principle is reflected in Federal Rule of Criminal Procedure 7(c)(1), "which dictates that an indictment 'must be a plain, concise, and definite written statement of *the essential facts* constituting the offense charged,' followed by a citation to the provision of law the defendant is alleged to have violated."[303] The chief function of an indictment is "to inform the defendant of the nature of the accusation against him"[304] by providing enough information regarding *the essential facts* to allow the defendant and the court to "decide whether they are sufficient in law to support a conviction."[305]

In most criminal cases, the indictment "merely tracks the elements of the statutory language, cites the statutory provision involved, and provides a brief description of the alleged

---

[299] Doc. No. 3, Indictment, at 5-6.
[300] *Jacobson v. United States*, 503 U.S. 540, 548-49 (1992); *United States v. Theagene*, 565 F.3d 911, 919 (5th Cir. 2009).
[301] Doc. No. 75-4, FBI Reporting Document, dated Aug. 1, 2023, at 2.
[302] *United States v. Trump*, 736 F. Supp. 3d 1206, 1216 (S.D. Fla. 2024) (citing *United States v. Haas*, 583 F.2d 216, 219 (5th Cir. 1978)).
[303] *Id.* (emphasis added) (quoting Fed. R. Crim. P. 7(c)(1)).
[304] *Russell v. United States*, 369 U.S. 749, 767 (1962).
[305] *Id.* at 768 (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875)).

misconduct with a relevant time period."[306] For Owens, however, the government used a so-called "speaking indictment" packed with "various nonessential allegations more akin to a narrative of the government's theory of prosecution."[307] Speaking indictments are disfavored over concern that "any unnecessary language in a 'speaking' indictment might be used for an unnecessary or improper purpose."[308]

In high-profile prosecutions, speaking indictment are used to influence the jury pool prior to trial. "[B]y design, the government's speaking indictments advocate a story – one usually reserved for opening and closing jury arguments, but now intended for the news media, the jury pool and the trial jury."[309] Through filing a self-serving narrative, prosecutors are afforded "the unchecked opportunity to shape public perception of a case from the outset" and can easily "foster[] a biased or tainted jury pool."[310] By the time *voir dire* arrives, "would-be jurors have been tainted by hearing the worst allegations against a defendant with no rebuttal" making it difficult, if not impossible, to empanel a jury without preconceptions.[311]

Unfair prejudice increases significantly when a "speaking indictment" contains inadmissible evidence. "It is hard enough to select an unbiased jury in a criminal case without the

---

[306] *Trump*, 736 F. Supp. 3d at 1216.

[307] *Id.* at 1216-17 (citing *United States v. Edmond*, 924 F.2d 261, 269 (D.C. Cir. 1991) ("Despite the all too common use of 'speaking' indictments, the function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them.")).

[308] *United States v. Lawson*, No. 3: 08-21-DCR, 2009 U.S. Dist. LEXIS 1144, at *5 (E.D. Ky. Jan. 8, 2009). *See also* 5 Crim. Proc. § 19.3(c) (4th ed.) ("The prosecution's reasons for using a speaking indictment will vary with the circumstances of the case, but one possibility is to put before the public a description of the strength of the prosecution's case that could not be presented in a media release because of professional responsibility prohibitions.").

[309] Ronald H. Levine, *Talk is Cheap: The Misuse of 'Speaking' indictments*, Business Crimes Bulletin (Nov. 2016), https://www.postschell.com/uploads/post__schell__talk_is_cheap__the_misuse_of_speaking__indictments__business_crimes_bulletin__nov_2016.pdf.

[310] Preston Burton and Jill Winter, *It Is Time to Muzzle the Speaking Indictment*, 48 Champion 26, 27 (2024).

[311] Abbe David Lowell, *Prosecutors Erode Our Rights with Show-and-Tell Indictments Like Eric Adams's*, Wash. Post (Oct. 9, 2024, at 8:25 ET), https://www.washingtonpost.com/opinions/2024/10/09/prosecutor-indictments-eroding-rights/.

task being made nearly impossible because the airwaves and internet are flooded with damning language and the one-sided details and selective photos, chosen by prosecutors, that have never been tested in any legal proceeding."[312]

In the Fifth Circuit, "Allegations in an indictment that are unnecessary to prove the crime charged are surplusage"[313] and surplusage is prejudicial where it "serve[s] only to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts involved."[314]

### *United States v. Trump*

The government used a speaking indictment against President Trump in the case involving documents at the President's Florida estate.[315] The court found "that much of the language in the Superseding Indictment is legally unnecessary to serve the function of an indictment as explained in the foregoing caselaw."[316] The court also recognized the "risks that can flow from a prosecutor's decision to include in a charging document an extensive narrative account of his or her view of the facts, especially in cases of significant public interest."[317] The court specifically disapproved of the government's use of the indictment to publish evidence of other crimes to potential jurors. The court explained that "[t]he Federal Rules of Criminal Procedure contemplate a specific procedure governing attempts to introduce evidence of other crimes, wrongs, or acts."[318] The federal government's case against President Trump has been dismissed.

---

[312] *Id.* Under Title 28, Code of Federal Regulations, Section 50.2(b)(7), DOJ personnel "should not make available photographs of a defendant unless a law enforcement function is served thereby."

[313] *United States v. Wittich*, No. 14-35, 2014 U.S. Dist. LEXIS 173809, at *2 (E.D. La. Dec. 15, 2014) (citing *United States v. Miller*, 471 U.S. 130, 136-37 (1985)).

[314] *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971).

[315] *United States v. Trump*, 736 F. Supp. 3d 1206, 1216-17 (S.D. Fla. 2024).

[316] *Id.* at 1217.

[317] *Id.*

[318] *Trump*, 736 F. Supp. 3d at 1217 (citing Fed. R. Crim. P. 404(b)).

Respectfully submitted,

JODY E. OWENS, II

By one of his attorneys,

CARROLL BUFKIN, PLLC

/s/ Gary Bufkin

_____
By: Gary Bufkin, MSB# 10810
CARROLL BUFKIN, PLLC
1076 Highland Colony Parkway, Ste 125
Ridgeland, MS 39157
(601) 982-5011
tgb@carrollbufkin.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which provides notice and a copy to all counsel of record.

Dated: January 12, 2026

/s/ Gary Bufkin

_____

Gary Bufkin, MSB# 10810