UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                            CRIMINAL NO. 3:24-CR-103-DPJ-LGI

JODY E. OWENS II, ET AL.

ORDER

This matter is before the Court on Defendant Jody E. Owens II's Motion to Dismiss [75]. For the reasons explained below, the Court denies the motion.

I.      Background

On October 23, 2024, a grand jury in the Southern District of Mississippi returned an 11-count indictment charging Owens, Chokwe Antar Lumumba, and Aaron B. Banks with conspiracy, federal program bribery, use of an interstate facility in aid of racketeering, honest services wire fraud, money laundering, and making false statements.  Indictment [3] at 20–31. At the time of their indictment, each defendant was serving in the City of Jackson or Hinds County government—Owens as Hinds County District Attorney, Lumumba as Mayor of Jackson, and Banks as the President of the Jackson City Council.  *Id.* at 3.

The charges stem from an FBI sting operation initiated in December 2022, when two FBI agents posed as real-estate developers interested in a downtown Jackson development project. Gov't Resp. [88] at 2.  The Government says Owens "solicited and accepted at least $115,000 in cash and promises of future financial benefits" in exchange for using his relationships with other Defendants to secure approval for the fictitious development project.  Indictment [3] at 1–2. Roughly two months after first discussing the project with the undercover agents, the Government says Owens was "ready, willing, and predisposed to engage in bribery."  *Id.* at 6.

On January 12, 2026, Owens moved to dismiss the indictment [75].  He seeks relief under Federal Rule of Criminal Procedure 12(b) "based on outrageous Government conduct and entrapment as a matter of law."  Mot. [75] at 1.  The motion is fully briefed, and, given the 163 pages of briefing (133 from Owens alone) and 81 exhibits the parties presented, the Court sees no need for oral argument.

II.    Outrageous Government Conduct

The outrageous-government-conduct defense first appeared in *United States v. Russell*, when the Supreme Court stated, "we may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  411 U.S. 423, 431–32 (1973).  The Fifth Circuit recognized this defense four years later in *United States v. Graves*, 556 F.2d 1319 (5th Cir. 1977), *cert. denied*, 435 U.S. 92 (1978), but it has never found a case so outrageous that it would justify dismissing an indictment.

A.    Standard

"A ruling on a motion to dismiss an indictment on the basis of outrageous government conduct or overreaching is a matter of law to be decided by the trial court, based on its factual findings."  *United States v. Miller*, 799 F.2d 985, 988 (5th Cir. 1986) (citing *United States v. Nixon*, 777 F.2d 958, 963 (5th Cir. 1985) (ruling on such motions "must necessarily be based on factual findings made by the judge trying the case")).

The burden of proving this defense is on the defendant, and it is "extremely high." *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997).  The Fifth Circuit has "consistently held that 'government misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of

the Fifth Amendment.'" *Id.* (quoting *United States v. Johnson*, 68 F.3d 899, 902 (5th Cir. 1995) (internal quotation marks and alteration omitted)). "Even though the conduct 'might shock some sensibilities,' . . . it must be evaluated in light of the undercover activity necessary to the 'enforcement of the criminal laws.'" *Miller*, 799 F.2d at 988 (quoting *Nixon*, 777 F.2d at 963). Thus, this defense "can only be invoked in the rarest and most outrageous circumstances." *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981), *cert. denied*, 457 U.S. 1108 (1982).

The Fifth Circuit has uniformly held "that outrageous involvement turns upon the totality of the circumstances with no single factor controlling." *Id.* "Further, each case in which a defendant claims a due process violation must be considered individually under a totality of the circumstances standard." *United States v. Stanley*, 765 F.2d 1224, 1231 (5th Cir. 1985) (citing *Tobias*, 662 F.2d at 387). Within that scope, "the defendant must show government overinvolvement combined with a passive role by the defendant." *Asibor*, 109 F.3d at 1039 (citing *United States v. Arteaga*, 807 F.2d 424, 427 (5th Cir. 1986)).

B.    Analysis

1.    Passive Participation

The Government argues that Owens may not assert government misconduct if he was an "active participant" in the bribery scheme. Gov't Resp. [88] at 18. That's legally correct. The Fifth Circuit has without fail held that "[a] defendant who actively participates in the crime may not avail himself of the defense." *Arteaga*, 807 F.2d at 427. The Government offers 14 pages of facts demonstrating Owens's active involvement in the bribery scheme, mostly based on his own recorded statements. *See* Gov't Resp. [88] at 2–15. Owens spends little time disputing those facts, and the Court accepts them for purposes of this motion.

3

Owens instead tries to shift the focus to events before he allegedly joined in the bribery scheme. He contends that "the totality of the circumstances inquiry focuses first on the government's conduct and then the conduct of the defendant *when first government contact occurred*." Owens Mem. [76] at 12 (emphasis added). He supports that with cases rejecting this defense because the defendants immediately agreed to participate. *See, e.g.*, *United States v. Gutierrez*, 343 F.3d 415, 417–18 (5th Cir. 2003).

True enough, the cases Owens cites involved defendants who quickly engaged in criminal conduct. Such facts are relevant. But, as noted, the defense "must be considered individually under a totality of the circumstances standard." *Stanley*, 765 F.2d at 1231 (citing *Tobias*, 662 F.2d at 387). Under that standard, many Fifth Circuit cases have rejected this defense based on a defendant's participation after initial contact by the government. *See, e.g.*, *Tobias*, 662 F.2d at 387. So while the totality of the circumstances includes the initial facts Owens highlights, it also includes the facts occurring later. *Id.*

*United States v. Yater* offers a good example. 756 F.2d 1058 (5th Cir. 1985). Yater met two government informants who later "decided to try to arrange a drug sale" based on Yater's connections to a drug dealer. *Id.* at 1060. For four months, the informants "frequently" called Yater seeking an introduction to arrange a drug deal. *Id.* According to Yater, he received "forty to fifty calls," *id.* at 1060 n.3, yet "he refused to cooperate," *id.* at 1060. Four months later, and now dying of cancer, Yater relented. *Id.* at 1061. Using his connections, Yater facilitated a drug deal and participated in its execution. *Id.* After being convicted, he appealed based in part on outrageous government conduct. *Id.* at 1062. The Court held that "even under the facts as alleged by" Yater—which included his four-month-long refusal to cooperate—his subsequent

participation precluded an outrageous-government-misconduct defense. *Id.* at 1066. The court specifically cited his conduct *after* he reluctantly joined the crime the government created. *Id.*

