IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

FEB 23 2026

UNITED STATES OF AMERICA

v.                                                            CRIMINAL NO. 3:24-cr-103-DPJ-LGI

JODY E. OWENS II

## GOVERNMENT'S RESPONSE IN OPPOSITION TO OWENS'S MOTION TO DISMISS

The United States of America submits this consolidated Response in Opposition to Defendant Jody E. Owens II's Motion to Dismiss for Outrageous Government Conduct and Entrapment as a Matter of Law (ECF No. 75) and Memorandum in Support (ECF No. 76).

Owens has failed to establish any valid basis to dismiss the indictment against him. Instead, he cites meritless claims of alleged government wrongdoing and, in addition, attempts to cast himself as the victim. Neither argument is persuasive. And while Owens is not the first to follow the adage that "if the law and the facts are against you, pound the table," the aggressively caustic tone of his motion makes its lack of factual and legal support all the more jarring.

Even accepting Owens's allegations at face value, they do not come close to making a preliminary showing of either outrageous government conduct constituting a due process violation or government entrapment. His outrageous government conduct claim fails both because Owens was an active participant in the bribery scheme and because he fails to allege government conduct that is either outrageous or over-involved. Likewise, his entrapment claim is deficient because he was not targeted by the government, he was charged because of his own inculpatory and unsolicited statements and his eager participation and orchestration of the scheme, and, as a procedural matter, the question of entrapment should be reserved, if at all, for the jury. Owens's motion and request for a hearing should thus be denied.

1

## FACTUAL BACKGROUND

### I.     December 2022–July 2023: Beginning Stages of the Investigation

In May 2022, the Federal Bureau of Investigation ("FBI") received credible information from a civilian that a lobbyist employed by the City of Jackson who was closely associated with Mayor Chokwe Antar Lumumba attempted to solicit a bribe in exchange for a contract with the city. Based on that information, the FBI initiated an undercover operation. As part of the investigation, beginning in December 2022, two FBI confidential human sources ("CHS-1" and "CHS-2" and collectively, "CHSs") posed as real estate developers looking to buy property and invest in Jackson. CHS-1 hired the services of a local lobbyist who had connections to an associate of Lumumba. In turn, the lobbyist introduced CHS-1 to various players in the Jackson political arena.

Initially, the investigation did not develop significant leads. However, in July 2023, during a conversation about various bars in downtown Jackson, the lobbyist mentioned to CHS-1 that Jackson had a successful cigar bar—the Downtown Cigar Company (sometimes referred to as "the cigar bar"), owned in part by Owens, the Hinds County District Attorney. CHS-1 expressed a general interest in smoking cigars and in visiting the cigar bar. The cigar bar was known to the FBI and the CHS-1 as a hub of back-room dealings and a meeting place for the well-connected in Jackson. So the lobbyist placed a call to the manager of the cigar bar to let him know that CHS-1 would be visiting. Owens was not a subject of the investigation at that time. While CHS-1 recalls perhaps knowing that the District Attorney was a co-owner of the cigar bar, he did not know Owens's name and could not have picked him out of a line-up.

On the evening of July 26, 2023, CHS-1 visited the cigar bar and met with its manager, explaining his plan to engage in real estate development in Jackson. The manager, in reply,

2

expressed a low opinion of the competence of the Jackson city government. CHS-1 then noted that in his experience, regardless of the competence of local officials, CHS-1 found it necessary to "take care of them." The manager agreed that pay-offs would be necessary in Jackson to accomplish anything, but that CHS-1 would find paying off officials in Jackson "cheap" compared to other places. The manager then agreed to set up a meeting between CHS-1, CHS-2, and individuals the manager believed would be interested in assisting with their real estate development goals in Jackson. Importantly, although CHS-1 briefly spoke with Owens at the cigar bar, they did not discuss anything of substance. Several weeks later, the CHSs went to the cigar bar and met with ten others in the backroom, including Owens.

## II.    October 2023: Nashville Trip & Owens Becomes a Target

To demonstrate their success as developers and to build trust, the CHSs, at the bar owner's direction, invited the backroom meeting attendees to travel with them to Nashville in October 2023. Owens, CHS-2, and other individuals met and casually discussed numerous topics over the two-day trip to Nashville.

During the trip, while discussing the potential for real estate development in Mississippi and Jackson, one of the CHSs brought up a recent bribery investigation of the Mayor Pro Tem of Dallas, Texas. Gov. Ex. 1. Owens responded by talking about his experience, along with other elected officials, going on trips funded by the American Israel Public Affairs Committee ("AIPAC"). Specifically, Owens stated that a group of approximately 400 black elected officials networked with each other and discussed how to appropriately use the power of their official positions and how to pass on generational wealth to their families. Owens commented that "the reason so many black folks go to jail over five fucking thousand dollars" is that they do not know how to handle wealth once they had acquired it. Owens brought up examples of the mayors of

Detroit, Michigan and Vicksburg, Mississippi, who were prosecuted for accepting bribes in the approximate amount of $5,000. Owens expressed that there were many ways "not to go to jail," but that if people were not used to managing large amounts of money, they could easily "step into the bullshit."

CHS-2 then brought up a hypothetical of a border patrol agent who would accept a million dollars to let cartel-controlled vehicles cross the border without inspection. Owens responded that prison guards in Mississippi, who are paid low salaries, could make $20,000 for smuggling a pound of tobacco into a correctional facility. Owens said that those prison guards should engage in that kind of behavior, though he would prosecute them for it. Owens and CHS-2 agreed that people were inevitably going to engage in corrupt behavior. CHS-2 went on to tell Owens: "That's how we make our money, getting what we need done." CHS-2 then went on to tell Owens that when the members of their real estate development business made decisions about whether to invest in a project, they would need to know that they could count on a majority of the votes of the relevant public officials.

