**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                              **Case No.  3:24-CR-103-DPJ-LGI**

**JODY E. OWENS II,
CHOKWE ANTAR LUMUMBA, and
AARON B. BANKS**

### JODY OWENS'S MOTION TO DISMISS COUNTS 1 THROUGH 6 AND COUNTS 8, 9 AND 10

The defendant Jody Owens, through counsel, respectfully moves this Court to dismiss Counts 1 through 6 and Counts 8, 9 and 10 of the indictment because each of those counts rely on the commission of an official act by an elected state official which, in this case, cannot be proven, and because Counts 2 through 6 fail to meet the required $5000 value threshold.

### INTRODUCTION

Jody Owens has been charged in Count 1 with conspiracy in violation of 18 U.S.C. 371, in Counts 2 through 6 with federal program bribery in violation of 18 U.S.C. Section 666 (a)(2), in Count 8 with use of an interstate facility in aid of racketeering in violation of 18 U.S.C. Section 1952(a)(3), in Count 9 with honest services wire fraud in violation of 18 U.S.C. Sections 1343, 1346, and 2, in Count 10 with money laundering in violation of 18 U.S.C. Section 1956(a)(1)(B)(i) and in Count 11 with false statements in violation of 18 U.S.C. 1001.

As will be developed below, each of the counts in the indictment against Owens other than Count 11 suffer the same legal infirmity. All are predicated on the assumption that when co-defendant former Mayor Chokwe Antar Lumumba adjusted a date by which developers could submit a response to the City of Jackson's "Request for Statement of Qualifications" (RFQ) to develop long barren city property, his decision to alter the date was an "official act" within the

1

meaning of controlling Supreme Court law on the crime of bribery. The evidence in this record, however, as developed in witness interviews and grand jury testimony, demonstrates that the Government falls far short of the level of proof mandated by the Supreme Court. The mayor's procedural and administrative decision to re-set the RFQ deadline did not violate any federal bribery provision. In simple terms, there was no crime.

Separately, we contend that the five federal program charges (Counts 2 through 6) must be dismissed because the Government will not be able to prove that the value of the transactions outlined in each count meets the required $5000 value threshold.

## LEGAL STANDARD

Up until 2016, the Government had a very expansive and aggressive interpretation of what constituted the crime of bribery under the various federal statutes. The crime of bribery, in its essence, is a quid pro quo, a person giving something of value (the quid) to a federal or state public official, with the understanding that the public official will take action favorable to the person (the quo). To put a point to it, it was the government's view that nearly everything a public official accepted – from campaign contributions to lunch – counted as a quid; and nearly everything that a public official did – from arranging a meeting (and rescheduling it) to inviting a guest to an event counted as a quo.

In 2016 in *McDonnell v. United States*, 136 S. Ct. 2355, 579 U.S. 550 the Supreme Court reviewed the federal bribery statutes relied upon to convict the Governor of Virginia. At trial, the Governor was convicted of violating the honest services wire fraud statute, 18 U.S.C. Sections 1343, 1346 and 2. The parties agreed that the definition of an official act in the bribery statute, 18 U.S.C. Section 201, would apply to the honest services statue (the statute relied upon in Count 9 in this indictment).

The basic facts in *McDonnell* were these: During his campaign to become the Governor of Virginia, the defendant *McDonnell* was befriended by Jonnie Williams. Williams headed Star Scientific, a company that developed Anatabloc, a nutritional supplement. Williams sought the governor's assistance in promoting his product. McDonnell helped Williams get his foot in the door of government agencies by introducing Williams to Virginia's Secretary of Health and Resources. At a subsequent political rally, Williams showed his appreciation for the introduction by buying McDonnell's wife $20,000 worth of designer clothes.

Shortly thereafter, McDonnell ran into financial difficulties. He turned to Williams for help. Williams gave McDonnell $65,000.  McDonnell set up several more meetings for Williams with state agencies, going so far as to make the Governor's mansion available for some of the meetings. Williams responded by lending the McDonnell family his vacation home and his Ferrari and gave the governor a Rolex watch.