*Yater* is not an outlier. The Fifth Circuit often looks to defendants' conduct after joining a criminal enterprise even in cases when the government initiates those schemes. *See, e.g., United States v. McDaniel*, 12 F.3d 1099, 1993 WL 543396, at *3 (5th Cir. 1993) (holding defendant actively participated because after government suggested offenses, defendant took concrete steps to carry them out including bringing others into scheme); *United States v. Evans*, 941 F.2d 267, 270 (5th Cir. 1991) (finding active participation though "DEA agents approached [defendant] and offered to help him manufacture drugs, phoned him to pursue the arrangement, supplied the expertise, sold [defendant] the equipment, and supplied the laboratory site"); *United States v. Nissen*, 928 F.2d 690, 693 (5th Cir. 1991) (finding active participation by defendant); *Stanley*, 765 F.2d at 1230–32 (same); *United States v. Nicoll*, 664 F.2d 1308, 1314–15 (5th Cir. 1982) (same), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984); *Tobias*, 662 F.2d at 383–84 (rejecting defense based on defendant's conduct after he tried to withdraw from cocaine manufacturing offense but was encouraged by DEA to switch to manufacture PCP instead).

So Owens must show he was not an active participant in the bribery scheme based on the totality of the circumstances. The Government offers substantial evidence that he was. It is unnecessary in this Order to catalog everything the Government says. *See* Gov't Resp. [88] at 2–15. But in the most general terms, it cites recordings during which Owens explains how the developers (undercover agents) could gain influence, who would need to be paid, how much they would need to be paid, how they would be paid, and when they would be paid. *Id.* at 4–9. The Government also cites evidence that Owens collected and was responsible for distributing the

5

alleged bribes. *Id.* at 9–11 (citing Gov't Exs. [88-14; 88-15; 88-16; 88-17; 88-18]). He also allegedly brought others into the scheme. *Id.* at 10. Such acts are like those in cases when this defense failed. *See, e.g.*, *Stanley*, 765 F.2d at 1232 (noting that defendant recruited others).

In addition, the Government cites evidence that Owens was a willing participant as many of his statements touted his experience with similar bribery schemes involving some of the same players. *See* Gov't Resp. [88] at 5 (citing Gov't Exs. [88-4; 88-5; 88-6; 88-8; 88-9]). For instance, he is recorded in January 2024 stating that when paying city council members, "[w]e never give them the asking prices. . . . He gets installments. That's my game." Gov't Ex. [88-11] at 3:34–45. He also discussed ways to launder the money that again suggested past bribery schemes. Gov't Ex. [88-13] at 7:32–37 (stating that he "needed to clean it and spread it . . . . That's why we have businesses. To clean the money."); *see also* Gov't Ex. [88-15] at 02:22–27 (stating that "the vehicle I like the most is campaign donations, that way I can clean the money through companies and through individuals").

While Owens may dispute these facts at trial, the Court accepts them for purposes of this motion. And based on those facts, Owens has not met his burden of showing that he was merely a passive participant. Because this is an essential element, he has failed to prove outrageous government misconduct. But to create a thorough record, the Court will also address the misconduct element.

### 2. Government Misconduct

Owens lists six ways the Government's conduct was outrageous. Much of the narrative overlaps, so the Court will group some of it. Also, the allegations about the grand jury fall under a different test and will be handled separately. This section first considers whether Owens was targeted and whether that matters. Next, it looks at Owens's claims that the Government acted

outrageously by inducing him to commit a crime for the first time, directing the criminal

enterprise, and manufacturing the crime.  Owens Mem. [76] at 13–15.

> a.    Targeting

Owens says the FBI targeted him even though he had never been "suspected of bribing

public officials."  *Id.* at 14.  He believes "[t]he government expressly sought to 'get something'

on [him] by inducing him to 'first time' bribery."  *Id.*  And it did so by manufacturing a scheme.

*Id.* at 15.

***Whether targeting is prohibited.***  As an initial point, Owens has not proven he was

induced to accept bribes for the first time.  As noted, his recorded statements suggest he had done

this before.  *See, e.g.*, Gov't Exs. [88-11; 88-13; 88-15].  In any event, the Fifth Circuit has

rejected similar targeting arguments.

"That a defendant may have been targeted without sufficient evidence of any

predisposition to commit the crime under investigation has been prohibited by this Circuit only

where the government employs a contingent fee informant and directs him to implicate specific

persons."  *Nissen*, 928 F.2d at 693 (citing *United States v. Duvall*, 846 F.2d 966, 974 (5th Circuit

1988)); *accord United States v. Arditti*, 955 F.2d 331, 344 (5th Cir. 1992) (rejecting argument that

"government engaged in outrageous behavior by targeting him without a reasonable suspicion"

because no contingent fee informant was instructed to implicate specific individual); *see also*

*Hagen v. Coggins*, 208 F.3d 1007, 2000 WL 178169, at *2 (5th Cir. 2000) (citing *United States v.*

*Allibhai*, 939 F.2d 244, 249 (5th Cir. 1991) (noting that the Fifth Circuit "has specifically rejected

the argument that the government should have reasonable suspicion that an individual is

involved in some illegality before targeting him in a sting operation").

Owens's argument that the targeting related to "'first time' bribery" also seems to blur the line between entrapment and outrageous government conduct. Owens Mem. [76] at 14. While the Court does consider the totality of the circumstances, predisposition is an entrapment element. For example, in *Arditti*, the Fifth Circuit noted that the defendant "seemingly confuses the predisposition element of establishing the entrapment defense with the necessary proof of outrageous conduct." 955 F.2d at 344. And it also observed that when "governmental excess ensnares a nonpredisposed individual, the entrapment defense should be sufficient to protect him." *Id.*

**The alleged targeting.**  Because the Government did not engage in outrageous conduct if it targeted Owens, the Court could stop there. But it will address Owens's claim that the Government targeted him before Fall 2023 and that it went to great lengths to "get something" on him. Owens Mem. [76] at 15.