After getting to know the CHSs and learning of CHS-1's supposed wealth, Owens began to put himself forward as the man who could facilitate CHS-1's real estate development projects in Jackson. Specifically, in an October 16, 2023 meeting between CHS-1 and Owens, while discussing the Jackson Redevelopment Authority ("JRA") (a city commission with authority over the sale of property), Owens pronounced, "I can give you the JRA." Gov. Ex. 2. Immediately after that meeting, CHS-1, Owens, and Sherik Marve Smith (a trusted associate of Owens) walked around downtown Jackson looking at potential real estate development locations.[1] When CHS-1 questioned Owens as to how they could get such a project approved in

---

[1] On October 17, 2024, Smith pleaded guilty to a single-count bill of information charging him with conspiracy to commit bribery. *See* Case No. 3:24-cr-00102.

4

the heart of downtown Jackson, Owens bragged that he had a "bag of information" on the City Council and that he could get votes approved. Gov. Ex. 3. Given that statement, the investigation shifted to Owens's potential abuse of his position as the District Attorney in furtherance of the fictitious development project.

### III.    November 2023: Owens is Re-Elected

A few weeks later, at Owens's invitation, the CHSs attended Owens's party to celebrate his re-election as District Attorney. During the party, Owens, unsolicited, stated that his job as District Attorney was "the part-time job" used to get "leverage" for his "full-time job" in development. Gov. Ex. 4. The next day, Owens and Smith negotiated an upfront payment of $250,000 to be paid to Owens, Smith, and the cigar bar manager for their roles in the impending real estate development project—specifically, gaining access to the public officials that would be needed for the project's success. Gov. Ex. 5. Owens clarified that any payments made to the City Council members to secure their votes would not be taken out of his cut, but that they would be "cheap." Owens then named the Council members he believed could be bribed, and how much it would take. Gov. Ex. 6. Owens also explained that his "percentage increased" because of J. Edgar Hoover, the former FBI Director. Gov. Ex. 7.

### IV.    December 2023: First Trip to Florida

In December 2023, Owens, Smith, and the cigar bar manager traveled to Ft. Lauderdale, Florida to meet with the CHSs on a yacht. During this trip, CHS-2 asked Owens how he would like to receive his payment, and Owens stated that cash payment was "easier," and that he had brought a bag on the trip specifically for that purpose. During the trip, Owens and the CHSs discussed the details of how to get the votes they would need for the project. Gov. Ex. 8. It was during that meeting when Owens revealed that, around a month prior, he had instructed Smith to

5

begin a sexual relationship with the Director of the City of Jackson's Department of Planning and Development for the purpose of gaining access to and influence over information held by the Director.

CHS-2 then gave Owens $125,000 in cash, with Owens representing that he would pay Smith and the cigar bar manager their respective portions himself. After receiving the cash, Owens emphasized that he intended to use his access to negative information on City Council members of the City Council to gain votes in favor of the CHSs' real estate development plan. Owens stated that he was the only person able to prosecute people in Hinds County, so everyone came to him "need[ing] something fixed," that he had been keeping a "book for a while," and that he had something on "most" of the Council members. When asked who they should approach first, Owens identified Aaron Banks (then President of the City Council) and Angelique Lee (then Vice President of the City Council).

## V.   January 2024: Planning the Bribery of Banks

On January 10, 2024, the CHSs met with Owens and Smith in Owens's private office in Jackson, which Owens referred to as his "War Room." In the War Room, Owens showed the CHSs large sheets of paper on the walls containing information about each Jackson City Council member. The group also discussed details of the Request for a Statement of Qualifications ("RFQ") that would be issued by the City of Jackson for a plot of land in downtown Jackson near the Convention Center. The CHSs made it clear that they wanted their project to qualify for approval. Owens and Smith, in turn, stated that they were already pressuring and advising the drafter of the RFQ to make the RFQ as closely aligned with the CHSs' vision as possible.

Later, at the cigar bar, the CHSs expressed a desire to influence City Council members long-term, so that they could undertake a series of development projects in Jackson over an

6

extended period. In response, Owens and Smith explained that paying members of the City Council too much money up front would be counterproductive. Specifically, Owens said: "I don't know if you have been around addicts before, right? You can give them a little blow, a little blunt, a little drink. But if you give them a case of whiskey, and you give them a kilo of coke, and you give them a motherfucking pound of weed. They will die." Gov. Ex. 9.

On January 11, 2024, Owens, Smith, Banks, and the CHSs met in the backroom of the cigar bar. During a sidebar conversation between Owens and Banks that was captured on a recording device used by CHS-2, the pair discussed how much money Banks would request from the CHSs, deciding on $50,000. Gov. Ex. 10. Owens then explained that he would tell the CHSs it would be $25,000 now and $25,000 later. Owens then dismissed Banks from the room and informed the CHSs that Banks wanted $50,000 to vote to approve the group's real estate development plan, but that the CHSs should not pay the entire amount to Banks. Owens explained that he had other ways of compensating members of the City Council aside from up-front cash payments: "We never give them the asking price. I buy pussy, I buy cars, I buy cows, I buy drugs, whatever. My point is, like [Banks] need 50, you get 30. He gets installments. That's my game. Some people will overpay and say I'm the guy who needs more and some people will choose who to pay. He wants 50? We'll give him 15 this year and 15 next year." Gov. Ex. 11.

When Banks rejoined the meeting, Owens re-started the conversation by telling Banks that they knew he was running for re-election and asking him what he needed to support the CHSs' project. A back and forth between CHS-2 and Banks ensued, at which point Owens advised CHS-2 that he should "stop talking," explaining that he "just [does not] trust wiretaps no more."

## VI.    February 2024: Paying Banks & Lee

On February 12, 2024, the CHSs had dinner with Owens, Lumumba, Smith, and a member of Lumumba's staff. During the dinner, Owens can be heard telling Lumumba that Owens did a background check on the CHSs to ensure that the CHSs were not FBI agents.[2]

Following dinner, during a cigar bar backroom meeting between Owens, Smith, and the CHSs, CHS-2 explained that he was concerned that they did not have enough votes secured. Owens responded: "Tomorrow, I'll get you three more" and "You got the Mayor and President of the City Council. You got the leadership. I will get you the pawns tomorrow." Gov. Ex. 12.