Governor McDonnell helped Williams launch Anatabloc at a luncheon that was attended by several researchers from various Virginia universities. McDonnell then asked for and received a $50,000 loan from Williams. McDonnell recommended to state officials that Anatabloc be included in the state employee healthcare plan. By the end of McDonnell's term as a governor, Williams had provided the McDonnells with another loan, several golf outings, a vacation and a $10,000 wedding gift to one of the governor's daughters.

The issue before the Supreme Court was whether any of McDonnell's actions, all clearly designed to assist Williams and all performed after Williams gave the governor money and gifts, amounted to an "official act" within the meaning of the federal bribery statute, Section 201. In deciding the issue, the Court made plain its disdain for McDonnell's conduct:

> There is no doubt that this case is distasteful; it may be worse than that.  But our concern is not with tawdry tales of Ferraris, Rolexes, and ball gowns. It is instead with the broader

3

legal implications of the Government's boundless interpretation of the federal bribery statute. *McDonnell*, supra at 2375.

The Supreme Court framed the issue before it thusly:

> The issue in this case is the proper interpretation of the term "official act."  Section 201(a)(3) defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending or which by law be brought before any public official in such official's official capacity, or in  such official's place of trust or profit." *McDonnell*, supra at 2367.

The Court rejected the government's "boundless" interpretation of "official act" that made everything a politician did a potential "quid". Instead, the Court adopted a "more bounded interpretation of the phrase "official act."  Pertinent to the facts of our case, the Court ruled that prosaic and ministerial acts such as "setting up a meeting, calling another official, or hosting an event does not, standing alone, qualify an official act." *Id*.

> In reaching that conclusion, the Court noted that Section 201(a)(3) has two requirements:

> First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may by law be brought" before a public official."  Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, supra at 2368.

The Court addressed the threshold question of whether everyday events such as setting dates for meetings or scheduling an event meet the definition of a "question, matter, cause, suit, proceeding or controversy." It rejected such a broad interpretation. The Court noted that the "last four words in that list – "cause," "suit," "proceeding," and "controversy," connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." It reasoned that "a typical meeting, telephone call, or event" arranged by a public official does not qualify the exercise of government power over "cause, suit, proceeding or controversy."  *McDonnell*, supra at 2370.

4

The Supreme Court was very clear that ministerial or procedural acts by a public official, such as setting the date, time and place of a meeting, do not in and of themselves constitute official acts within the meaning of the federal bribery statutes.  To rule otherwise, the Court observed, "would raise significant constitutional concerns." Our form of representative government "assumes that public officials will hear from their constituents and act appropriately on their concerns", regardless of whether sometime in the past that constituent has made a campaign contribution to the public official or picked up a lunch bill.  *McDonnell*, supra at 2372.

Before applying the teachings of *McDonnell* to this case, we hasten to add that the Supreme Court's holding as to what can properly be labeled an "official act" is applicable to the all the Counts we have identified in this motion to dismiss. The *McDonnell* decision itself noted that the definition of an official act in Section 201 was applicable to the honest service statute that is relied upon in Count 9 of the indictment.  After the *McDonnell* decision, in *Snyder v. United States*, 601 U.S. 1 (2024), the Court noted that Congress modelled Section 666, the basis for Counts 2 through 6, after Section 201, the federal bribery statute in *McDonnell*. In other words, the definition of an official act in Section 201 is the same in Section 666 prosecutions.  Count 10, the money laundering charge, is predicated on an allegation that Owens committed a financial transaction that was in violation of Sections 1343, 1346 and 666. If, we will soon see, ex-Mayor Lumumba did not commit an official act when he re-calendared a deadline for the submission of responses to a RFQ, then a fortiori no money laundering occurred. Finally, the conspiracy charge in Count 1 is predicated in part on the theory that Owens orchestrated a bribe payment to ex-Mayor Lumumba in return for the mayor's ministerial act of re-calendaring the RFQ deadline. But, once again, the mayor's decision to re-set the deadline was a ministerial function and there was no conspiracy.