Some of these arguments feel like semantics. Owens says he was a target of the bribery investigation in 2022. The Government says it began a public-corruption investigation in Jackson in 2022 in response to "credible information" that initially had nothing to do with Owens. Gov't Resp. [88] at 2. That said, Owens's "name *had* surfaced in connection with several unrelated criminal matters before he became the subject of a federal investigation in November 2023." *Id.* at 19. Owens has not yet disputed this assertion, and the record reflects that he was on the FBI's radar, though not for this specific investigation.

Owens points mainly to two things to show he was the intended target of this investigation:  an FBI email and an FBI interview with a potential confidential source. Mot. [75] at 29–30 (citing Email [75-22]; ███████ Tr. [75-3]). The email was sent September 12, 2022, and confirms that the Public Corruption Task Force (PCTF) was looking into Owens. *See* Email

8

[75-22]. But it was not for bribery. The email's subject line states, "Jody Owens-Loans." *Id.* And the body of the email shows that the FBI was then considering possible Paycheck Protection Program (PPP) violations related to Owens's "Downtown Cigar Company," stating that "we are getting Jody added as a subject to one of our investigations but that hasn't happened yet." *Id.*; *see* Gov't Resp. [88] at 19 (referring to PPP loan investigation); Owens Reply [103] at 4 (referring to loan investigation). Owens says the reference to adding him shows he was being added as a subject to the bribery investigation. Owens Reply [103] at 4. But it could just as likely mean he was being added as a subject to one of the PPP investigations—which is what the email's subject line indicates. Email [75-22]. Plus, the next line of the email says that if added as a subject, the FBI will "start looking to issue a subpoena or two," which seems more consistent with the PPP investigation than the bribery investigation. *Id.* In any event, the burden is on Owens, and he has not shown that the "Jody Owens-Loans" email relates to the bribery investigation.

His second argument focuses on an FBI interview with one of his employees. In March 2023, the District Attorney's Office hired ███████ ███████ as a full-time investigator and █████ ██████████████████████." Mot. [75] at 10 (citing ████████ Tr. [75-3] at 3–4). Yet unbeknownst to Owens and the DA's office, ████████ had been indicted on March 8, 2022, on "federal gun charges." *Id.*; *see* ████████ Indictment [75-5]. The indictment remained sealed until April 26, 2023. *See* Mot. to Unseal [75-9]. That same day, ████████ was arrested and interviewed by two FBI agents who explored using him as a confidential source, presumably in exchange for leniency. Mot. [75] at 10.

Owens claims all of this occurred to find something on him. To start, he argues that "[t]o 'get' Owens, the FBI first needed to 'get' ████████[,]" so it obtained information from an

informant to press firearm charges against ▆▆▆▆. *Id.* at 9.  The Government then sealed the ▆▆▆▆ indictment because it was "obsessed . . . with Owens." *Id.* at 10.  There is a major timing problem with this argument.  As the Government notes, and the Court's docket confirms, ▆▆▆▆ was indicted, and that indictment was sealed *before* Owens hired him.  Gov't Mem. [88] at 21.  Owens has not explained how the Government could have known that he would hire ▆▆▆▆ one year *after* ▆▆▆▆ was charged in a sealed indictment.  Plus, the Government explains that sealing ▆▆▆▆'s indictment related to the ongoing investigation into former Hinds County Sheriff Marshand Crisler.  *See* Gov't Resp. [88] at 21.  The Court takes judicial notice that Crisler's indictment was unsealed on April 27, 2023, the day after ▆▆▆▆'s indictment was unsealed.  Mot. to Unseal [75-9].  Sealing indictments under such circumstances is routine, and Owens fails to prove that any of this had anything to do with him.

As for the FBI's interview with ▆▆▆▆, Owens says the "primary focus was Owens" and the agents wanted ▆▆▆▆ to "incriminate" him.  Mot. [75] at 11.  According to Owens, during this meeting "the FBI described its 'scheme' to 'get something' on Owens." *Id.* at 27 (citing ▆▆▆▆ Tr. [75-3] at 3); *see also* Owens Mem. [76] at 14 ("The government expressly sought to 'get something' on Owens by inducing him to 'first time' bribery.").  And "[w]hen ▆▆▆▆ asked what more [Agent] ▆▆▆▆ wanted, ▆▆▆▆ responded, 'Jody.'" Reply [103] at 3.

First, the "get something" comment is taken out of context. *See* ▆▆▆▆ Tr. [75-3] at 101.  Second, ▆▆▆▆ was seeking to cooperate and did ask what more the agents wanted. ▆▆▆▆ Tr. [75-3] at 158.  But the response was not "Jody."  The agent responded, "[W]e would need substantive, specific allegations against these, these people that we know you know.  Jody." *Id.*  And that's consistent with other statements like these:

> So we've talked, all those names that we talked about, right? . . . But we got to have, we can't just . . . Send you in . . . We can't just send you in there without

any kind of like Jody Owens, for example.  You know Jody, you're close to Jody. . . .  But as we sit here right now, you haven't told us anything that Jody's really doing that's, that would rise to the level of a Federal crime that we would be investigating.  And we can't just go fishing for stuff, you know.

███████ Tr. [75-3] at 144–45.

Read as a whole, the agents explored whether ████████ could be a confidential source as to Owens and other public officials.  There were a lot of questions about Owens (who was ████████'s boss), but they also talked about at least a dozen other individuals connected to Jackson and Hinds County government.  *See, e.g., id.* at 57, 114, 119, 150.  And ████████ often offered information about Owens, and other individuals, without prompting from the agents.  *See, e.g., id.* at 32–33, 158.  The conversation did not focus on a bribery sting and was more of a general inquiry to see what ████████ might know or be able to provide.[1]

Seeing whether ████████ knew anything of value about someone he had access to and whose name kept coming up in criminal investigations is unsurprising and routine.  Nor does this show that the FBI created this entire bribery sting solely to target Owens.  Also, Owens never suggests that ████████ was used as a confidential source against him.  There were other investigations into Owens, but when ████████ couldn't offer any specifics, he was not used.  There was nothing so outrageous about this interview that it would require dismissal.