During this same meeting, Owens explained that politicians finance their lives through their campaign accounts. Due to that fact, Owens told CHS-2 that the best way to influence politicians in Jackson was through money funneled to politicians through their campaign accounts. But Owens made clear that the money had to come from within the state of Mississippi. Owens said that he planned to deposit cash given to him by the CHSs into a bank account owned by a Mississippi company, explaining that this was an effective way to "clean" the money. He added that he did not care if the money came from illegal activity, he just needed to clean the money through bank accounts of businesses owned by him and then transmit the money to the politicians they wished to influence. Specifically, Owens said: "I don't give a shit where the money comes from. It can come from blood diamonds in Africa, I don't give a fucking shit. I'm a whole DA. Fuck that shit. My job, as I understand it, with a little paperwork, is to get this deal done, and get it done most effectively." Gov. Ex. 13.

---

[2] During an FBI interview, Smith stated that Owens also took a picture of one of the license plates on one of the vehicles used by the CHSs. According to Smith, Owens used that information to try to determine whether the CHSs were "legit."

Later, Owens stated: "We can take dope boy money, I don't give a shit. But I need to clean it and spread it. I can do it in here. That's why we have businesses. To clean the money. Right? I don't give a shit. You give us cash, we deposit it, and give it back that way. That's easy." *Id.* Owens explained that the overall goal was to have the money from the CHSs appear to come from within the state of Mississippi, but to do so in a way that the politicians receiving that money knew that the money was coming from the CHSs.

On February 13, 2024, the CHSs and Owens discussed the planned payment for Banks's vote. CHS-2 suggested the plan would be to pay Banks that evening, but Owens corrected him, stating, "we're not paying anything tonight" because if the CHSs gave him too much in that moment Banks could "disappear" on the CHSs. Gov. Ex. 14. After some more back and forth, Owens explained that it would be a "better investment" to pay $10,000 to Banks and $10,000 to Lee.[3]

Owens also warned the CHSs about his concerns regarding Banks potentially reporting the payment to law enforcement officers, noting that Banks had recently accused a local pastor of offering him a bribe. Owens noted that "words matter a lot, and not saying certain shit, 'cause I don't put it past any motherfucker to be wired up." Gov. Ex. 15. Finally, Owens explained that as far as making payments goes, "the vehicle I like the most is campaign donations, that way I can clean the money through companies and through individuals that way. Now, I love cash because everyone needs it and it matters, right." *Id.* Owens and CHS-1 ultimately agreed to give Banks the money that night while CHS-1 was in Jackson so Banks could see CHS-1 and know it came from the CHSs.

---

[3] On August 14, 2024, Lee pleaded guilty to a single-count bill of information charging her with conspiracy to commit bribery. *See* Case No. 3:24-cr-00072.

On the night of February 13, 2024, Owens and the CHSs met in the backroom of the cigar bar. CHS-2 gave Owens $60,000 in cash, explaining that he had brought $25,000 for Owens, $25,000 for Banks, and $10,000 for Lee. Owens took the $25,000 intended for him and placed it in his pocket. Owens held back the $25,000 Banks payment and $10,000 Lee payment for later. CHS-2 asked where Owens intended to store the cash for Banks and Lee. Owens responded that he intended to store the cash in a safe in his office at the Hinds County District Attorney's Office.

Owens stated that he had spoken with Lee, and that Lee knew the money was coming from the CHSs. Banks then arrived at the cigar bar, at which point Owens gave Banks an envelope with $10,000 cash inside and told Banks it was from the CHSs, his "friends." Gov. Ex. 16. Owens told Banks he wasn't sure what Banks was "comfortable walking around with" because "this is not a check like we normally do." Owens told Banks to "do what you need to do, if you need to document some of this, then document it."

Several days later, Owens initiated a wire transfer from an account called "Friends of Jody Owens" to an account owned or controlled by a company called 1 Vision/T Enterprises, Inc. The transfer was for $10,000 with a notation: "PAYING OFF CAMPAIGN DEBT OF ANGELIQUE LEE." On February 18, 2024, Owens, using his cell phone, sent CHS-1 the picture of the wire transfer receipt. He also sent CHS-1 a video from Lee thanking the CHSs for their support.

On February 28, 2024, Owens and Smith met with the CHSs in the War Room. During the meeting, Owens explained to the CHSs that Lee's wages were being garnished, and she was in serious debt. Owens posited that the best way to pay Lee would be through Owens's campaign because "it is a better way to clean the money." Owens also notified the CHSs that Lumumba

10

had agreed to travel to Florida to meet with them. When CHS-2 asked why they needed Lumumba's approval given his lack of a vote, Owens explained that Lumumba had the power to block or hold up projects.

During the same meeting, Owens warned the CHSs of behavior that could lead to potential criminal charges. He specifically referenced the Louis Armstrong case, which involved a similar bribery scheme[4]: "They came in and was everybody's friends. They got a huge contract. And, somehow, they were able to show that Louis got something, right? So, we got to stay away from the 'b-word.' Fund is not the 'b-word.' The 'b-word' is a bad word. We don't even say it. Right? You know what the 'b-word' is, right?" Gov. Ex. 17. Later, when explaining how he intended to pay off Lee's debts with the CHSs' money, he stated: "I wired it directly to the, uh, debtee, debtor, right, because that's the only way I want the paper trail to look. Because here's the thing, at the end of the fucking day, my most important job is to keep everybody out of jail or prison, because I'm not fucking going." Gov. Ex. 18.

Over the course of several calls and in-person meetings on February 29, 2024, Owens broke down the plan regarding how to pay Lee and Banks the rest of the bribe money set aside for them. Owens also explained his plan for how the money would move from the CHSs to Lumumba. In the afternoon on that day, during a meeting at the Westin hotel, Owens and the CHSs discussed paying money to a city employee who was not an elected official. At that time, the group had become aware the employee who Owens had directed Smith to sleep with was leaving her employment with the City of Jackson. CHS-2 expressed frustration over this development, stating the employee was an asset. Owens replied that they could get the employee

---

[4] Louis Armstrong was indicted in 1999 based on allegations of extortion and bribery involving a local strip club and the Time Warner Cable company. Armstrong ultimately pled guilty and was sentenced to fifteen months' incarceration. *See* Case No. 3:98-cr-00095.

11

to stay. When the CHSs asked how, Owens stated: "we get somebody to pay her to stay. It just can't be us." Gov. Ex. 19. When asked how much he thought that would cost, Owens replied: "fifty." CHS-1 clarified that Owens meant $50,000, and Owens answered affirmatively.