The underlying facts of the City of Jackson's futile efforts to develop barren land in downtown Jackson help illuminate whether the act of moving the RFQ deadline meets the Supreme Court's definition of an "official act." For over a decade, the City of Jackson has tried in vain to develop land owned by the city in the hope that a developer would build a hotel adjacent to the city's convention center. As observed in the indictment:

> "In order to complete the downtown development project, the City of Jackson's Department of Planning and Development ("DPD") sought the assistance and Partnership of a so-called "Master Developer." Specifically, over the years, the DPD Issued multiple Requests for Proposals ("RFP") – solicitations from qualified contractors seeking to serve as a Master Developer -- for the downtown development project. Indictment, paragraph 18.

In its futile quest for a developer over almost two decades, the City has been issuing what in the parlance of city development are known as "Request for Proposals." May 22, 2024, FBI interview with Mike Davis, Jackson Development Assistant Manager at page 17 ("we've been trying to develop [this land] for many, many years.") An RFP is a business document that announces and describes a project that a city wants to accomplish and solicits bids from qualified contractors who are willing to compete for the project. The RFP process envisions a detailed response from a prospective developer that addresses the development of the project from soup to nuts, including the scope and objective of the project, the relevant timelines and budget considerations, and potential risks or roadblocks. If a proposal in response to an RFP were found to be acceptable by the Department of Planning and Development, that proposal would be considered by the City Council.

Not once in over a decade has a qualified developer submitted a proposal to the City of Jackson in response to the periodic RFPs. Most recently, in July 2023 the DPD issued an RFP "seeking a Master Developer that would transform a parking lot across from the Convention Center into a mixed-use development that included a hotel, parking garage and community green space." Indictment, paragraph 18. That RPF, like all its predecessors, drew not one response.

6

After over ten years of futility in issuing unanswered RFPs, the City of Jackson shifted its focus. On February 5, 2024, the city issued a Request for Statement of Qualifications (RFQ). Indictment, paragraph 19. A RFQ asks for no more from a prospective developer than for it to submit its credentials and portfolios. Responses to RFQs are not reviewed by the city council but rather by personnel in the DPD. Neither the mayor nor the city council plays any role in reviewing RFQs or making decisions about the qualifications of the applicants.

A deadline of March 12, 2024, was initially set by the city for the submission of RFQs. To maximize the number of submissions, the deadline was moved to April 30. Prior to that deadline, it became apparent that there were three developers that were considering submitting a response to the RFQ. Davis at 31 ("we had conversations with enough folks to where we had an idea that we were going to get three responses." On April 1, the mayor moved the date from April 30 to April 16.  The DPD person who moved the deadline did not think the request was "odd" and it did not raise any "red flags." Davis at 36, 40. See also May 29, 2024 Grand Jury testimony of Jhai Keeton, Deputy Director of Planning and Development, p. 37-38 ("not uncommon for dates to be changed). The new deadline was communicated by email to all three interested parties. Davis at pages 41, 42. The three interested developers complied with the April 16 deadline. There is zero evidence that any other developer expressed an interest whatsoever in the project itself or displayed a desire to submit a response to the RFQ.

We now know that one of the entities that responded to the RFQ on the April 16 deadline was a organization created by the FBI. Two other entities made submissions on April 16. Indeed, we believe that the two submissions were from presumably legitimate developers. And relevant to the allegations in the indictment concerning the alleged bribes of City Council members Banks

and Lee, the City Council has never had a role in reviewing the two legitimate submissions that were made on or about April 16.

The question posed by this motion is simple: Did the decision by then Mayor Lumumba to move the date for a response to the RFQ qualify as an "official act" within the meaning of the Supreme Court's decisions interpreting the federal bribery statutes? We submit that the question barely outlives its asking. The calendaring of the RFQ deadline at the outset was nothing more than a ministerial act. The deadline could have been placed anywhere on the calendar. Once the deadline had a date, another ministerial act moved it back in time. By the time that April rolled around, three developers had expressed an interest in submitting their qualifications. There was no expectation that a fourth or fifth developer was anywhere on the horizon. When the mayor adjusted the deadline one more time, all three interested parties were notified of the new deadline. No prospective applicant was harmed by the new date. The three known parties that had expressed an interest in responding to the RFQ made timely submissions.