To sum up, the targeting allegations fail to show—alone or together with other evidence—that the indictment should be dismissed for outrageous government misconduct.  The

---

[1] The Government says Owens was also tangentially linked to ████████ criminal case.  ████████ indictment was connected to Crisler's indictment, and the Government notes that Owens's name came up during the Crisler investigation.  Gov't Resp. [88] at 21.  According to Crisler, Owens allegedly agreed to assist with "an expungement" of an undercover agent's felony convictions.  *Id.*  But the Government notes that it only offers this information as "another example of how Owens's name kept coming up in various contexts during investigations."  *Id.* at 21 n.8.

Court considers the totality of the circumstances.  Semantic arguments about whether Owens was yet a formal "target of the investigation" at the time the sting began are not so egregious that they deprived Owens of his due-process rights.  Mot. [75] at 17.

> b.    Inducing Owens and Manufacturing the Crime

***Inducement.***  Owens says the Government committed outrageous conduct when it persisted in its "inducement" for "months" despite Owens's "rejection and reluctance."  Owens Mem. [76] at 16.  That inducement included flying Owens to Nashville on a private jet for a weekend of heavy drinking to break down his resistance.  *Id.* (citing FBI Recording Oct. 9, 2023 [75-44] at 02:45:00–46:04).  Owens says it was not until "[t]hree months after first learning about the alleged scheme, [that] the government alleges Owens was 'ready, willing, and predisposed' to participate."  *Id.* at 25 (citing Indictment [3] at 6).

Owens suggests that his reluctance started on July 26, 2023.  On that day, the agents "first contacted Owens" at a cigar shop Owens partially owns, and "[i]n response, Owens did nothing."  Mot. [75] at 32.  But Owens never suggests that the undercover agent mentioned the bribery scheme to him during that interaction, so there was nothing to reject.

Owens then points to his statements at an August 14, 2023 meeting at the cigar shop.  *Id.* at 37 (citing FBI Recording Aug. 14, 2023 [75-30] at 04:20–06:04).  That meeting occurred because, on July 26, an undercover agent posing as a developer spoke with the manager of Owens's cigar shop.  *Id.* at 26.  During the July meeting, the agent told the manager he was looking for a real-estate deal and suggested he would bribe the necessary people to get the project approved.  *Id.* at 26, 30. The manager understood and said he would set up a meeting with people "interested in helping [the agent and his business partners with their] goal of buying City owned property."  *Id.* at 26.  That meeting was set for August 14, and Owens and others

showed up.  Thus, the FBI did not directly invite Owens to attend.  He attended after the agents planted the bribery seed with Owens's employee.

In this August meeting, Owens describes the agents as "push[ing]" and "insist[ing]" that bribery was necessary to accomplish the real-estate project.  *Id.* at 33.  According to Owens, he and other meeting attendees focused on the real-estate proposal while the undercover developers repeatedly suggested the bribery scheme.  *Id.* at 35.  In response to these overtures, Owens addressed the undercover developers and said:

> I'm going to be honest with you, we've seen your spirit before.  They come in, they flash [money] . . . we've seen you before . . . .  So here's the thing . . . .  Immediately, it's like this, you do your proposal.  If it makes sense, we'll support you, if it don't, then that's it.  We like good people.  We want you here [in Jackson] . . . .  But if it doesn't make sense, we still gonna be cool.

*Id.* at 37 (emphasis removed) (quoting FBI Recording Aug. 14, 2023 [75-30] at 04:20–06:04).  Owens says this statement "expressly rejected" the FBI's bribery scheme.  *Id.*

That's the only example Owens provides of an express rejection, and it omits other comments that cast his words in a different light.  Using ellipses, Owens leaves out the statements:  "We will give you our political capital" and "If you want it, it's yours."  FBI Recording Aug. 14, 2023 [75-30] at 04:30–55.  He also omits this, "When it comes to the money and the business side of things, if it makes sense to you, it makes sense to us."  *Id.* 05:12–5:16.

Even as Owens quotes it, his statement is at best ambiguous, it is not a rejection.  When considered with the statements he omitted, a rejection is even less clear.  And the fact that he showed up for the meeting at all is circumstantial evidence that he was receptive—his manager knew the developers' intent and arranged the meeting.  In short, the Court does not find that he "expressly rejected" the proposal.  *Id.* at 37.  And given what he said, it was not outrageous for

the Government to move to the next phase.  Indeed, it would have been surprising for anyone to accept bribes at an initial meeting with total strangers.

Owens claims that after he "rejected" the bribery scheme, he "demonstrated reluctance for months thereafter." *Id.* at 32.  The record he cites doesn't support this argument.  Owens first refers to the time between the August 14 meeting when bribes were expressly discussed and September 25, 2023, when he agreed to fly on a private jet for an all-expenses-paid jaunt to Nashville with the developers.  *See id.* at 38–43.

The FBI agents mentioned the Nashville trip first during the August 14 meeting and then again when trying to schedule it.  The FBI had no direct contact with Owens about the scheduling.  Agents instead communicated with Owens's cigar shop manager trying to set a date. *See id.* at 41–42.  The FBI wanted to get Owens to Nashville.  But Owens has not proven that he resisted.

According to him, on September 8, 2023, the manager, acting as a go-between, "told the undercover agent that Owens had not committed to the trip." *Id.* at 41 (citing FBI Recording Sept. 8, 2023 [75-40]).  What the manager actually said during that call was, "I can probably get Jody . . . but I don't think he is going to be able to stay three days." FBI Recording Sept. 8, 2023 [75-40] at 02:19–26.  "I can confirm with Jody tonight. . . .  I know he got a trial coming up." *Id.* 2:57–3:05.

Owens then claims that the next day, September 9, the FBI texted proposed dates to the manager who "responded but without a commitment from Owens." Mot. [75] at 41 (citing Texts [75-37] at 9–10).  True, but the response was simply, "On it." Texts [75-37] at 10.  Then, according to Owens, on September 11, his manager reported to the undercover agent "but still no commitment from Owens." Mot. [75] at 42.  While Owens seemingly offers this as proof of his

resistance, in fact, the manager stated, "Jody is going to let me know his availability by Wednesday." Texts [75-37] at 10.