The conversation then turned to another city employee. That employee, who is an attorney, worked in part on planning and development for the City of Jackson. Owens stated that this employee would help with their plans, both now and in the future, and that it would cost approximately $4,000 a month to pay that person. Owens stated that he already discussed the idea with that employee and would have additional conversations with that person. CHS-2 asked Owens what the employee said when Owens floated the idea. Owens replied: "She needs it. She wants it. She wants to [inaudible] make some money." Gov. Ex. 19.

Owens stated that those two employees worked together a lot. The group then discussed the amount that both employees were making in their current employment with the City of Jackson. Owens stated that he talked with the attorney employee the day before, and he would talk to that employee again and tell her she would not be paid directly by "this team" but that the payment would come because of "this team." Gov. Ex. 19.

In the evening that same day, during a meeting at Owens's cigar bar, Owens stated that the CHSs needed to give Owens between $50,000 and $100,000 in cash for Lumumba. Owens then explained that he would deposit that cash into multiple accounts and get checks from different entities. Owens made clear that Lumumba would not take cash directly from the CHSs, so the money needed to move through Owens in the form of campaign contribution checks. That way, the money would go to Lumumba from within the state of Mississippi. Owens emphasized that if CHS-2 gave Lumumba $100,000 in cash directly, "everybody goes to jail because we gave over five thousand cash." Gov. Ex. 20.

12

Owens stated he would keep the CHSs' money in a safe at the District Attorney's Office, mixed in with "dope money and drug money and more than a million dollars." Owens said the following in explaining why he did this:

> You know why? Because if someone comes in my motherfucking safe it's a million dollars in cash, it's a million dollars. You know what, if they come to my house, it reads like this "DA Owens had twenty grand in cash." The regular people who vote for me, who give me $10 or a $100, they can't count that much money. But guess what, in my safe at my DA office I got a million dollars in cash, guess what, your fucking ten grand don't matter, your fifteen grand it don't matter, I got a million dollars there. But guess what, at my house it matters.

Gov. Ex. 20.

## VII.    March 2024: Preparing to Bribe Lumumba

Over the next week, Owens refined the plan to pay Lumumba. He told the CHSs that Lumumba would not be comfortable receiving a large sum of cash. Instead, he directed the CHSs to pay him cash, which Owens would then turn into multiple checks to give to Lumumba. He claimed that going through him as a "filter" was safer "because they believe, at least through my position, that, you know, I'm not compromised that way." Gov. Ex. 21. After speaking with Lumumba later, Owens confirmed that Lumumba was more comfortable receiving money in the form of campaign donations, and that he had told Lumumba they would host a fundraiser for him in Florida where they would have "ten guys that write ten checks" or that Owens would give Lumumba ten checks in one envelope. Owens went on to tell CHS-1: "What we used to do, if people wanted to stay under the radar, you just give a bunch of different checks from a bunch of companies." Gov. Ex. 22.

About two weeks later, during another meeting between Owens and the CHSs, Owens told the CHSs that he had opened a bank account in the name of the CHSs' business and incorporated the business in Mississippi. The purpose of the business bank account and

13

incorporation in Mississippi was to give the appearance that the CHSs operated a business in Mississippi. Owens explained that he planned to convert $50,000 in cash from the CHSs into five $10,000 checks to give to Lumumba so that it would appear that the money came from within the state of Mississippi. Owens added that while in Florida, they should plan to have women around and provide Lumumba with transport to a strip club. At one point, Owens also laid out his concerns about obscuring the source of the money moving to Lumumba to avoid being prosecuted:

> Think about federal prosecutors, right, I mean, like, they track money, deposits. The money is there. So, there is going to be accounts that got ten grand that spent already, right? Probably from the cigar shop. I got a company called Perinatal Services. A medical company. We're gonna do it that way already. If y'all want to stay off the grid.

Gov. Ex. 23.

On March 27, 2024, CHS-1 delivered $50,000 in cash to Owens at the Hinds County District Attorney's Office. A day later, Owens delivered five $10,000 checks to CHS-1 so that the CHSs could give the checks to Lumumba during the Florida trip. While on the trip, Owens, Lumumba, and the CHSs met on a yacht. During the meeting, Owens took the lead, explaining to Lumumba that the CHSs had given him the money so that it could be "filtered" through "several accounts." Gov. Ex. 24. He further assured Lumumba that there would be a "second phase" of payments "to make sure there are no worries about [Lumumba] financially." *Id.* Following that exchange, CHS-1 requested that the RFQ submission deadline be moved up. Lumumba agreed, made the requisite phone call to a city employee, and then received the five checks prepared by Owens from CHS-2.

Later that same evening, Owens directed the CHSs on how to make an additional $5,000 in cash available to Lumumba that night while the group attended a strip club. Gov. Ex. 25.

Owens specifically directed that CHS-2 should not put cash in Lumumba's hand. Rather, Owens said the money should be placed on a table and Lumumba should be told to have fun.

## VIII.   The Results

In sum, Owens's efforts, aided by Smith, culminated in Banks, Lee, and Lumumba accepting bribes from the CHSs through Owens in exchange for their votes and support for the fictitious real estate development project. Banks accepted $10,000 in cash, a protective detail service, and an offer of employment for his daughter at the DA's Office (paid for by the CHSs). Lee accepted a total of $19,000 of benefits in the form of cash, campaign debt payments, and luxury clothing. Lumumba accepted $50,000 in "campaign contributions" routed through various entities and individuals acting as conduits. Owens received $125,000 from the CHSs as a fee to help facilitate access and bribes to public officials. These amounts far exceeded the $5,000 that Owens did not think was worth going to jail for. The upper limit of Owens's avarice remains unclear to the government.

## IX.   May 2024: The Take Down

In May 2024, the FBI interviewed Owens outside his home after serving him with a search warrant for his phone. The FBI also presented Owens with the warrants for the War Room, his office at the District Attorney's Office, and the cigar bar. During the interview, Owens almost immediately identified the case as having to do with the convention center hotel project. Owens referred to himself and Smith as "liaisons" between the city of Jackson and the CHSs but denied influencing any policy concerning the project. When asked whether any safes or lockboxes exist in his office, Owens replied, "none exist."