The *McDonnell* opinion is very clear that the setting of meetings or the arranging of events do not constitute official acts within the meaning of federal bribery statutes. An official act, the Court explained, is not procedural, like the setting and resetting of dates for meetings and events, but is substantive, akin to making a decision in an administrative hearing. much more than the procedural decisions that are made as to meetings and events. In *McDonnell*, the governor set dates for meetings and events that allowed his benefactor the opportunity to promote his product. Here, the event was a deadline that was set and then reset a couple of times, simple procedural decisions that had no bearing on a "cause" or "controversy" that was pending before any city official. *See United States v. Pawlowski*, 351 F. Supp. 840 (E.D. Penn 2018)(overturning Section 666 conviction because campaign contributions (the quid) did not result in an official act (the quo).

8

Imagine, for a moment, that we added to the facts of *McDonnell* that the governor set the date for a meeting and then – after receiving money and gifts from Williams – the governor moved the date of the meeting backwards or forwards. It is inconceivable that on those additional facts alone, the *McDonnell* court would find the "quo" necessary for a bribery conviction.

To be sure, the *McDonnell* Court noted that the setting of a meeting – or, in our case, the moving of the date of a deadline – might be circumstantial evidence of bribery. To give an example, if counterfactually there was in this case a shred of evidence that a developer considered a response to the RFQ but was thwarted because of the moved deadline, one might contend that that fact would be relevant to a bribery prosecution. But, of course, no such evidence exists in the real world of this case.

The spectacle of a mayor of Jackson flying to Miami for a fundraiser may be distasteful to some. But distasteful or not, the ministerial decision to change the deadline for RFQs did not affect a "cause" or "controversy" that was pending before any Jackson public official. *See United States v. Tomblin*, 46 F.3d 1369 (5th Cir. 1995); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993)("Accepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act.")

When all is said and done, it now is clear that this legally insufficient indictment is the product of an FBI plan that went awry. In late 2023, – after 6 years of several fruitless investigations of co-defendant Lumumba – the FBI latched onto a plan that involved asking:

> Owens and ▮▮▮▮▮▮ to set a meeting with City of Jackson officials, to include the Mayor, in order to 'pull an outstanding Request for Proposal (RFP) concerning properties the UCE is interested in purchasing. Mayor Lumumba has the authority to pull the RFP. Investigators believe if the RFP is along with a bribe payment, this would constitute an "official act." [undoubtedly referring to the *McDonnell* decision] *See* September 27, 2023 FBI memorandum (attached as Exhibit 1)

The plan, in short, was for the FBI to use the issuance of an RFP to ensnare council members like Lee and Banks and the mayor. The council members would be ensnared by promising to support a bogus developer who was selected in an RFP process in return for campaign contributions. The mayor would be ensnared by "pulling the RFP" after the bogus developer submitted a proposal in return for campaign contributions.

What the FBI did not contemplate when it devised its plan in 2023 is that the City of Jackson, weary from years of knocking its head against the wall with RFPs that were always ignored, would decide to instead issue an RFQ. There was no longer an RFP that could be "pulled" and there was no longer a proposal that could be voted on by the City Council. The FBI's "plan" could not work.

The FBI had to confront the fact that after seven years of investigations and millions of dollars spent on alcohol, yachts and private planes, all it had to show for that time and money was a meaningless change of a date on the calendar.

The indictment itself reveals how the government recognizes that the FBI's plan went awry. In paragraph 18 of the Indictment, the government acknowledges that an RFQ, not an RFP, was issued by the City of Jackson in 2024. The government is fully aware that council members like Aaron Banks and Angelique Lee have no role whatsoever in reviewing or making decisions about the responses to an RFQ. To elide that problem, the indictment asserts that "after a selection process" – that the city council plays no role in – "the chosen developer submits a proposal in partnership with the DPD. The proposal is ultimately approved or denied by the Jackson City Council." Indictment, paragraph 19.