Owens observes that more follow ups occurred and that on September 13, his manager told the undercover developers that "Owens did not agree to" the proposed dates. Mot. [75] at 42. True, but that's not a rejection of the offer, it's a scheduling issue. In fact, the September 13 text from the manager goes further—it provides the dates Owens said he *would* be "available for travel." Texts [75-37] at 11. While there were additional communications trying to finalize a date and ensure Owens's attendance, the correspondence does not indicate resistance. Owens appears to have agreed to go a few days after these communications started. In fact, the evidence he cites never conveys that he wasn't interested, even if it took until September 25 to agree on the dates.

Once in Nashville, Owens says the Government poured it on, using alcohol to coerce and "break down" his resistance. Owens Mem. [76] at 15; *see* Mot. [75] at 45–59. Owens describes himself as a "diagnosed alcoholic," Mot. [75] at 45, and he accuses the Government of knowing about his weakness for alcohol and exploiting it. *See* Reply [103] at 24. The Government says during the "hundreds of hours" its agents spent with Owens, he never claimed to have an issue with alcohol. Gov't Resp. [88] at 22. He was "seemingly sober" during the execution of bribe payments, *id.* at 23, and some meetings took place during the day in the Hinds County DA office, *id.* In addition, the FBI did not provide Owens alcohol in early September when he made the decision to accept the all-expenses-paid trip to Nashville with individuals he knew were interested in bribing public officials.

The Court is mindful of the "extremely demanding" standard for proving outrageous government conduct. *United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009). Further, this

circuit has time and again recognized that even when "the government's conduct might shock some sensibilities, we must evaluate it in light of the undercover activity necessary to the enforcement of the criminal laws." *Nixon*, 777 F.2d at 963–64.

Given the tactics sanctioned in *Tobias*, the Court cannot say the Government committed outrageous conduct by providing Owens with alcoholic beverages once he arrived in Nashville. *See* 662 F.2d at 383 (declining to find government's conduct outrageous when it provided defendant with the suggestion, supplies, and instructions for making drugs); *Asibor*, 109 F.3d at 1040 (finding no outrageous conduct when government purchased illegal drugs); *United States v. Pawlak*, 935 F.3d 337, 345–46 (5th Cir. 2019) (holding no outrageous conduct occurred when government maintained website with pre-uploaded child pornography to catch would-be viewers and distributors); *United States v. Garrett*, 716 F.2d 257, 260–61 (5th Cir. 1983) (finding no misconduct when government paid defendants commission as part of a fictitious insurance contract scheme).

Like the defendant in *Tobias*, who tried to cancel his order for cocaine supplies and then agreed to make PCP at the government's suggestion, Owens's statements and willingness to maintain contact with developers he knew were trying to bribe him provides necessary context for the Government's actions. Thus, Owens has not met his burden to prove outrageous government misconduct as to this phase of the investigation. Even if he did, he actively participated as noted above.[2]

---

[2] Owens also says that "[t]o investigate black public officials in Jackson, Mississippi, the FBI sent agents with disturbing attitudes toward black people." Mot. [75] at 61. He did not argue selective prosecution, he cites no authority for this argument, and the Fifth Circuit has rejected it. *See United States v. Collins*, 972 F.2d 1385, 1396–97 (5th Cir. 1992).

16

*Manufacturing a crime.*  Owens argues that the FBI originated the bribery scheme.  But the Fifth Circuit has consistently found that this is not enough for the outrageous-government-conduct defense.  For example, in *United States v. Gray*, two government agents suggested a smuggling scheme to defendants and provided them with repair services, an airstrip, and a crew. 626 F.2d 494, 498–99 (5th Cir.), *cert denied*, 499 U.S. 1038 (1980).  The court found that even though the government "suggested the scheme" and arranged transportation, this did "not constitute government misconduct."  *Id.* at 498.  Distinguishing that case from *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), a case Owens cites heavily, the court found that the "informants merely eased the way for the conspirators" and that "providing of essential aid is not misconduct per se."  *Id.*; *see* Owens Mem. [76] at 2–4.

Other binding cases reach the same conclusion.  *See, e.g.*, *Asibor*, 109 F.3d at 1039–40 (finding no governmental misconduct "even if the government agents 'both supplied the drugs to defendants and then bought them back with government funds'"); *Tobias*, 662 F.2d at 383 (finding no outrageous governmental conduct when DEA placed ads in drug magazine, defendant first expressed interest in manufacturing cocaine but then tried to withdraw, and DEA talked him into making PCP instead and showed him how).

Consistent with these holdings, the Fifth Circuit found no outrageous government misconduct when the FBI arranged a bribery sting in *Garrett*.  716 F.2d at 257.  There, federal agents worked with an informant to establish a fictitious insurance agency to "expose corruption among labor leaders by bribing them to acquire union insurance" through the fake company.  *Id.* at 260–61.  While the court does not detail the complete scope of the agents' dealings with the defendants while undercover, it states that "[t]he defendants talked often to [the] government agents" over several months.  *Id.* at 262.  Under their agreement with the undercover agents, the

17

defendants paid a city councilman, with funds supplied by the agents, to support the agents' bid for an insurance contract.  *Id.* at 263.  Both defendants then took a cut of the commission for the contract they helped secure.  *Id.*

On appeal, Garrett argued that the crimes as he committed them would not have happened "but for" the actions of the government.  *Id.* at 274.  Implicitly rejecting this argument, the court found that "[u]nder *Tobias* and *Nicoll* and the prevalent jurisprudence, we cannot find that the government's conduct was so egregious and outrageous as to make the defendants' convictions subject to attack as a denial of due process."  *Id.* at 275.

So too here.  Even if the Government "suggested the scheme," *Gray*, 626 F.2d at 498, that does not make it outrageous.  Nor would it be outrageous to supply materials of value, "create[] [a] fictional cover story," *United States v. Rodriguez*, 603 F. App'x 306, 313 (5th Cir. 2015), or seek to win defendants' trust, *see Tobias*, 662 F.2d at 386.