Owens was then given a false statement warning when asked, "Have you ever offered to use dirt that you've gathered as DA on public officials as a way to influence them?" Owens

responded, "I don't have any dirt. I don't have any dirt on anybody. I don't have any files. I don't have dirt on City Council; I don't have dirt on the mayor." Owens admitted to receiving cash for lobbying efforts and dinners but denied ever giving cash to public officials. Owens then walked his denial back and admitted to giving campaign contributions to Lumumba. But he stated that this was all in the form of checks and that he was "fundraising."

Owens eventually stated that he did not know how much money he received, he thought he was getting set up, and he may need an attorney. When asked again about the source of the contributions and checks, Owens was non-committal. Even when asked about the conduit scheme, Owens refused to answer the question. Owens said he could not recall Banks ever receiving money from the Nashville investors.

## LAW AND ANALYSIS

First, it must be noted that throughout his Motion to Dismiss (ECF No. 75), Owens paints an idyllic picture of his life and personal characteristics, referencing, for example, his military service, education, and career. Although such biographical background may be appropriate for the Court to consider at sentencing, it is not pertinent to the legal analysis controlling Owens's motion. Looking beyond that filler, Owens contends that the indictment against him should be dismissed based on two related but independent grounds: outrageous government conduct and entrapment. The government addresses in turn why each claim fails.

### I.    The Government Did Not Engage in Outrageous Conduct.

Owens first moves this Court to dismiss the indictment due to alleged outrageous government conduct. But here is nothing outrageous about the government's conduct here. Perhaps more importantly, controlling Supreme Court and Fifth Circuit precedent foreclose Owens's argument based on his active participation in scheme.

16

The parties agree that "[g]overnment misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (citation omitted). As a result, a motion to dismiss based on outrageous government conduct is appropriate only in the "rarest of circumstances." *Id.* at 421; *see also United States v. Tobias*, 662 F.2d 381, 386 (5th Cir. 1981). To violate due process, the government conduct in question "must shock the most cynical among us." *United States v. Rodriguez*, 603 F. App'x 306, 312–13 (5th Cir. 2015); *see also United States v. Yater*, 756 F.2d 1058, 1065 (5th Cir. 1985) (stating that outrageous government conduct must be "shocking to the universal sense of justice" (quotation marks omitted)). Accordingly, the standard for proving such conduct is "extremely demanding." *United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009); *see, e.g.*, *United States v. Asibor*, 109 F.3d 1023, 1039–40 (5th Cir. 1997) (affirming a denial of an outrageous government conduct motion in a case in which government agents both supplied the drugs to the defendant and bought them back with government funds).

Claims of outrageous government conduct often arise in the context of extreme government overreach beyond entrapment, *see, e.g.*, *United States v. Jannotti*, 673 F.2d 578, 607 (1982) ("a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense"), or forced confessions involving physical coercion, *see, e.g.*, *Watts v. Indiana*, 338 U.S. 49, 55 (1949) (confession obtained after six days of intense interrogation). But key here, a defendant "cannot avail himself of the defense of outrageous government conduct where he has been an *active and willing participant* in the criminal activity that gave rise to his arrest." *Rodriguez*, 603 F. App'x at 312 (citation omitted). A defendant claiming outrageous government conduct must demonstrate

17

"both substantial government involvement in the offense and a passive role by the defendant." *Gutierrez*, 343 F.3d at 421.

The evidence here—previewed at length above and to be expanded on at trial—leaves no doubt that Owens was a willing and active participant in the alleged bribery scheme. Owens directed CHSs as to which officials to pay, when to pay them, how much to pay them, where to pay them, and in what form the payments should take to see the CHSs development project get approved, and to see himself continue to reap financial benefit. He touted his experience and readiness and, contrary to Owens's assertions, expressed no reluctance in proceeding full steam ahead.

As for the government's role, the CHSs indisputably posed as developers that were key to the scheme, provided the funds, and presented the real estate development opportunity, but it was *Owens*, not the CHSs, who "[ran] the entire operation." *Tobias*, 662 F.2d at 386. It was Owens who stated, unsolicited, that he could "give" the CHSs the JRA. It was Owens who stated that he had a "bag of information" on members of the Council. It was Owens who stated that being the District Attorney was merely his part-time job, and that his real job would be to see the CHSs succeed. Despite his protestations during his interview that he was only giving campaign donations, it was Owens who planned to bribe two city employees, who were not elected officials, and therefore had no need or mechanism to receive campaign donations.

Owens was not only an "active and willing" participant, he was the lynchpin to the scheme. *Rodriguez*, 603 F. App'x at 312. The CHSs, who were themselves unfamiliar with the inner-workings of Jackson politics and development work, merely followed his lead. Thus, given his role, it is not possible for Owens to meet the standard for an outrageous government conduct claim. *Accord United States v. Posada Carriles*, 541 F.3d 244, 361 (5th Cir. 2008) (no

18

outrageous government conduct where the defendant was a willing participant in the criminal conduct); *Tobias,* 662 F.2d at 386–87 (same); *Gutierrez,* 343 F.3d at 422 (same); *Asibor,* 109 F.3d at 1039–40 (same); *Yater,* 756 F.2d at 1066 (same).

Even assuming for argument's sake that Owens played a passive, minor role in the scheme, and that the government was somehow overinvolved, Owens would *still* fail to show that the government's tactics in this case are "shocking to the universal sense of justice." *United Yater,* 756 F.2d at 1065.[5] The conduct that is shocking and outrageous here is Owens's, not the government's. The government did not coerce or force Owens to commit bribery, and the government was not the organizer of the scheme.