It's that last sentence in paragraph 19 that is the tell. That sentence assumes an occurrence that has never happened in the past and never will in the future. It assumes that a developer will

appear out of nowhere and make a serious bid for the right to develop a hotel in downtown Jackson. The only way that the Government can support its allegations concerning Banks and Lee in Count 1, (alleging a conspiracy), Counts 2 and 3 (alleging a bribe of Banks) and Count 6 (alleging a bribe of Lee), is to fantasize about an event that is as improbable as a talking dog. If, in some other universe, a proposal by a developer for the development of Jackson's long barren land was placed in front of the City Council for approval, there would be some substance to the bribery allegations relating to the two city council members. But there was never going to be such a proposal in this case. There has not been a proposal like that despite persistent efforts by the city for over a decade. Stated differently, the only "official act" that Banks and Lee could possibly commit would be to sell their vote on a proposal that was a result of the RFP process. There is no way they could commit an official act if there was only a RFQ. Banks and Lee were never in a position to vote on a phantom proposal that came from the RFQ process.

We close with an additional point that is directed at Counts 2, 3, 4, 5 and 6, all brought under the federal program bribery statute set forth in U.S.C. Section 666(a)(2). An element of that statute requires that the transaction in question has a value of $5000 or more. In Counts 2, 3 and 6, the transaction that is identified is "support for the Developers' proposed development project." In Counts 4 and 5, the transaction is the shortening of "the RFQ submission deadline to benefit the Developers." We do not believe that the government will be able to prove this element in any of the five counts.

In so arguing, we are cognizant that the Fifth Circuit has a very loose definition of how one determines the value of a transaction that is allegedly part of a bribe. *See United States v. Delgado*, 984 F.3d 435 (5th Cir. 2021). That said, addressing first Counts 4 and 5, there is no rational way to conclude that changing the deadline for RFQs had a value in excess of $5000. The RFQ submission

deadline had already been moved once by administrative personnel. Changing the date did not eliminate competition, the same developers who were initially interested in making a submission did so on the new date. Beyond that, there has never been any competition in the bidding process. The City of Jackson has issued RFPs to build a hotel near the downtown convention center since 2008. Not a single qualified developer has ever applied.

Indeed, it is that last point – the absence of any realistic developer to ever materialize – that demonstrates the flaw in Counts 2, 3 and 6. Those counts hinge on the theory that Council members Banks and Lee pledged "support for the Developers' proposed development project." But the City Council has never had before voted on whether to accept a proposal. The alleged promises by Lee and Banks to support an occurrence that will never happen is worth zero.[1]

## REQUESTED RELIEF

Owens prays that the above charges in the indictment against Owens should be dismissed with prejudice.

Respectfully submitted,

JODY E. OWENS, II

By one of his attorneys,

/s/ Warren Gary Kohlman

_____

By: Warren Gary Kohlman
*Pro hac vice*, DC Bar No. 177527

---

[1] The Supreme Court's concern in *McDonnell* about the government's "boundless" interpretation of the bribery statutes has been echoed by many scholars and practitioners in recent years. Cincinnati Council Member P. G. Sittenfeld was convicted of bribery. His appeal was heard by a panel of the Sixth Circuit. Sittenfeld's conviction was upheld in a 2 to 1 decision, but all three judges were sufficiently troubled by the underlying facts that they encouraged the Supreme Court to take certiorari. *United States v. Sittenfeld*, Case no. 23-3840 (6th Cir. 2025).

Dozens of scholars and practitioners joined three amicus briefs that were filed on behalf of Sittenfeld. Shortly thereafter, Sittenfeld was pardoned. When he persisted with his petition for a writ of certiorari, the Department of Justice successfully moved to dismiss his case with prejudice. The afore-referenced amicus briefs are attached to this motion.

/s/ *Luke Whitaker*
By: Luke Whitaker
CARROLL BUFKIN, PLLC
1076 Highland Colony Parkway, Ste 125
Ridgeland, MS 39157
(601) 982-5011
lwhitaker@carrollbufkin.com


Gary Bufkin, MSB #10810
Joel Averitt, MSB #106777
CARROLL BUFKIN, PLLC
1076 Highland Colony Parkway, Ste 125
Ridgeland, MS 39157
(601) 982-5011
tgb@carrollbufkin.com
javeritt@carrollbufkin.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which provides notice and a copy to all counsel of record.

Dated: February 27, 2026.


/s/ Warren Gary Kohlman
_____

By: Warren Gary Kohlman
*Pro hac vice*, DC Bar No. 177527