Having reviewed each category of alleged outrageous conduct individually and collectively, the Court finds that Owens does not meet the "extremely demanding" standard for proving this defense.  *Sandlin*, 589 F.3d at 758.  Thus, this case is not the "rarest [of] circumstances" where the Government's conduct justifies dismissing the indictment.  *Gutierrez*, 343 F.3d at 421 (citation omitted).  The Court denies Owens's motion to dismiss the indictment based on outrageous government conduct.

III.     Grand-Jury Issues

Owens says the Government acted outrageously by eliciting false testimony before the grand jury and including misrepresentations in the indictment.  He raises these issues under his outrageous-government-misconduct argument, but he correctly notes that these issues employ

18

different legal standards.  *See* Owens Mem. [76] at 16 (citing *United States v. Strouse*, 286 F.3d 767, 771 (5th Cir. 2002)).  The Court therefore addresses them separately.

When considering government misconduct before the grand jury or in an indictment, rather than employ the totality-of-the-circumstances approach defined in *Tobias*, 662 F.2d at 387, courts in this circuit follow the approach explained in *Strouse*.  *See United States v. Cessa*, 861 F.3d 121, 142 (5th Cir. 2017) (applying *Strouse* approach).  Under this rule, "the indictment may be dismissed only if the [false] testimony is knowingly sponsored by the Government and material to the decision to indict."  *United States v. Forte*, 65 F. App'x 508, 2003 WL 1922910, at *6 (5th Cir. 2003) (citing *Strouse*, 286 F.3d at 773–74).

The testimony must first be false.  *See Strouse*, 286 F.3d at 771.  But the Fifth Circuit has "refuse[d] to adopt the proposition that, absent perjury or government misconduct, an indictment is flawed simply because it is based on testimony that may later prove to be questionable."  *Cessa*, 861 F.3d at 142 (quoting *United States v. Sullivan*, 578 F.2d 121, 124 (5th Cir. 1978)).

Even if false, the government must "knowingly sponsor[]" it, *Strouse*, 286 F.3d at 772, which turns on whether the government "had prior knowledge," *id.*at 776; *see also id.* at 772 (asking "whether the government knew of the perjury at the time it offered [the witness's] testimony before the federal grand jury").  And even then, it must still be material, which means it is "capable of influencing the tribunal on the issue before it."  *Id.* at 771 (emphasis omitted).  The false statements "need not be material to any particular issue, but may be material to collateral matters that might influence the court or the jury in the decision of the questions before the tribunal."  *United States v. Damato*, 554 F.2d 1371, 1373 (5th Cir. 1977).

A.    Testimony

Under this test, Owens alleges three instances of false testimony before the grand jury. *See* Mot. [75] at 28; Owens Mem. [76] at 16 (discussing *Strouse* test).  Those three alleged instances are:  (1) "Owens was *not* being investigated at the time of the Cigar Shop undercover operation," (2) "during the operation, the undercover agent 'just happened to kind of run into Owens' at the Cigar Shop," and (3) "Owens 'kind of then inserted himself into this bribery scheme.'" Mot. [75] at 28 (quoting ███ Grand Jury Test. [75-17] at 9).  The Court will consider each statement in turn.

1.    Whether Owens Was a Target

Owens claims that Agent ███████████ lied to the grand jury when he testified that "Owens was not being investigated at the time of the Cigar Shop undercover operation."  *Id.* (emphasis omitted).  But that's not what the agent was asked.  The question Owens cites was: "[W]hen this investigation got started, was Mr. Owens a target of the FBI that had been previously mentioned *as somebody who was taking bribes*?"  ███ Grand Jury Test. [75-17] at 9 (emphasis added).  Agent ████ responded, "He was not."  *Id.*  Owens says this is false and that ████, "better than anyone, knew that Owens *was* being investigated by the FBI . . . when the Undercover Agent infiltrated the Cigar Shop on July 26, 2023."  Mot. [75] at 29.

Considering the full question, Owens's own arguments show that the agent correctly responded.  According to Owens, the investigation "was underway" in December 2022.  *Id.*  The Court agrees; the agents first posed as real-estate developers in December 2022.  Gov't Resp. [88] at 2.  And Owens adds that when the FBI began to investigate him, he was not "suspected of bribing public officials."  Owens Mem. [76] at 14.  That too seems true.  And that's exactly what the agent told the grand jury.  ███ Grand Jury Test. [75-17] at 9.  Owens was not a target

suspected of taking bribes in December 2022. *Id.* At worst, the agent answered one part of a compound question. Owens has not shown that the Government "knowingly sponsored" perjured testimony. *Strouse*, 286 F.3d at 772. Nor did he address why the testimony would be material; it wasn't. This testimony would not warrant dismissal.

2.      Running into Owens

Next, Owens alleges the Government presented false testimony when Agent ███ testified that he "just happened to kind of run into Owens" at the cigar shop on July 26, 2023. Mot. [75] at 30 (quoting ███ Grand Jury Test. [75-17] at 9). While the Government claims the agent's presence at the shop was due, at least in part, to the recommendation of a local lobbyist, Gov't Resp. [88] at 23–24, Owens says this story was invented as "pretext." Mot. [75] at 31.

Owens presents evidence from which it appears that the undercover agent wanted to get in the cigar shop, and the Government essentially concedes that there were other motives for the visit. Gov't Resp. [88] at 2 (the cigar shop was known to the FBI "as a hub of back-room dealings and a meeting place for the well-connected in Jackson"). It also seems that the agents knew Owens owned the bar, and they had looked into Owens on unrelated matters. *Id.* at 24. In that light, the testimony could seem misleading. On the other hand, there is no evidence the agents knew Owens would be there that day or that they tried to set a meeting specifically with him.

Though a closer call, Owens has not shown that the Government "knowingly sponsored" false testimony. *Strouse*, 286 F.3d at 772; *see also United States v. Stearman*, 981 F.2d 1256, 1992 WL 386839, at *3 (5th Cir. 1992) (finding no government misconduct when government witness had factual basis for grand-jury testimony). Even if he had, Owens acknowledges in his

briefing that he must prove the false statements were "material to the decision to indict."  Owens

Mem. [76] at 16 (quoting *Forte*, 2003 WL 1922910, at *6); *see also* Reply [103] at 11 (same).