In an attempt to support his claim, Owens misstates the history of the government's investigation. For example, Owens spends much of his motion claiming that the FBI had it out for him before he conspired to bribe Jackson city officials. ECF No. 75 at 9–19. This is simply untrue, but his confusion is understandable. The reality is, Owens's name *had* surfaced in connection with several unrelated criminal matters before he became the subject of a federal investigation in November 2023. First, Owens was involved in obtaining suspicious Paycheck Protection Program ("PPP") loans for the cigar bar and another business. The September 2022 email Owens references regarding this matter, *see* Def. Ex. 22, was from a young tactical analyst (not a special agent, as Owens claimed in his motion) who did not have the power to open

---

[5] Owens has not cited single Fifth Circuit case affirming or reversing the denial of a dismissal of an indictment based on outrageous government conduct. The single out-of-circuit case he does cite is the often-cited and often-inapposite case of *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978). It is distinguishable from this case in several respects. The government in that case initiated contact and supplied the laboratory materials and an "indispensable ingredient" for making "speed" to a defendant who may not have been able to acquire it otherwise. *Id.* at 376, 380. The government also encouraged the defendants, provided them with technical skills, and assisted when they had a problem committing the crimes. *Id.* at 381. Here, Owens made himself the target and Owens had the means, ability, and desire to commit the bribery offenses.

matters unilaterally. That email was followed by multiple conversations in which the primary case agent told the analyst that the FBI would be declining the investigation for lack of predication.

Second, Owens was the subject of an investigation by the Mississippi Capitol Police for allegedly pointing a firearm at another individual just before midnight on the evening of September 2, 2022. The Capitol Police report states that Owens entered the apartment of Samantha Grant and pointed a handgun at Grant's former boyfriend, who was at the apartment to retrieve his personal belongings. Although Owens attracted negative public attention in the local media, the incident did not result in a federal investigation of Owens.[6]

Third, two individuals connected to Owens were arrested and arraigned in late April 2023. One of the individuals, ████████████ was arrested and arraigned on federal charges on April 26, 2023. *See* Case No. 22-cr-00312. That morning, ██████ waived his *Miranda* rights and sat for a voluntary interview with the FBI. At the time, ██████ worked as an investigator for Owens at the District Attorney's Office. ██████ was appropriately asked about potential information that he might have about any public officials, including his employer, Owens.[7]

_____

[6] *See* Russ Latino, *Magnolia Tribune* (Nov. 11, 2024), "EXCLUSIVE: Hinds DA threatened man with gun, unredacted report alleges," https://www.wlbt.com/2022/09/13/exclusive-unredacted-incident-report-alleges-hinds-da-threatened-man-with-gun-lists-possible-motive/.

[7] Owens highlights the ██████ interview throughout his motion to no avail. The interview—of which Owens previews only a portion—is unrelated to the underlying matter. It was lengthy and covered numerous topics and other public officials. The interviewing agents *twice* made it clear to ██████ the FBI was not interested in a fishing expedition. Rather, the FBI was interested to know whether ████ had knowledge of specific criminal acts by officials or employees in city or county government. ████ did not. Such questioning is commonplace in federal investigations. There is nothing sinister or outrageous about the practice. Separately, the government notes that the ██████ interview appears to have been provided to defense counsel in violation of the Protective Order in *United States v.* ████ ████████████████████████████ (Orders Regarding Discovery).

One day later, on April 27. 2023, ████████████, a former acting Hinds County Sheriff, was arrested and arraigned on federal charges. *See* Case No. 3:23-cr-0030. During the investigation of ████ ████ told a CHS that Owens had agreed to assist the CHS with an expungement of the CHS's felony convictions.[8] The same CHS was used in the investigations of both ████ and ████.[9] Contrary to Owens's assertion, the delayed arrest of ████ had nothing to do with Owens. Instead, the delay was the result of the ongoing related investigation of ████ and the need to preserve the utility of the CHS for as long as possible.

The sealed indictment against ████, which was based on ████s conduct while he was employed by the Jackson Police Department ("JPD"), was filed on March 8, 2022. ████

████████████████████████████████████████████████

████████████████ ████████████████████████

████████████████████████

As noted, the indictment against ████ was unsealed in April 2023. Owens now seemingly claims that the government secretly indicted ████ and kept the indictment under wraps until ████ was employed by Owens, as part of a larger strategy to target Owens. Given that the indictment of ████ was filed *before* ████ left JPD, Owens's allegation would require the government to have been clairvoyant. The government would have had to have



known in March 2022 that ██████ planned to leave JPD in April 2022 and later find employment with Owens, all as part of a preposterous plot to investigate Owens without predication. The nonsensical nature of this allegation is further demonstrated by the fact that the government declined to use ██████ as a cooperator to fish for information against Owens in April 2023.

In sum, even though Owens was mentioned in the context of other investigations, Owens was not a designated subject in the underlying FBI investigation until November 2023.[12] The FBI, when it sent the two CHSs to Jackson, did not anticipate that Owens would become a key player in a bribery scheme. In fact, it did not anticipate his involvement at all. Owens ended up becoming a subject because of his own, unsolicited, inculpatory statements; in particular, his statement about the alleged "bag of information" he had on members of the Jackson City Council that he obtained as District Attorney. The government was in no one way "out to get him."

Owens's additional efforts to blame his conduct on alcohol are meritless. ECF No. 75 at 45–61. Owens implies the only reason he committed bribery is because he was drunk. He even goes so far as to imply that the government both knew of his alleged alcoholism and exploited his alleged illness.[13] *Id.* at 45. This assertion is incorrect. To be sure, it became clear to the government over the course of the investigation that Owens likes to drink alcohol. But at no point during the hundreds of hours Owens spent with the CHSs—or post-indictment in conversations with Pretrial Services, for that matter—did Owens claim to have an issue with

---

[12] Owens was not the only individual added as a subject of the underlying investigation in November 2023. Others who took part in backroom conversations were also added as subjects but were never charged based on their lack of participation in the scheme.

[13] To date, neither the government nor Pretrial Services has seen any evidence of Owens's alleged alcoholism diagnosis. During his initial interview with Pretrial Services, Owens did not claim to have a problem with alcohol.

alcohol. More to the point, there is no evidence that Owens was unaware of his actions during the planning and execution of the bribe payments. On the contrary, Owens was seemingly sober at those times. As one example among many, during a meeting in the middle of the day at the Hinds County District Attorney's Office on March 5, 2024, CHS-1 and Owens discussed the extended RFQ deadline, project financing, and hosting a trip to Florida for Lumumba. Gov. Ex. 21.