Yet he never explains why this specific testimony is material.  The Court finds that it is not.

        3.        Whether Owens Inserted Himself into the Scheme

Owens claims the government presented false testimony when Agent ▮▮▮ testified that

Owens "inserted himself into this bribery scheme."  Mot. [75] at 32 (quoting ▮▮▮ Grand Jury

Test. [75-17] at 9).  In support, Owens says ▮▮▮ knew that an undercover agent already had a

"lengthy meeting" with Owens, that Owens "rejected" the government's "criminal overtures" for

"months," and that the FBI then engaged in a "relentless inducement campaign."  *Id.*

First, as addressed above, the evidence Owens cites does not show an express rejection or

"months" of resistance.  *Id.*  Second, there is circumstantial evidence supporting the testimony.

Again, the agent first mentioned bribery when speaking with the manager of Owens's cigar shop.

*See id.* at 25.  That person understood the intent and agreed to "set up a meeting for [the agent

and his] business partners" at the cigar bar on August 14 with people "who would be interested

in helping [the agent and his business partners with their] goal of buying City owned property."

*Id.* at 26 (citing FBI Report Aug. 1, 2023 [75-4] at 2).  There is no dispute that Owens was

among those who showed up for the meeting.  He was not invited by the agents, and the agents

had not mentioned bribes to Owens before then.  This at least suggests that Owens inserted

himself into the conversation by voluntarily showing up for a meeting where bribes were the

likely subject.  In any event, the question is whether the agent lied under oath, and given these

facts, he could have easily thought that Owens did insert himself.  Even still, Owens has not

shown that the statement was material.

In sum, the three grand-jury statements Owens cites are supported, some perhaps more so than others.  *See Stearman*, 1992 WL 386839, at *3.  Owens has not shown that the Government "knowingly sponsored" perjured testimony.  *Strouse*, 286 F.3d at 772.  Nor has he shown that these statements—even if untrue—were "capable of influencing the tribunal on the issue before it."  *Id.* at 771.[3]

B.      Indictment Misstatements

Owens argues that the indictment contains "at least five material misrepresentations."  Mot. [75] at 19.  These are:  (1) & (2) "WHEN and WHY the FBI infiltrated the Cigar Shop," *id.*, (3) "Who the Undercover Agent Met at the Cigar Shop," *id.* at 24, (4) "What the Undercover Agent Discussed at the Cigar Shop," *id.* at 25, and (5) "Who Developed [the] 'Scheme to Bribe Jackson Public Officials.'"  *Id.* at 27 (quoting Indictment [3] at 5).  This form of prosecutorial misconduct falls under the *Strouse* test as well.  *See Cessa*, 861 F.3d at 142 (applying the *Strouse* test).

1.      When and Why FBI Infiltrated the Cigar Shop

Owens first attacks this allegation:  "In July 2023, Developer 1 visited [the cigar bar] in downtown Jackson, which had been recommended to him because of his genuine interest in the products sold."  Indictment [3] at 5.  Owens calls this a "half-truth, at best, which is no truth at all."  Mot. [75] at 19.  According to Owens, the idea to visit the cigar shop originated with the agent who brought it up with a Jackson lobbyist and then tried to fish for a recommendation to use as pretext.  *See generally id.* at 19–24.  Thus, he believes there was never a real

---

[3] Assuming Owens intended to assert these arguments under outrageous governmental misconduct (even though he correctly notes the *Strouse* test), the Court finds that it cannot constitute outrageous governmental misconduct for the same reasons it doesn't violate *Strouse*.

recommendation, though the lobbyist eventually said he would call the cigar shop to make sure the undercover developer was taken care of. *Id.* at 24.

Even assuming a knowingly sponsored half-truth, Owens has not explained materiality. He does say—as to all of the alleged misrepresentations in the indictment—that they were designed "to conceal the ███████ Interview and other evidence, and to undermine Owens's defenses." *See* Mot. [75] at 19. But Owens offers no authority suggesting that the Government was required to disclose any of that. Indeed, a defendant has "no right to have exculpatory evidence presented to the grand jury." *United States v. McClain*, 280 F. App'x 425, 428 (5th Cir. 2008) (per curiam) (citing *United States v. Williams*, 504 U.S. 36, 52 (1992)). Owens has not shown that the alleged half-truth is "capable of influencing the tribunal on the issue before it." *Strouse*, 286 F.3d at 771.

### 2.   Who the Agents Met and What They Discussed

Next, Owens accuses the Government of misrepresenting who its agents met at the cigar shop and what they talked about during that first visit in July 2023. Mot. [75] at 24–25. The indictment states that the agent met the shop's manager and he "agreed to introduce [the agent] to individuals he believed could assist [the agent] with his goals." Indictment [3] at 5. Owens says that the agent "also met Owens that night." Mot. [75] at 24. While this is true, *see* FBI Rep. Aug. 1, 2023 [75-4] at 2, simply omitting that the agent also briefly spoke to Owens (and not about bribes) does not amount to false testimony. Nor does failing to include a complete retelling of the agent's conversation with the shop manager. *See* Mot. [75] at 25.

The statements are also immaterial. Unlike the first disputed testimony, Owens does at least mention materiality as to these. He claims they were "intended to obfuscate the Government's first contact with Owens, diminish the significance of the undercover operation at

Owens's Cigar Shop, minimize the inducement period, and undermine Owens's defenses including his entrapment defense." *Id.*; *see also id.* at 26 (same). But he never explains *how* these omissions do any of that.

They don't. For starters, the meeting on July 26 was not kept from the grand jury. The agent testified that he spoke with Owens that day. ███████ Grand Jury Test. [75-17] at 11. Also, the "inducement period," Mot. [75] at 25, could not have started on this date because no inducements occurred. And all of this seems aimed at his defenses, though the Government was not required to present exculpatory evidence (even assuming this would qualify). *Williams*, 504 U.S. at 55 ("conclud[ing] that courts have no authority to prescribe . . . a duty" to disclose exculpatory evidence to grand jury). Owens has not shown these allegedly false averments were "capable of influencing the tribunal on the issue before it." *Strouse*, 286 F.3d at 771.