Owens's efforts to shift blame to the primary case agent in this matter are also unavailing. The case agent did not lie or otherwise make misrepresentations or material omissions before the grand jury.[14] Owens first alleges that the case agent told a "half-truth" to the grand jury when he stated that CHS-1 first visited the cigar shop in July 2023 because it has been recommended to the agent based on his genuine interest in cigars. *See* ECF No. 75 at 19–24. Relatedly, he also alleges that the case agent lied when he testified that CHS-1 "just happened to kind of run into Owens" at the cigar shop. *See* ECF No. 75 at 30–32.

As discussed, Owens was not a target in the underlying investigation in July 2023. Though the case agent and, by extension, CHS-1, were aware that the cigar shop was known as a location for back-room dealing, that back-room dealing was not reported to be connected to Owens as of July 2023. The cigar bar's backroom was also generally known—and explained by the lobbyist to be—a place to meet the power players of Jackson. At bottom, it was a combination of CHS-1's genuine interest in cigars, his discussions with the lobbyist about the

---

[14] Owens additionally claims that the indictment omits contextual information. *See* ECF No. 24–28. Although the government disputes each of Owens's claims, as a general matter—particularly as the information it wished the government had included *was* presented to the grand jury—what the government opts *not* to include in charging instruments is entirely within the government's discretion. It will not now re-litigate those decisions here, particularly as it is not altogether clear what relief, if any, Owens seeks based on those claims of omissions. The government finds it more likely that Owens is using his motion as a vehicle to express his grievances to the larger public, which would explain, in part, why he is simultaneously claiming that the government included too much and too little in its indictment.

cigar bar, and the understanding from source-reporting of the cigar bar's reputation that led CHS-1 to the bar. It was *not*, at the time, a specific desire or plan to target Owens. In fact, as of the time of his first visit to the cigar bar, though CHS-1 recalls having a general awareness that the cigar bar might have been co-owned by the District Attorney, he did not know Owens by name. And he did not even know Owens would be at the cigar shop that day.

Owens also claims that the case agent lied when he told the grand jury that Owens was not under investigation before July 26, 2023. *See* ECF No. 75 at 30. That is simply incorrect. As alleged evidence of the case agent's lie, Owens points to a September 2022 email from a young tactical analyst discussing potentially adding Owens as a predicated subject to a separate fraud investigation. As discussed, the case agent declined to open that matter for lack of predication. Owens also points to the ███████ interview as additional evidence that Owens was a subject of an FBI investigation before November 2023. But, as already detailed, the case agent inquiring into possible wrongdoing on Owens's part based on uncorroborated source-reporting does not mean that Owens was a predicated subject in *any* FBI investigation, let alone the one underlying this case.

Lastly, Owens claims that the case agent falsely testified to the grand jury when he stated that Owens had inserted himself into the bribery scheme. ECF No. 75 at 32. Yet this is exactly what happened. When the CHSs arrived in Jackson, Owens was not a subject of the investigation, nor did the CHSs or case agents believe there to be a chance that he would become a subject in future. The manager of Owens's cigar bar recommended that Owens receive an invitation to attend the October 2023 Nashville trip because of his influence in Jackson. The manager, in fact, recommended that several others receive invitations as well. It was ultimately

Owens's own statements and actions that led him to becoming a predicated subject in the underlying investigation.

In sum, Owens's outrageous government claim fails because Owens was an active participant in the alleged scheme. His claim also fails to state any conduct by the government—either the CHSs or the primary case agent—that could be described in any way as outrageous or over-involved.

## II.    Owens Was Not Entrapped by the Government.

Owens also contends that the indictment should be dismissed because he was entrapped by federal agents to commit bribery-related offenses over a period of six months. This claim is without any basis.

As a threshold issue, entrapment is an issue for jury determination. That is because it "involves the basic determination of guilt or innocence," and "the defendant's predisposition to commit an unlawful act seldom will be capable of determination without the trial of the general issue." *Yater*, 756 F.2d at 1062. The narrow exception to that rule applies only when "the evidence is so clear and convincing that it can be passed on by the trial judge as a matter of law." *Coronado v. United States*, 266 F.2d 719, 721 (5th Cir. 1959).

The disputed allegations of entrapment here are anything but "clear and convincing." Neither the defense nor the government have identified a Fifth Circuit case in which an entrapment claim prevailed in a pre-trial motion to dismiss. And this case should not be the first. Simply put, government entrapment is not a proper basis on which to move to dismiss this case. Rather, the question of entrapment, if properly raised at all, should be reserved for the jury[15] and, if necessary, raised in a post-trial motion arguing entrapment as a matter of law.

---

[15] The government will separately move in limine seeking to preclude an entrapment defense at trial. If the government does not prevail in that motion, the government also anticipates this issue will come up

Even if the Court were to take up this issue now, the motion should still be denied on the merits. To rely on an entrapment defense, a defendant must make a prima facie showing of (1) "some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense" and (2) "his lack of predisposition to commit the offense." *United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997). To show lack of predisposition, the defendant must point to some evidence of resistance on his part. *See United States v. Arditti*, 955 F.2d 331, 343 (5th Cir. 1992) ("Where there is no overwhelming evidence of serious resistance, and the defendant jumped in with both feet, the defendant is an eager, active participant and was therefore not entrapped."). The first step in a successful entrapment defense is to make a prima facie showing that "government conduct 'created a substantial risk that an offense would be committed by a person other than one ready to commit it.'" *United States v. Pruneda-Gonzalez*, 953 F.2d 190, 197 (5th Cir. 1992) (quoting *United States v. Kang*, 934 F.2d 621, 624 (5th Cir. 1991)); *United States v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989). Unless Owens makes such a prima facie showing with "hard evidence," the government need not prove the absence of entrapment beyond a reasonable doubt and Owens will not be entitled to an entrapment jury instruction. *United States v. Gonzalez-Perez*, 778 F.3d 3, 11 (1st Cir. 2015).

Here, Owens is not entitled to an entrapment jury instruction, let alone dismissal based on a finding of entrapment as a matter of law. There is no evidence of improper government inducement or lack of predisposition to commit the charged offenses.

CHS-1 will testify about the coincidental circumstances that led to CHS-1's initial interactions with Owens. The testimony will demonstrate an absence of any governmental

---

again when the parties submit proposed jury instructions.

targeting or inducement.[16] Owens never showed hesitation or unwillingness to engage in or participate in the bribery scheme. On the contrary, Owens took great pains to keep himself at the top of the scheme's hierarchy, taking it upon himself to direct the CHSs to the officials to be paid and determining how much, when, and in what manner those officials should be paid.

As for predisposition, Owens's own statements show his predisposition, beginning with his October 9, 2023, statements condoning corrupt acts by prison guards. Owens's predisposition was made explicit through his statements soon thereafter that he could "give" the CHSs the JRA and that he had a "bag of information" on the City Council.

Moreover, throughout the scheme, Owens made statements demonstrating his familiarity with such schemes and a willingness to evade detection by law enforcement. For example, on February 12, 2024, Owens stated, "I don't give a shit where the money comes from. It can come from blood diamonds in Africa, I don't give a fucking shit. I'm a whole DA. Fuck that shit. My job, as I understand it, with a little paperwork, is to get this deal done, and get it done most effectively." Gov. Ex. 13. He went on to state, "We can take dope boy money, I don't give a shit. But I need to clean it and spread it. I can do it in here. That's why we have businesses. To clean the money. Right? I don't give a shit. You give us cash, we deposit it and give it back that way. That's easy." *Id.* And later that month, Owens explained it would be better to move the bribe money to the mayor via campaign checks, because giving Lumumba cash directly would mean that "everybody goes to jail." Gov. Ex. 20. He further advised that he kept the money given to him by the CHSs in a safe at the District Attorney's Office mixed in with "dope money and drug money and more than a million dollars." *Id.* Owens made clear that he did not keep large

---

[16] The Fifth Circuit has held that an undercover investigation begun without reasonable suspicion "does not bar the conviction of those who rise to the bait." *United States v. Allibhai*, 939 F.2d 244 (5th Cir. 1991). To the extent any "bait" existed at all (it did not), Owens certainly wasted no time rising to it.

amounts of cash at his home because that money could be directly linked to him. However, money, mixed in with other funds in a safe at the District Attorney's Office could not be easily traced. *Id.*[17]

Though Owens might like to think of himself as the unlucky target of some grand government conspiracy, and that he was such a formidable foe of the federal government in 2023 that the government opted to open an un-predicated investigation into his misconduct, the simpler explanation wins the day: Owens became a subject in this investigation because of his own, unsolicited statements regarding potential bribery. He continued as a subject because of his active and continued participation in, and leadership of, a criminal bribery scheme over a period of six months. And he was ultimately indicted by a grand jury because he facilitated bribe payments to three government officials and then lied about it. Owens has not demonstrated that he lacked the necessary predisposition to commit the offenses with which he is charged. His motion to dismiss based on entrapment as a matter of law should be denied.[18]

---

[17] In addition, while Owens sought to portray himself as a choir boy, his publicly documented history tells a different story. For example, it has been alleged that Owens sexually harassed several of his subordinates while leading the Southern Poverty Law Center's Jackson office. *See* C.J. Lemaster, "D.A. Owens' Arc, from Southern Poverty Law to George Soros to an FBI yacht," *WLBT* (Sept. 13, 2022), at https://magnoliatribune.com/2024/11/11/owens-arc-from-splc-to-soros-to-fbi-yacht/. And, as mentioned, in September 2022, according to a police report, Owens threatened the boyfriend of a woman he was seeing—a subordinate of his at the District Attorney's Office who was not his wife—with a gun. *See* Russ Latino, *Magnolia Tribune* (Nov. 11, 2024), "EXCLUSIVE: Hinds DA threatened man with gun, unredacted report alleges," https://www.wlbt.com/2022/09/13/exclusive-unredacted-incident-report-alleges-hinds-da-threatened-man-with-gun-lists-possible-motive/.

[18] Owens also takes issue with the fact that the indictment is a "speaking indictment." Speaking indictments are commonplace and, unlike what is contained within his own motion, nothing in this particular indictment is irrelevant or unfairly inflammatory. The indictment contains relevant facts the government intends to prove at trial, including Owens's own, highly relevant statements. *United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993) ("[I]f the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." (cleaned up)). Moreover, even if the indictment contained surplusage, dismissal would not be the proper remedy. *United States v. Goodman*, 285 F.2d 378, 379 (5th Cir. 1960).

## CONCLUSION

Owens has failed to allege any outrageous government conduct, let alone conduct sufficient to warrant the indictment's dismissal pre-trial. Owens has also failed to make the required showing for an entrapment defense. His motion to dismiss and request for a hearing should be denied.

Respectfully submitted,

J. E. BAXTER KRUGER
United States Attorney
Southern District of Mississippi

*Kimberly Purdie*
Kimberly T. Purdie (MS Bar No.: 104168)
501 East Court Street, Suite 4.430
Jackson, MS 39201
Tel: (601) 965-4480
Email: kimberly.purdie@usdoj.gov

/s/David H. Fulcher
David H. Fulcher (MS Bar No.: 10179)
501 East Court Street, Suite 4.430
Jackson, MS 39201
Tel: (601) 965-4480
Email: dave.fulcher@usdoj.gov

/s/Charles W. Kirkham
Charles W. Kirkham (MS Bar No.:102022)
501 East Court Street, Suite 4.430
Jackson, MS 39201
Tel: (601) 965-4480
Email: chet.kirkham@usdoj.gov

/s/John A. Meynardie
John A. Meynardie (MS Bar No.: 9912)
1575 20th Avenue
Gulfport, MS 39501
Tel: (228) 563-1560
Email: john.meynardie@usdoj.gov

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section
U.S. Department of Justice

/s/ Madison H. Mumma
Madison H. Mumma (NC Bar No.: 56546)
Trial Attorney
Criminal Division
Tel: (202) 514-8187
Email: madison.mumma@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I served the foregoing document by delivering it electronically to the following lead counsel for Jody E. Owens II:

Thomas Gerry Bufkin
CARROLL BUFKIN, PLLC
1076 Highland Colony Parkway
600 Concourse, Suite 125
Ridgeland, MS 39157
601-982-5011
Email: tgb@carrollbufkin.com

Kimberly T. Purdie
Assistant United States Attorney