3.        Who Developed the Bribery Scheme

Owens points to a header in the indictment stating that "Owens Develops a Scheme to Bribe Jackson Public Officials." Mot. [75] at 27 (quoting Indictment [3] at 5). Owens says this is false because the FBI developed the scheme "months *before* the Government's first contact with Owens." *Id.*

As discussed, the record shows that the FBI first suggested bribing public officials. But it also supports the statement that Owens "developed" that scheme. Merriam-Webster offers several relevant definitions: "to work out the possibilities of"; "to make active or promote the growth of"; "to cause to evolve or unfold gradually: to lead or conduct (something) through a succession of states or changes each of which is preparatory for the next"; "to expand by process of growth"; and "to set forth or make clear by degrees or in detail." *Develop*, Merriam-Webster, https://www.merriam-webster.com/dictionary/develop.

25

As noted above, the agents said they would bribe public officials to get their real-estate development approved, but Owens was recorded for many months identifying the officials they would need to influence, how it would be done, how much should be paid, how the money would be laundered, and other details. *See* Gov't Resp. [88] at 2–14. Owens doesn't dispute any of that in his reply, and that alleged conduct supports the statement that he "developed" the scheme.

Owens is correct when he says the indictment fails to note that the FBI originated the idea of a bribery scheme, and he argues that the omission is material because it was intended to "undermine [his] defenses including his entrapment defense." Mot. [75] at 28. But as with the other alleged misrepresentations, he offers no authority explaining why the header is "capable of influencing the tribunal on the issue before it." *Strouse*, 286 F.3d at 771. As noted, there is no prohibition against initiating a sting, and, even if the omitted information could be considered exculpatory, the prosecution was not required to provide exculpatory evidence to the grand jury. *Williams*, 504 U.S. at 55. The header was neither false nor material.

In sum, neither the grand-jury testimony nor the alleged misstatements in the indictment justify dismissing the charges.

IV.    Entrapment

Owens's third argument for dismissal is that he was entrapped as a matter of law. *See* Owens Mem. [76] at 17. In response, the Government says that Owens "was not targeted by the government, he was charged because of his own inculpatory and unsolicited statements and his eager participation and orchestration of the scheme." Gov't Resp. [88] at 1. The Government argues that if entrapment is considered at all, it must be reserved for the jury. *Id.* at 25.[4]

---

[4] The Government has also filed a motion in limine to preclude the entrapment defense at trial. *See* Mot. [92].

Entrapment has two elements:  (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant.  *See United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001) (citation omitted); *Jacobson v. United States*, 503 U.S. 540, 548–49 (1992).  But "unless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." *Sherman v. United States*, 356 U.S. 369, 377 (1958); *see also Goss v. United States*, 376 F.2d 812, 813 (5th Cir. 1967) (per curiam) (observing the "issue of entrapment is a question for the jury unless as matter of law the defendant has established beyond a reasonable doubt that he was unlawfully entrapped").  Courts have cautioned that "[t]he defendant's predisposition to commit an unlawful act will seldom be capable of determination without the trial of the general issue." *Graves*, 556 F.2d at 1321 (quotation marks omitted).

Here again, Owens showed up at the August 14 meeting under circumstances suggesting predisposition.  He was not personally invited by the undercover agents.  Also, the evidence he marshals for this motion does not support his claim that he rejected the bribery scheme and then resisted for months.  Finally, his recorded statements—if the jury believes them—could indicate experience with bribery schemes and a predisposition to commit them.  *See, e.g.*, Gov't Exs. [88-4; 88-5; 88-6; 88-8; 88-9].

Owens did not reply to the Government's argument that entrapment is generally a jury issue.  *See* Reply [103] at 12–20.  And while the evidence at trial may look different, this record does not allow the Court to find "beyond a reasonable doubt" that Owens was unlawfully

entrapped as a matter of law. *Goss*, 376 F.2d at 813. Thus, the Court denies Owens's motion to dismiss the indictment on this basis.[5]

V.    Speaking Indictment

Owens's last argument centers on the Government's use of a so called "speaking indictment." Importantly, he never explicitly says he is entitled to dismissal on this basis, but he claims that the Government used the indictment to share its theory of the case and taint the jury pool. *See* Owens Mem. [76] at 33–34. In his motion, he quotes from the comment section of one blog post and one podcast episode as evidence of the "unfair prejudice" he has suffered. Mot. [75] at 63–65 nn.328–46.

Owens relies heavily on *United States v. Trump*, 736 F. Supp. 3d 1206 (S.D. Fla. 2024). Owens Mem. [76] at 35. There, Donald Trump argued that the special counsel drafted a speaking indictment and asked the court to dismiss several counts or in the alternative, to strike certain language in the indictment. *Trump*, 736 F. Supp. at 1210. The district court did not dismiss any counts and granted only a small portion of the motion to strike. *Id.* at 1217. Unlike in *Trump*, Owens has not moved to strike surplusage, and neither *Trump* nor any other cases Owens cites supports dismissing the entire indictment on this basis.

Finally, in as much as Owens claims he was prejudiced by a tainted jury pool, he appears to have responded in kind with this motion. In it, he describes not only his defenses but also areas immaterial to these legal issues. His motion was quickly disseminated through traditional

---

[5] The Government says that neither it nor Owens has found a Fifth Circuit case when the entrapment-as-a-matter-of-law defense has prevailed in a pretrial motion. *See* Gov't Resp. [88] at 25. The Court couldn't find such a case either.

and social media before being sealed.  To the extent these pleadings may have tainted the pool, the Court will address that during jury selection.

Owens's motion to dismiss the Indictment is also denied on this ground.

VI.     Conclusion

The Court has considered all the parties' arguments.  Those arguments not specifically addressed would not have altered the outcome.  For the reasons stated, Defendant Jody Owens's Motion to Dismiss [75] is denied.

**SO ORDERED AND ADJUDGED** this the 14th day of May, 2026.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE